## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAYPAL, INC.,<br>2211 North First Street<br>San Jose, CA 95131,<br><br>*Plaintiff*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>and<br><br>KATHY KRANINGER, in her official capacity<br>as Director, Consumer Financial Protection<br>Bureau,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>*Defendants.* | Civil Action No. ___19-3700___ |

## <u>COMPLAINT</u>

Plaintiff PayPal, Inc. ("PayPal"), by and through its attorneys, hereby alleges as follows:

### INTRODUCTION

1.      For nearly two decades, PayPal has been a leader in facilitating fast, secure, convenient, and affordable digital and mobile payments on behalf of consumers and merchants worldwide.  Its mission is to enable its customers to participate fully in the global economy and to improve their financial health by enabling them to access, receive, and move their money across the globe, anytime, on any platform, and through any device.  PayPal fully embraces the mission of the Consumer Financial Protection Bureau ("the CFPB" or "the Bureau") to protect

consumers and regulations that empower consumers to make informed financial decisions.  As

part of that commitment, PayPal makes its customers the central focus of all that it does and has

built a robust compliance program that puts the safeguarding of its consumers at the forefront of

its products and services.

2.       This action challenges a rule promulgated by the CFPB that requires PayPal to

make misleading and confusing disclosures about the fees and functionalities of its products and

places unreasonable restrictions on consumers' abilities to link certain credit products to their

PayPal accounts.  As a result, the Bureau's rulemaking has resulted in consumer

misunderstandings and confusion and has deprived PayPal's customers of access to significant

benefits offered by PayPal.  The Rule, entitled the "Prepaid Accounts Under the Electronic Fund

Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z) Rule" ("the Prepaid

Rule," "the Final Rule," or "the Rule"),[1] emerged from a CFPB initiative to regulate a product

known commonly as a "prepaid card" or "general purpose reloadable card" ("GPR card").  A

GPR card typically is a physical card whose core function is to store a consumer's funds until the

consumer wishes to use the card to spend or transfer those funds.  GPR cards are generally

purchased at retail locations like drugstores and supermarkets, loaded (or reloaded) with funds

provided in cash or by direct deposit, and then used by consumers similarly to bank debit cards.

3.       PayPal's primary consumer offering is a "digital wallet."  Digital wallets are

fundamentally different from GPR cards.  Like physical wallets, digital wallets permit consumers

to keep their payment credentials—such as debit cards, credit cards, and bank account

---

[1]  PayPal's references to "the Rule" correspond to several related final rules that collectively implement the regulations at issue here.  *See* 81 Fed. Reg. 83,934 (Nov. 22, 2016) (Final Rule); 82 Fed. Reg. 18,975 (Apr. 25, 2017) (delaying implementation of the Final Rule by six months); 83 Fed. Reg. 6364 (Feb. 13, 2018) (amending the Final Rule and delaying its implementation until April 1, 2019).

information—in a single place that can be accessed to make purchases or to transfer funds. When a consumer authorizes a payment with his or her PayPal account, PayPal accesses the consumer's credentials from its secured electronic platform, interfaces between the consumer and the intended recipient, and transfers money without the need for the consumer to expose his or her full sensitive financial credentials to the payment recipient.  Although consumers have the ability to store money with PayPal (if, for example, the consumer receives a payment from another party and does not immediately transfer those funds to a bank account), they can make purchases or send money with PayPal without doing so.  Indeed, the majority of PayPal's customers use PayPal's services to transfer funds and make purchases using linked financial instruments, not to store and spend cash balances.

4.      Although a GPR card is materially different from a digital wallet, the Bureau nevertheless decided, arbitrarily, to subject both offerings to the same regulatory disclosure regime.  PayPal engaged extensively with the CFPB throughout the rulemaking process, presenting evidence to the CFPB that PayPal's digital wallet offerings differed in significant ways from GPR cards and warning of negative consequences to consumers should the CFPB ultimately apply a GPR-card disclosure regime to digital wallets.  Contrary to its mission of protecting U.S. consumers, however, the CFPB unreasonably dismissed PayPal's evidence and finalized a Rule that treats identically GPR cards and PayPal's very different digital wallet products.

5.      The Bureau did not attempt to justify this result by pointing to empirical evidence—it cited no reports, studies, surveys, or research demonstrating that consumers acquire and use digital wallets in the same way they acquire and use GPR cards.  Nor did the Bureau offer any analysis as to whether or how digital wallets posed risks for consumers similar to those

posed by GPR cards.  The proposed rule instead offered a mere three-paragraph description of digital wallets, which acknowledged that digital wallets are distinct from products such as GPR cards because digital wallets are principally used "to store the consumer's bank account, debit card, credit card, and/or prepaid card *credentials*."[2]  The proposed rule further noted that "there may be significant variations in how funds are held in digital wallets and how payments are processed by digital wallets and that payment processing by digital wallets is evolving quickly."[3]  Nevertheless, the Bureau concluded that, because digital wallets *may* "allow a consumer to store funds in [them] directly," they should be regulated the same way as the GPR cards that were the real subject of the Bureau's rulemaking.[4]  The Bureau thus seized on an occasional and incidental feature of digital wallets to impose on digital wallets a sweeping regulation designed for GPR cards.

6.     The resulting regulatory regime is fundamentally ill-suited to PayPal digital wallets and is likely to mislead or confuse consumers.  The Rule mandates PayPal make disclosures concerning fees that PayPal does not charge and misrepresent the actual fees paid by most customers.  These mandatory disclosures undermine PayPal's own clear disclosures provided when consumers use their PayPal accounts.  For example, the Rule mandates that customers be given—and actually view—"short form" fee disclosures.  The requirements for this short form disclosure are extremely prescriptive and rigid.  Certain fee categories must be placed in specified positions and presented in certain font sizes, largely because the CFPB deemed these categories most significant for GPR-card customers—and regardless of their relevance to

---

[2]  "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)," 79 Fed. Reg. 77,102, 77,110 (Dec. 23, 2014) (emphasis added).

[3]  *Id.*

[4]  *Id.*

PayPal's products.  The Rule further *prohibits* PayPal from including explanatory phrases within the disclosure box to describe the nature of these fee categories.  Additionally, for each required fee category, the Rule states that the highest possible fee under the worst-case scenario must be disclosed, even if the fee would rarely be incurred by the typical consumer (and would *never* be incurred without further customer authorization).  In other words, the Rule's mandated short form disclosure regime forces PayPal to make disclosures that confuse consumers as to the products' actual costs yet bars PayPal from providing the very information that would assist consumers in making an informed decision.

7.      As a result of these compulsory disclosure requirements, PayPal must present the following short form to customers:

| Monthly Fee | Per purchase | ATM withdrawal | Cash reload |
|---|---|---|---|
| **$0** | **$0** | **N/A** | **N/A** |
| ATM balance inquiry (in-network or out-of-network) | | | N/A |
| Customer Service (automated or live agent) | | | $0 |
| Inactivity | | | $0 |
| **We charge 3 other types of fees.**  Here are some of them: | | | |
| Electronic withdrawal (standard or Instant) | | | $0 or 1%*(max $10) |
| International transaction (excluding ATM withdrawal and balance inquiry) | | | 2.5%* |
| *This fee can be lower depending on how and where this account is used. | | | |
| **No overdraft/credit feature.** | | | |
| Not FDIC insured. | | | |
| For general information about prepaid accounts, visit cfpb.gov/prepaid. | | | |
| Find details and conditions for all fees and services in the PayPal Cash Account Long Form, which can be accessed in the applicable Terms and Conditions on PayPal.com | | | |

8.      As PayPal foresaw throughout the rulemaking process, this disclosure has confused many PayPal customers.  As a result of the mandatory disclosures, customers mistakenly believe that PayPal charges fees to access funds stored as a balance with PayPal, to make a purchase with a merchant, or to send money to friends or family in the United States.  To

the contrary, PayPal does not charge customers a purchase fee, and sending money to other

PayPal accounts within the United States is free.  PayPal also does not charge to transfer money

from a PayPal account to a bank account, unless the customer elects to pay a small fee—clearly

disclosed and agreed to by the customer at the time of transfer—if the customer wants the

transfer to be accomplished in 30 minutes or less.

    9.      The following comments submitted to PayPal by its customers are just some

examples of the misunderstandings caused by the Rule's mandated short form disclosures:

- "[S]eems like you changed things and now there's fees to spend/use my
  money.  … maybe I misread things but if so, then i'd say your description is
  not clear."  (PayPal does not charge customers fees to use their funds to make
  purchases.)

- "I'm not sure if you are going to charge me to hold the money & then the next
  time I pay with paypal, use it. Would that be free?"  (PayPal does not charge
  customers fees to hold their funds in its digital wallet products or to use those
  funds to make purchases.)

- "Seems like there's a fee for any way you use your money… I don't
  understand this new rule."  (PayPal does not charge customers fees to use their
  funds to make purchases.)

- "It sounds like there will be more fees than there was.  It was unclear if I can
  still transfer to my bank without a charge."  (PayPal does not charge
  customers fees for standard transfers of funds to linked bank accounts.)

- "Why do I have to have all these terms and conditions for a small amount of
  money in my paypal account?  Fees to transfer to my bank now … ?  This is a

really anti-consumer move on your part." (PayPal does not charge customers fees for standard transfers of funds to linked bank accounts.)

10.     In addition to requiring PayPal to make new and confusing fee disclosures, the Prepaid Rule restricts the ability of consumers to attach their own credit products to digital wallets. Specifically, in certain circumstances, the Rule bans consumers from linking credit products to PayPal digital wallets for the first 30 days after they acquire the digital wallet product. This prohibition applies even where a consumer has already acquired the credit product before obtaining the digital wallet, and any concern about consumer welfare should focus on the acquisition of the credit products themselves, not the consumer's decision that his or her best financial interests are served by utilizing those credit products through PayPal's secure process.

11.     Finally, the Rule violates PayPal's constitutional rights by forcing it to convey the government's chosen message without regard for whether that compelled speech meaningfully advances the government's professed interests. Indeed, as PayPal repeatedly informed the Bureau, the Rule's contemplated disclosures are largely inapposite, misleading, or confusing when applied to digital wallets. What is more, the Bureau has restricted PayPal from providing its customers with the information that would clarify potential misconceptions, a restriction that plainly violates PayPal's First Amendment rights.

12.     PayPal now brings this action to alleviate the (entirely foreseeable) negative consequences of the Rule for consumers.

## THE RULE'S LEGAL DEFECTS

13.     The Prepaid Rule is unlawful under the Administrative Procedure Act ("APA") and the U.S. Constitution, for three principal reasons.

14.     First, it axiomatic that an agency has no statutory authority to act unless Congress has conferred that specific power on the agency. Here, the Prepaid Rule contravenes the

Bureau's statutory authority in at least two ways:  (1) It establishes a mandatory and misleading disclosure regime nowhere authorized by federal law; and (2) it imposes a 30-day ban on consumers linking certain credit cards to their prepaid account—a prohibition the law nowhere authorizes the Bureau to impose.[5]

15.     The Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*, "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems" with the "primary objective" of safeguarding "individual consumer rights."[6]  Although Congress explicitly noted the "unique characteristics" of various electronic transfer systems and charged the Bureau with "issu[ing] model clauses for *optional* use by financial institutions,"[7] the Rule overlooks the differences between digital wallets and other prepaid accounts and seeks to impose the same *mandatory* disclosures, prescribed in exacting detail, on both sets of products.  The Rule did not merely provide for "optional" disclosures; it mandated a specific set of GPR-card-focused disclosures with essentially no flexibility.[8]  These disclosures cover fees that are largely inapplicable to the way digital wallet users actually use their products and create serious risks of consumer confusion.  EFTA nowhere authorizes the Bureau to impose these requirements, and the Court should set them aside.

16.     Similarly, the Bureau claimed to find statutory support for its 30-day ban on linking certain credit products to digital wallets in the Truth in Lending Act ("TILA"), 15 U.S.C.

[5]  5 U.S.C. § 706(2)(C) ("The reviewing court shall … hold unlawful and set aside agency action … in excess of statutory jurisdiction, authority, or limitations.").

[6]  15 U.S.C. § 1693(b).

[7]  *Id.*; *id.* § 1693b(b) (emphasis added).

[8]  *See, e.g.*, *id.* § 1632(a), (c); *id.* § 1637(c)(1)(A).

§ 1601 *et seq.*  TILA, however, is a *disclosure* statute whose purpose is to promote consumers' "informed use of credit";[9] it does not empower the Bureau to impose substantive restrictions on consumer choice like temporary bans or cooling-off periods.  Indeed, nowhere does TILA so much as mention the type of waiting-period requirement the Bureau imposed in the Prepaid Rule.[10]

17.     Second, even if the Bureau had the statutory authority it claims, its rulemaking process was fundamentally flawed, marked by a misunderstanding of the different characteristics of digital wallets and tainted by an insufficient cost-benefit analysis that failed to properly weigh the limited benefits consumers might derive from the Rule against the costs stemming from the unnecessary and confusing changes to digital wallets that the Rule mandates.

18.     In issuing a one-size-fits-all Rule that treats PayPal's digital wallets as if they were GPR cards, the Bureau violated the APA's core requirement of reasoned decision-making.[11]  The Bureau's most basic error was ignoring the critical differences between digital wallets and prepaid products like GPR cards.  Unlike GPR cards, for example, PayPal's digital wallets do not charge consumers fees to open, maintain, or access the funds stored there (in the event funds are stored at all), and permit consumers to immediately link existing accounts, including their own previously acquired credit products, to their digital wallet to function as funding sources.  And unlike GPR card customers, digital wallet customers primarily use the product to transfer funds from one of their existing credit or deposit accounts to a third party.

---

[9]  15 U.S.C. § 1601(a).

[10]  Although TILA permits the Bureau to require certain disclosures in situations not germane to the circumstances here, the Bureau claimed to predicate the disclosures at issue here on EFTA.

[11]  5 U.S.C. § 706(2)(A) ("The reviewing court shall … hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.").

Further, unlike GPR cards, which are typically purchased in brick-and-mortar stores—the specific acquisition context that drove the Bureau's fact-finding and analysis—digital wallets are acquired and used electronically.

19.    At bottom, the Rule represents a serious category error—one that has serious consequences for digital wallet providers like PayPal and their customers and one that violates the APA's core mandate that agencies engage in reasoned decision-making.  Indeed, the Prepaid Rule was designed for a specific product (GPR cards) acquired in a specific way (in retail stores), but is being applied to a very different product acquired in a very different way.  The Bureau has provided no coherent and reasonable explanation for this effort to jam a square peg into a round hole.

20.    Moreover, the Bureau's rulemaking was deeply flawed for another reason:  It performed a cost-benefit analysis riddled with gaps and omissions.  All agencies have a basic obligation to consider the consequences of their regulatory actions, but the Bureau is under a heightened statutory obligation to do so.  As mandated by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), the Bureau must consider a proposed rule's "potential benefits and costs to consumers and covered persons"—"including the potential reduction of access by consumers to consumer financial products or services" stemming from that rule.[12]  The Bureau failed to perform the proper analysis here and, as to digital wallets, failed to acknowledge this limitation on its authority.  Remarkably, in the Prepaid Rule's 40-page cost-benefit section, the Bureau never so much as mentions the term "digital wallet"; it never even attempts to calculate the limited benefits the Rule might offer consumers using digital wallets; and it wholly fails to quantify the costs the Rule will impose on digital wallet customers who are

---

[12]  12 U.S.C. § 5512(b)(2)(A).

forced to navigate misleading and inapplicable disclosures and are barred from immediately linking certain credit products to PayPal's platform in order to pay for goods and services or to transfer money to third parties.  The Bureau's failure to properly perform the cost-benefit analysis mandated by Congress requires that the Prepaid Rule be set aside.

21.     Third, the Prepaid Rule is invalid, and may not be enforced against PayPal, because it violates the First Amendment of the U.S. Constitution.  Generally, when the government compels private commercial speakers to convey the government's chosen message, it must satisfy a heightened standard by demonstrating that the law or regulation directly advances a substantial government interest.[13]  Here, the Bureau's onerous compulsory disclosures require PayPal to prominently feature items that are irrelevant to the core use of its digital wallet offering, such as "periodic," "per purchase," "customer service," and "inactivity" fees.

22.     Additionally, the Prepaid Rule requires PayPal to use certain fee terminology mandated by the Bureau without permitting any clarification within the short form itself about what the terminology means.  For example, the Rule's mandatory short form template requires mention of "cash reload" fees using those exact words or words "substantially similar," and bans any clarification in the short form that "cash reload" does not include electronic receipt of funds into digital wallets via third-party transfers or electronic fund transfers into digital wallets originating from linked bank accounts.  Further, the Rule's short form disclosure requirements dictate that fee categories must mention only the highest possible fee that can be incurred in a worst-case scenario and do not permit an explanation of the circumstances when the fee will be

---

[13] *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980).

lower and by how much, even when substantially lower fees are typical and customers will have clear prior notice when higher fees would be incurred.

23.     As a result, the Prepaid Rule's ill-suited disclosure obligations functionally impair the speech in which PayPal might otherwise engage.  The effect of the Rule's inflexible application to PayPal is to muddle PayPal's ability to present and describe its products to consumers in a manner that accurately informs, not confuses, them about the key product features.  This interference with truthful, non-misleading commercial speech violates the First Amendment.  And the Bureau can hardly have a substantial interest in forcing PayPal and other digital wallet providers to prominently feature disclosures that are largely irrelevant to the principal uses of their products and that actively mislead consumers about the features of those products.

24.     For all these reasons, the Rule should be set aside in whole or in part, and its application to PayPal should be enjoined.

## JURISDICTION AND VENUE

25.     This action arises under the Administrative Procedure Act and the U.S. Constitution.  The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.  The Court is authorized to issue the relief sought pursuant to the APA, 5 U.S.C. §§ 701-706.

26.     PayPal has standing to bring this action because it is directly regulated and adversely affected by the Rule.

27.     Venue is proper in this Court under 28 U.S.C. §1391(e) because Defendants CFPB and Kathy Kraninger reside in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

28.     PayPal is a leading technology company that enables digital and mobile payments on behalf of consumers and merchants worldwide.  PayPal is incorporated in Delaware and headquartered at 2211 North First Street, San Jose, California 95131.  It is a subsidiary of PayPal Holdings, Inc., a publicly traded corporation.

29.     Defendant Consumer Financial Protection Bureau is an agency of the United States Government, located at 1700 G Street NW, Washington, D.C. 20552.

30.     Defendant Kathy Kraninger is the Director of the CFPB, an agency of the United States Government, located at 1700 G Street NW, Washington, D.C. 20552.  Defendant Kraninger is sued in her official capacity as Director of the CFPB.

## FACTUAL ALLEGATIONS

### I.     PAYPAL AND DIGITAL WALLETS

31.     Founded nearly two decades ago, PayPal is a leading online payments company, with more than 295 million active user accounts around the world as of October 2019.  PayPal Holdings, Inc. became an independent publicly traded company in July 2015.  PayPal's offerings in the United States include consumer and business accounts under the PayPal brand name as well as accounts under the Venmo brand name.  Both PayPal-branded and Venmo-branded consumer accounts are regulated by the Prepaid Rule.

32.     PayPal's technology enables digital and mobile payments on behalf of consumers and merchants worldwide, and the company is committed to providing financial tools for consumers to participate fully in the global economy and improve their financial health.  In furtherance of this goal, PayPal strives to empower its customers by honoring and facilitating their choices to access, receive, and move their money anywhere across the globe in an efficient and secure manner.

33.     PayPal's main consumer offering is a "digital wallet."  Digital wallets are used primarily to access and consolidate a consumer's traditional payment devices (or "funding instruments") such as credit cards, debit cards, and checking accounts in order to permit the consumer to make electronic peer-to-peer transfers of funds or to purchase products from third-party merchants.  PayPal also enables customers to receive payments for sales of goods at online auction sites or at other electronic marketplaces.  Additionally, only if customers choose to do so, PayPal allows customers to hold and transfer stored value in their accounts.

34.     To use a digital wallet, a consumer links the wallet to the credentials for the consumer's underlying funding instrument.  Just as a physical wallet enables consumers to organize and access tangible payment cards, a digital wallet organizes and enables access to the electronic credentials for the consumer's underlying funding instruments.  Given the sensitivity of this data—which includes account numbers, expiration dates, and other personally identifying information—digital wallet providers like PayPal devote significant resources to data security and strive to safeguard their users' payment credentials.

35.     Once a funding instrument has been linked to a digital wallet, the digital wallet provider can complete transactions on the consumer's behalf.  For example, if a PayPal digital wallet customer based in California wishes to purchase a widget from a merchant based in Washington, D.C., the customer indicates which payment credentials she would like to use (a credit card, a checking account, etc.), and PayPal accesses those payment credentials to complete the transaction.  Customers do not expose their full financial credentials to merchants; PayPal facilitates the entire process.  This anonymity is an especially attractive feature for customers who would like to make purchases from merchants who have not yet earned the customers' full trust to safeguard their financial credentials.  PayPal functions as a trusted intermediary to

complete this type of economically beneficial transaction.  This is one of the core functionalities offered by the service.

36.     Generally, prepaid card issuers—like the financial institutions that issue GPR cards—generate revenue by charging a series of fees for the basic services they provide to their customers.  These fees might include charges to open an account, to make individual purchases, to load or reload cash into the account, to obtain customer service, or to maintain an account for more than a pre-established amount of time.

37.     PayPal charges customers fees in limited circumstances as fully disclosed both in its user agreement and at the time a customer orders a transaction to which a fee might be applied.  For example, although PayPal does not charge a customer a fee to transfer balance from his PayPal account to a linked bank account or debit card using the default standard service (which may take up to one to three business days to complete), a customer can choose to pay a fee of 1% of the transferred amount, capped at $10, for expedited service that effectuates the transfer in 30 minutes or less.  PayPal does not charge fees to open or maintain accounts, to make purchases from merchants, or to obtain customer service, and the majority of PayPal customers in the United States do not incur any fees to use PayPal's services.  Rather, PayPal's transaction revenues are generated primarily from fees charged to *merchants*.

## II.     THE STATUTORY AND REGULATORY LANDSCAPE

38.     Three statutes—EFTA, TILA, and the Dodd-Frank Act—provide the framework that authorizes and constrains the Bureau's rulemaking authority in this area of commerce.[14]

---

[14]  *See, e.g.*, 81 Fed. Reg. at 83,958-83,960.

A.      **The Electronic Funds Transfer Act**

39.     Congress enacted EFTA in 1978.[15]  Although cognizant that the "use of electronic

systems to transfer funds" offered "substantial benefits to consumers," Congress was concerned

that the "application of existing consumer protection legislation" to those systems was

"unclear."[16]  EFTA represents Congress's effort to "provide a basic framework establishing the

rights, liabilities, and responsibilities of participants in electronic fund transfer systems" that

keeps "individual consumer rights" at the forefront.[17]

40.     EFTA initially authorized the Board of Governors of the Federal Reserve ("the

Board") to prescribe regulations to carry out the statute's purposes.  Upon passage of the Dodd-

Frank Act, most rulemaking authority under EFTA shifted from the Board to the Bureau.[18]

41.     The Bureau does not have *carte blanche* authority to write rules under EFTA.

Rather, the Bureau's authority is constrained by the general requirement that any rule

promulgated by the Bureau "shall consider the potential benefits and costs to consumers and

covered persons, including the potential reduction of access by consumers to consumer financial

products or services resulting from such rule."[19]  Further, under EFTA, financial institutions

involved in facilitating consumer electronic transactions must make certain disclosures to

consumers before and after they engage in those transactions.[20]  To assist financial institutions in

---

[15]  EFTA is codified at 15 U.S.C. § 1693 *et seq.*

[16]  Pub. L. No. 95-630, § 902, 92 Stat. 3641, 3728 (1978); *see also* 15 U.S.C. § 1693(a).

[17]  Pub. L. No. 95-630, § 902, 92 Stat. at 3728.; *see also* 15 U.S.C. § 1693(b).

[18]  Pub. L. 111-203, § 1084, 124 Stat. 1376, 2081 (2010); 12 U.S.C § 5581(b).

[19]  12 U.S.C. § 5512(b)(2).

[20]  For example, EFTA requires that financial institutions disclose, "at the time the consumer
contracts for an electronic fund transfer service," information like the "consumer's liability for
unauthorized electronic fund transfers" and the "type and nature of electronic fund transfers

that process, EFTA requires that the Bureau "issue model clauses for *optional* use by financial institutions."[21] For example, with respect to disclosures at the heart of this case—those pertaining to "charges for electronic fund transfers"—EFTA specifically directs the Bureau to "take account of variations in the services and charges under different electronic fund transfer systems" when issuing model clauses.[22] This flexibility is one of EFTA's hallmarks: The statute never states that the mandated disclosures *must* be presented in any specific format or use any specific phrasing nor does it state that only maximum fees under worst-case scenarios should be disclosed. Instead, it largely leaves the presentation format, layout, font size, and phrasing to the discretion of financial institutions.

42.    The Board's initial rulemaking efforts under EFTA were codified in what is known as "Regulation E."[23] Between 1994 and 2010, the Board amended Regulation E multiple times and considered initiatives to "add consumer protection for certain prepaid and other stored-value products."[24] Although the Board specifically considered whether to use EFTA and Regulation E to regulate GPR cards and other similar prepaid financial products, it never finalized any of those proposals during this period.[25] And at no point since EFTA went into

---

which the consumer may initiate." Pub. L. No. 95-630, § 905(a), 92 Stat. at 3730-3731; *see also* 15 U.S.C. § 1693c. It also requires financial institutions to "notify a consumer in writing at least twenty-one days prior to the effective date" of any changes to certain terms, *id.* § 905(b), 92 Stat. at 3731, and mandates certain periodic disclosures about the specifics of a consumer's transactions, *id.* § 906, 92 Stat. at 3731-3732; *see also* 15 U.S.C. § 1693c.

[21] Pub. L. No. 95-630, § 904, 92 Stat. at 3730 (emphasis added); *see also* 15 U.S.C. § 1693b.

[22] Pub. L. No. 95-630, §§ 904-905, 92 Stat. at 3730-3731; *see also* 15 U.S.C. §§ 1693b, 1693c.

[23] 12 C.F.R. § 205 *et seq.* When responsibility for Regulation E was transferred from the Board to the Bureau, the regulation was renumbered as 12 C.F.R. § 1005 *et seq. See* 81 Fed. Reg. at 83,946 n.116.

[24] 81 Fed. Reg. at 83,946.

[25] *Id.*

effect more than 40 years ago, did the Board or the Bureau ever so much as *mention* "digital wallets" as a target for regulation under that statute until proposing the Prepaid Rule at issue here.

43.     PayPal has long acknowledged that its activities are "subject to federal … consumer protection law and regulations" including EFTA and Regulation E.[26]  As such, PayPal strives carefully and comprehensively to comply with regulatory requirements mandating it to "provide advance disclosure of changes to [its] services, follow specified error resolution procedures, and reimburse consumers for losses from certain transactions not authorized by the consumer."[27]  PayPal does not challenge the lawfulness of these requirements here, nor does it contend that EFTA is inapplicable to its digital wallet products.  Rather, as described further below, PayPal challenges the Bureau's claim that EFTA authorizes it to apply the Prepaid Rule's prescriptive short form disclosures to its digital wallet offerings.[28]

### B.     The Truth in Lending Act

44.     The Bureau's Rule does not (and could not) rely on TILA[29] for the Rule's principal disclosure requirements, but rather invokes TILA in prescribing limits on consumers' linking credit products to accounts covered by the Rule.

45.     Enacted by Congress in 1968, TILA aims to facilitate the "informed use of credit" by consumers by mandating the "meaningful disclosure of credit terms so that the consumer will

---

[26]  *See, e.g.*, PayPal Holdings, Inc., Form 10-K (Feb. 7, 2019), at 21; *see also* PayPal Holdings, Inc., Form 10-K (Feb. 11, 2016), at 19.

[27]  *Id.*

[28]  *See, e.g.*, 12 C.F.R. § 1005.2(b)(3) (adding "prepaid account" to the general definition of an "account" subject to Regulation E); *id.* § 1005.18 (setting forth disclosure requirements).

[29]  TILA is codified at 15 U.S.C. § 1601 *et seq.*

be able to compare more readily the various credit terms available to him."[30]  These disclosures,

Congress explained, would "enhance[]" "economic stabilization" and would "strengthen[]"

"competition among the various financial institutions and other firms engaged in the extension of

consumer credit."[31]

46.     Consistent with those congressional purposes, TILA has long been understood as

a disclosure statute, not as a basis to impose substantive restrictions on a consumer's ability to

contract for, or use, a credit product.

47.     Similar to EFTA, Congress initially charged the Board with prescribing

regulations under TILA,[32] but after the passage of the Dodd-Frank Act, that responsibility was

transferred to the Bureau.[33]

48.     As amended by the Dodd-Frank Act, TILA authorizes the Bureau to promulgate

rules that "carry out the purposes" of TILA.[34]  Those rules "may contain such additional

requirements, classifications, differentiations, or other provisions" that, "in the judgment of the

Bureau[,] are necessary or proper to effectuate" TILA's statutory goals.[35]  The Bureau's

regulations implementing TILA are collectively known as "Regulation Z."[36]

49.     Despite TILA's express disclosure purposes, the Bureau invokes TILA as

statutory authority to impose substantive restrictions pertaining to "credit feature[s] that may be

---

[30] Pub. L. 90-321, § 102, 82 Stat. 146 (1968); *see also* 15 U.S.C. § 1601(a).

[31] Pub. L. 90-321, § 102, 82 Stat. 146.

[32] *Id.* § 105, 82 Stat. at 148.

[33] Pub. L. 111-203, § 1100A, 124 Stat. 1376, 2107 (2010); *see also* 15 U.S.C. § 1604(a).

[34] 15 U.S.C. § 1604(a).

[35] *Id.*

[36] 12 C.F.R. § 1026 *et seq.*

offered in conjunction with [a] prepaid account"—namely credit products "offered by the

prepaid account issuer, its affiliate, or its business partner."[37]  The Bureau thus claims to find in

TILA the authority to impose a substantive restriction on consumers' use of a credit product,

namely a 30-day ban on the consumer linking certain credit cards to his or her prepaid account.[38]

## C.    The Dodd-Frank Act

50.     Enacted by Congress in 2010, the Dodd Frank Act created the Bureau and

permitted it to "prescribe rules and issue orders and guidance, as may be necessary or appropriate

to enable [it] to administer and carry out the purposes and objectives of the Federal consumer

financial laws."[39]  Congress also authorized the Bureau to "prescribe rules to ensure that the

features of any consumer financial product or service" are accurate and "disclosed to consumers

in a manner that permits consumers to understand the costs, benefits, and risks associated with

the product or service."[40]  This general rulemaking authority, however, cannot be understood to

override the specifically delineated authority imposed by Congress in EFTA and TILA.

51.     Moreover, in order to exercise its rulemaking authority under the Dodd-Frank

Act, the Bureau must satisfy certain congressionally imposed standards.  Of particular relevance

here, the Bureau must "consider the potential benefits and costs to consumers and covered

persons" resulting from a proposed rule, "including the potential reduction of access by

consumers to consumer financial products or services."[41]

---

[37]  81 Fed. Reg. at 83,935.

[38]  *Id.*; *see also* 12 C.F.R. § 1026.61(c).

[39]  Pub. L. 111-203, § 1022(b)(1), 124 Stat. 1376, 1980 (2010); *see also* 12 U.S.C. § 5512(b)(1).

[40]  Pub. L. 111-203, § 1032(a), 124 Stat. at 2006-2007; *see also* 12 U.S.C. 5532(a).

[41]  12 U.S.C. § 5512(b)(2)(A)(i).

III.    THE PREPAID RULE

    A.    **The Bureau Issues an Advance Notice of Proposed Rulemaking That Never References Digital Wallets**

    52.    More than seven years ago, the Bureau issued an Advanced Notice of Proposed Rulemaking ("ANPR") with the described purposes of "seeking comment, data, and information from the public about [GPR] prepaid cards."[42]  The Bureau claimed that it was interested in this "specific type" of prepaid card because it represented "one of the fastest growing segments of the overall prepaid market," and, in light of the "risk of consumer harm," the Bureau was "seeking information to determine how best to implement consumer protection rules for this product."[43]

    53.    The ANPR did not mention digital wallets at all.

    B.    **The Bureau Issues a Proposed Rule Sweeping Digital Wallets into the Definition of Prepaid Accounts**

    54.    Despite not mentioning digital wallets in the ANPR, on December 23, 2014, the Bureau published an expansive proposed rule in the Federal Register that implicated multiple aspects and features of digital wallet products.[44]

    55.    First, the Bureau's proposed rule defined "prepaid account" broadly.  The Bureau explained that digital wallets—which it spent only three paragraphs describing and analyzing out of its 200-page proposed rule—would fall within the term's ambit, so long as consumers had *any ability* "to store funds in [them] directly,"[45] even if they never actually did so.  The Bureau's proposal included little reasoning as to why or how it reached this decision.  Although it

---

[42]  "Electronic Fund Transfers (Regulation E)," 77 Fed. Reg. 30,923, 30,923 (May 24, 2012).

[43]  *Id.* at 30,923-30,924.

[44]  "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)," 79 Fed. Reg. 77,102 (Dec. 23, 2014).

[45]  *Id.* at 77,110, 77,129.

explicitly noted that "there may be significant variations in how funds are held in digital wallets and how payments are processed by digital wallets," the Bureau failed to explain or analyze any of those relevant "variations."[46] Instead, the Bureau explained that it wanted to "cast a wide net in including products within the proposed definition of prepaid account" and to apply requirements "evenly across like products."[47] Why a digital wallet should be considered a "like product" to a GPR card received scant discussion in the proposed rule.

56.     Second, the Bureau's proposed rule mandated that extensive disclosures be provided to consumers before they are permitted to acquire a prepaid account, as expansively defined. Specifically, these "short form" disclosures would require a prepaid account issuer to "highlight[] four types of fees" associated with its product—the "periodic fee, per-purchase fees, ATM withdrawal fees, and the cash reload fee"—at the top of the short form, "*even if such fees [we]re $0 or if they relate[d] to features not offered for a particular prepaid account product*."[48]

57.     In support of these fee disclosures and its prescriptive layout requirements, the Bureau highlighted several examples where they might help a consumer. The proposed rule described in detail how, for example, the disclosures would benefit a consumer "tak[ing] a package containing a prepaid account access device off a J-hook in a retail store" and how the disclosures would facilitate "comparison shop[ping] across products."[49] In doing so, the Bureau effectively acknowledged that it designed its proposed short form disclosure with brick-and-mortar-store, retail shoppers firmly front-of-mind.

---

[46] *Id.* at 77,110.

[47] *Id.* at 77,128.

[48] *Id.* at 77,148-77,149 (emphasis added).

[49] *Id.* at 77,149-77,150.

58.     That is further borne out by the consumer focus groups and one-on-one interviews convened by the Bureau, where 69 participants were quizzed about their reactions to various physical short form disclosure templates.[50]  The Bureau used "observations from and information gathered in" these focus groups and "feedback" from these interviews to develop and revise the disclosure templates.[51]  The participants, however, were never given the option to test how the proposed disclosures might appear in an electronic format in relation to a digital wallet product—indeed, the term "digital wallet" never even appears in the reports published by the research contractor that the CFPB hired to organize and conduct the focus groups and interviews.

59.     What is more, there is no evidence in the reports published by the CFPB's research contractor or in the Bureau's notice of proposed rulemaking, proposed rule, or final rule that any of the 69 participants were familiar with digital wallets, had used digital wallets in the past, or had any understanding of how digital wallets function or the fees they might or might not incur.  To the contrary, the CFPB's proposed rule notes that all 69 participants "self-identified as having used a prepaid card" in the previous year;[52] the CFPB does not similarly mention any experience the participants may have had with digital wallets.

60.     Third, the Bureau proposed a revision to Regulation Z which would "require a credit card issuer to wait at least 30 calendar days from prepaid account registration" before providing an accountholder an "application … to open a credit card account … that would be

---

[50]  ICF International, "Summary of Findings: Design and Testing of Prepaid Card Fee Disclosures," Nov. 2014, available at https://files.consumerfinance.gov/f/documents/ 201411_cfpb_summary-findings-design-testing-prepaid-card-disclosures.pdf.

[51]  79 Fed. Reg. at 77,122.

[52]  *Id.*

accessed by the access device for a prepaid account."[53]  This limitation, the Bureau asserted,

would "promote the informed use of the prepaid account and the credit card account by

separating the decision to purchase and register a prepaid account from the decision to accept an

offer to link a credit card account to that prepaid account."[54]  The Bureau's proposed rule did not

discuss this change in the context of digital wallets.  Nor did the Bureau explicitly distinguish or

analyze whether the proposed rule would stymie consumer efforts to link an existing credit card

to a prepaid account.

61.     In response to the proposed rule, PayPal submitted a comprehensive comment

letter addressing each of the three issues outlined above.[55]  Turning first to the Bureau's decision

to apply a rule designed for GPR cards to a digital wallet product, PayPal explained in detail why

digital wallets—including those that can hold a balance—should not be included in the definition

of "prepaid account."  PayPal clarified why digital wallets do not pose the same risks to

consumers as, for example, the GPR cards that prompted the Bureau's rulemaking efforts, and it

provided extensive information evidencing that consumers use digital wallets primarily to access

payment credentials connected to their own pre-existing financial instruments.

62.     PayPal also responded directly to the Bureau's proposed pre-acquisition

disclosure requirements.  PayPal explained that traditional GPR prepaid cards and digital wallets

were too different to be subject to the same standardized disclosures, and that trying to shoehorn

disclosures designed for GPR cards into the digital wallet space would only serve to confuse or

---

[53]  *Id.* at 77,138.

[54]  *Id.* at 77,187.

[55]  PayPal's comment letter from John Muller to Monica Jackson (Mar. 23, 2015) is available at
https://www.regulations.gov/document?D=CFPB-2014-0031-3820.

mislead consumers.  PayPal further noted that the Bureau's prescriptive font size and formatting rules were disconnected from the reality of how consumers obtain and access digital wallets.

63.     Furthermore, PayPal requested that the Bureau clarify that the restrictions on linked credit features outlined in the proposed rule did not apply to credit products linked by consumers to their digital wallet accounts.  PayPal explained that forcing consumers to wait 30 days before they were permitted to link their credit products to their digital wallets would be confusing and would thwart consumers' abilities to benefit from one of the core features motivating consumers to obtain a digital wallet in the first place.

**C.     The Bureau Finalizes a Rule That Fails to Properly Distinguish Digital Wallets from Other Prepaid Accounts**

64.     On November 22, 2016, the Bureau finalized the Prepaid Rule and established an effective date of October 1, 2017.[56]

65.     As relevant here, the Bureau irrationally disregarded PayPal's concerns with the proposed rule.  The Final Rule acknowledged—and then summarily rejected—PayPal's explanation of the differences between digital wallets and other types of prepaid accounts and its request to exclude digital wallets from the pre-acquisition disclosure requirements promulgated under EFTA.  The Rule also finalized a credit-linking provision that materially differed from the Bureau's proposed rule, and offered a cost-benefit analysis of the Bureau's rulemaking efforts that failed to adequately consider—or, indeed, to consider at all—the impact of the Final Rule on digital wallet providers and consumers.

---

[56]  "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)," 81 Fed. Reg. 83,934 (Nov. 22, 2016).

66.     First, the Bureau rejected PayPal's well-founded position that digital wallets were different in kind from other prepaid accounts, asserting in purely conclusory terms that it was "not convinced" that digital wallets were "fundamentally dissimilar to other types of prepaid accounts."[57]  The Bureau admitted that, unlike GPR cards and other forms of prepaid accounts, "digital wallets currently on the market" did "not charge usage fees," but justified sweeping digital wallets into the "prepaid account" definition by asserting that this "may not hold true in the future."[58]  "If" such "fees d[id] become standard" in the future—a contingency for which the Bureau offered no evidence suggesting why or when it would ever occur—the Bureau asserted that consumers should "know what those fees are and when they will be imposed."[59]

67.     With respect to PayPal's request that digital wallets be exempted from the Bureau's proposed 30-day credit-linking ban, the Bureau did not just reject PayPal's argument; it finalized a series of new and complex provisions that were based on a concept that it never noticed for public comment.  Specifically, the Bureau finalized a set of new credit requirements that imposed a 30-day ban delaying a PayPal accountholder's ability to link a credit card—*even one acquired through channels completely independent of PayPal*—if the issuer of that card was a "business partner" of PayPal (a term the Rule defined broadly).[60]

68.     Finally, although the Bureau recognized its obligation under the Dodd-Frank Act to "consider[] the potential benefits, costs, and impacts" of its Rule, the Bureau's efforts to produce the mandated cost-benefit analysis did not so much as mention the term "digital

---

[57]  *Id.* at 83,968.

[58]  *Id.*

[59]  *Id.* at 83,972.

[60]  *Id.* at 84,165.

wallet."[61]   The Bureau wholly failed to explain how any of its cost-benefit analysis applied to

digital wallets—a product the Bureau sought to regulate with no evidence of consumer harm.

### D.     The Bureau Delays Implementation of the Rule

69.     On March 15, 2017, the Bureau published a proposed rule in the Federal Register

that extended the October 1, 2017 general effective date of the Prepaid Rule by six months.[62]

70.     The Bureau explained that some "industry participants ha[d] raised concerns

about what they describe[d] as unanticipated complexities" arising from the Rule that made

satisfying the original implementation date unrealistic.[63]   In response, the Bureau proposed a six-

month delay that it believed "would be sufficient for industry participants to ensure that they

c[ould] comply with the [Prepaid Rule] with minimal disruption to consumers."[64]

71.     Although the Bureau stated that it was "not proposing to amend any substantive

requirements" of the Rule, the Bureau explained that a delay would also permit it to "more

closely evaluate concerns raised by industry participants" and to "propose revisions" to the Rule

if "necessary and appropriate."[65]   Underscoring that the target of the Rule had always been GPR

cards, the Bureau further noted that a delay would "both allow more time for [GPR card]

package printing and [would] allow pull-and-replace processes at retail locations to occur after

---

[61]   *Id.* at 84,269.

[62]   "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in
Lending Act (Regulation Z); Delay of Effective Date," 82 Fed. Reg. 13,782 (Mar. 15, 2017).

[63]   *Id.* at 13,783.

[64]   *Id.*

[65]   *Id.*

the winter holiday season."[66]  Implementation difficulties with respect to digital wallet products were not mentioned in the Bureau's proposed extension rule.

72.     On April 5, 2017, PayPal filed a comment letter addressing the Bureau's proposed rule to extend the implementation date.[67]  PayPal renewed its significant and substantive concerns about the Bureau's 30-day credit-linking ban, explaining that its restrictions would "reduce consumer choice and cause consumer confusion" as even cards that were "acquired through channels completely independent of PayPal" would be swept within the ban merely because the issuer of the card has a business, marketing, or promotional arrangement with PayPal.[68]

73.     The Bureau adopted its proposed six-month delay in a final rule published on April 25, 2017.[69]  It further announced its "plans to release a notice of proposed rulemaking address[ing] at least two issues that have been identified as areas where the [Prepaid Rule] may be posing particular complexities for implementation," including, as relevant here, the issue PayPal raised in its comment letter regarding the "linking of credit cards into digital wallets that are capable of storing funds."[70]

---

[66]  *Id.*

[67]  PayPal's comment letter from Jeffrey Levine to Monica Jackson (Apr. 5, 2017) is available at https://www.regulations.gov/document?D=CFPB-2017-0008-0020.

[68]  *Id.* at 3.

[69]  "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z); Delay of Effective Date," 82 Fed. Reg. 18,975 (Apr. 25, 2017).

[70]  *Id.* at 18,975, 18,977.

E.      **The Bureau Substantively Revises the Prepaid Rule But Fails to Adequately Address the Credit Linking Restriction**

74.     Two months later, the Bureau proposed substantive amendments to the Prepaid Rule.[71]  Among other proposed amendments, the Bureau attempted to remedy unintended and adverse consequences for consumers that would arise if credit cards issued by entities with promotional or marketing agreements with digital wallet providers could not be linked to digital wallets within 30 days of the acquisition of a prepaid account.

75.     To accomplish this goal, the Bureau proposed a complicated five-factor test to carve out an exception to restrictions on linking credit issued by entities that would otherwise fall within the definition of a digital wallet's "business partner."  These factors included whether the prepaid account issuer and the credit card issuer applied "the same terms, conditions, or features" to a consumer's accounts regardless of whether the consumer chooses to link the two accounts.[72]

76.     PayPal submitted a comment letter responding to the Bureau's proposed rule on August 14, 2017.[73]  PayPal explained that the Bureau's proposed five-prong carve-out did not fully address the problems arising from applying the Prepaid Rule's credit restrictions to digital wallets.  PayPal further explained that the Bureau's proposal requiring identical treatment for linked and non-linked credit products would limit digital wallet providers and credit card issuers' ability to offer significant consumer benefits through affiliated offerings.

---

[71]  "Amendments to Rules Concerning Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)," 82 Fed. Reg. 29,630 (June 29, 2017).

[72]  *Id.* at 29,649.

[73]  PayPal's comment letter from Jeffrey Levine to Monica Jackson (Aug. 14, 2017) is available at https://www.regulations.gov/document?D=CFPB-2017-0015-0021.

77.     Notwithstanding PayPal's objections, the Bureau finalized its proposed amendment on February 13, 2018, largely adopting the five-factor carve-out as it had been proposed the previous year.[74]  The Bureau also delayed the effective date of the Final Rule from April 1, 2018, to April 1, 2019.

**F.     The Rule Forces PayPal and Other Digital Wallet Providers to Comply with Incongruous and Burdensome Requirements**

78.     Since the Prepaid Rule went into effect more than eight months ago, PayPal has endeavored to comply with the Rule's onerous and disruptive requirements.  However, PayPal's efforts to comply with the Rule have only underscored the fundamental irrationality and harm to consumers of the Bureau's application of a regime designed for GPR cards to digital wallets. Just as PayPal and other commenters warned, digital wallet customers have expressed widespread confusion about the new short form disclosures—with consumers' objections focused on several fees that have little bearing on PayPal's product offerings and consumers' motivations to acquire the products.  In particular, the Bureau's mandate that only the highest possible fees charged under worst-case scenarios must be presented in the short form disclosure has generated significant consumer concern and confusion.  These results—which, again, PayPal warned the Bureau about repeatedly during the rulemaking process—have seriously impaired PayPal's ability to communicate with consumers and provide consumers with meaningful information about the core features of its digital wallet products.

---

[74] "Rules Concerning Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)," 83 Fed. Reg. 6364 (Feb. 13, 2018).

## COUNT ONE
### (APA, 5 U.S.C. § 706(2)(C))

## THE BUREAU EXCEEDED ITS STATUTORY AUTHORITY UNDER EFTA BY MANDATING PRESCRIPTIVE DISCLOSURES FOR DIGITAL WALLETS

79.     Paragraphs 1 through 78 are incorporated by reference as if set forth fully herein.

80.     The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations."[75]

81.     The prescriptive disclosure requirements in the Final Rule exceed the Bureau's statutory authority.

82.     Under EFTA, the Bureau may promulgate regulations regarding disclosure of the "terms and conditions of electronic fund transfers involving a consumer's account."[76]  Although EFTA requires that such disclosure "shall be in readily understandable language,"[77] it does not authorize the Bureau to mandate particular disclosure terms, nor does it authorize the Bureau to mandate the precise manner in which those terms are presented.

83.     Rather than establishing rigid requirements, the Bureau is directed to issue "model clauses for *optional* use by financial institutions to facilitate compliance with … disclosure requirements."[78]  In developing these optional model clauses, "the Bureau shall take account of variations in the services and charges under different electronic fund transfer systems and … shall issue alternative model clauses for disclosure of these differing account terms."[79]

---

[75] 5 U.S.C. § 706(2)(C).

[76] 15 U.S.C. § 1693c(a).

[77] *Id.*

[78] *Id.* § 1693b(b) (emphasis added).

[79] *Id.*

84.     In addition to mandating that financial institutions use specified terms to describe their fees,[80] the Rule requires that the disclosures be in a table;[81] that the table be arranged in a particular manner, with specified terms grouped together and ordered as determined by the Bureau;[82] that fees appear in bold-face type of specified sizes;[83] and that only the highest possible fee amounts under worst-case scenarios be disclosed without any explanation of how and when those amounts can be lower.[84]

85.     The Rule also fails to take into account the differences between digital wallet services and GPR cards and unlawfully prevents financial institutions from describing those differences in their short form disclosures.

86.     Because EFTA does not allow the Bureau to mandate the terms used in financial disclosures or the precise form and formatting of such disclosures, the Rule exceeds the Bureau's statutory authority and must be vacated.

## COUNT TWO
## (APA, 5 U.S.C. § 706(2)(C))

### THE BUREAU EXCEEDED ITS STATUTORY AUTHORITY UNDER TILA BY IMPOSING A 30-DAY BAN ON CONSUMERS' ABILITY TO LINK CERTAIN CREDIT PRODUCTS TO THEIR DIGITAL WALLET ACCOUNTS

87.     Paragraphs 1 through 86 are incorporated by reference as if set forth fully herein.

---

[80]  *See* 12 C.F.R. § 1005.18(b)(2).

[81]  *Id.* § 1005.18(b)(6)(iii).

[82]  *Id.* § 1005.18(b)(7)(i).

[83]  *Id.* § 1005.18(b)(7)(ii).

[84]  *Id.* § 1005.18(b)(3)(i) (a "financial institution shall disclose the highest amount it may impose for that fee …"); *id.* § 1005.18(b)(4)(ii) (a "financial institution may not use any symbols, such as an asterisk, to explain conditions under which any fee may be imposed").

88.     The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations."[85]

89.     The Rule imposes a 30-day prohibition on consumers' ability to link an existing credit product to a digital wallet under certain circumstances, including where the consumer would receive beneficial treatment for linking the product.[86]  Congress has not authorized the Bureau to impose substantive restrictions on a consumer's ability to obtain or use credit in this manner.

90.     The Bureau claims that such authority can be found in TILA.[87]  As amended by the Dodd-Frank Act, TILA's section on "disclosure guidelines" allows the Bureau to "prescribe regulations to carry out the purposes of [TILA]."[88]  These regulations "may contain such additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith."[89]

91.     The primary purpose of TILA is to "assure a meaningful disclosure of credit terms."[90]  In keeping with that congressional purpose, TILA's implementing regulations generally establish *disclosure* requirements—not *substantive* restrictions on the ability of consumers to access and use credit, unless specifically authorized by statute.

---

[85]  5 U.S.C. § 706(2)(C).

[86]  *See* 12 C.F.R. § 1026.61(c)(1)(iii); *id.* § 1026.61(a)(5)(iii).

[87]  *See* 81 Fed. Reg. at 83,949.

[88]  15 U.S.C. § 1604(a).

[89]  *Id.*

[90]  15 U.S.C. § 1601(a).

92.     There is no separate statutory authorization in TILA or anywhere else allowing the Bureau to prohibit a consumer from linking a credit card to a digital wallet or to require a delay in such linkage.

93.     The Bureau's theory that it may impose a 30-day ban under TILA—ostensibly to "separate the decision" to obtain the digital wallet from the decision to obtain a credit card—lacks any limiting principle, and in any case is entirely inapplicable where the consumer has *already* obtained the credit card.[91]   One can imagine innumerable substantive bans on accessing or using credit that might promote an "informed decision" by consumers, but TILA provides no authority for that rationale, and the Bureau cannot unilaterally choose to impose such restrictions without congressional authorization.

## COUNT THREE
## (APA, 5 U.S.C. § 706(2)(A))

## THE BUREAU'S FAILURE TO ADEQUATELY CONSIDER THE UNIQUE CHARACTERISTICS OF DIGITAL WALLETS WAS ARBITRARY AND CAPRICIOUS

94.     Paragraphs 1 through 93 are incorporated by reference as if set forth fully herein.

95.     The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … arbitrary, capricious, [or] an abuse of discretion."[92]

96.     An action is arbitrary or capricious where the agency fails to consider a relevant factor or an important aspect of the issue under consideration.[93]   The existence of critical

---

[91]  81 Fed. Reg. at 84,268.

[92]  5 U.S.C. § 706(2)(A).

[93]  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

differences between the types of activity being regulated is one such relevant factor.[94] The lack of evidence that there is any problem to be solved is another.[95]

97.    The Bureau violated the APA's core requirement of reasoned decision-making in applying the Rule to digital wallets in several ways.  The Bureau's fundamental error was to take a regulatory regime designed for GPR cards and irrationally apply it to digital wallets, without regard to significant differences between the two types of products.

98.    For example, the short form disclosure requirements significantly limit PayPal's ability to explain key features of its digital wallet, such as the extremely limited circumstances in which fees will be charged, and to describe how and when maximum fee amounts can be lower. These short form requirements were imposed because the "J-hook package" in which GPR cards are sold in retail stores "is no larger than 4 inches by 5.25 inches," along with "certain other aspects of purchasing GPR cards in retail settings [that] may also pose obstacles to comparison shopping," such as that "[s]tore personnel may not be sufficiently familiar with the different products to respond accurately to consumer questions."[96]

99.    In the context of an in-store purchase of a GPR card—potentially located behind a counter, where it is difficult for a consumer to review product details—it may be sensible for the Bureau to require a limited and defined set of disclosures.  This rationale falls away, however, when a consumer enrolls online, as with PayPal.  In that context, the consumer can be presented with additional information without size or space limitations, and any questions can easily be

---

[94]  *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983).

[95]  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (Kavanaugh, J.).

[96]  81 Fed. Reg. at 83,939.

directed to dedicated support personnel. The Prepaid Rule entirely fails to account for these material differences.

100.    The Bureau's research and testing likewise was limited to physical cards purchased in stores. In developing the short form disclosures, the Bureau convened focus groups of individuals that "self-identified as having used a prepaid card."[97] These focus groups were presented with disclosures "that could fit on existing packaging material used to market prepaid products on J-hooks in retail locations."[98] The results informed the Bureau's development of the short form disclosures that PayPal is now required to include with its digital offerings. The Bureau irrationally made no effort to determine whether the short form disclosures were appropriate in a digital wallet context.

101.    The Bureau also acknowledged that imposing onerous fee disclosures on digital wallets was largely an exercise in preemptive regulation. The Bureau admitted that digital wallets do not charge many of the fees that the Bureau requires to be disclosed.[99] The Bureau speculated, however, that hypothetical future developments could lead digital wallet providers to change their business models to include such fees.[100] Imposing substantial burdens on digital wallet offerors based on pure speculation as to future use cases is arbitrary and capricious.

102.    For these reasons and others, the Bureau's decision to extend the Rule to digital wallets was arbitrary and capricious, unsupported by substantial evidence, and not the product of reasoned decision-making.

---

[97]  *Id.* at 83,954.

[98]  *Id.*

[99]  *See id.* at 83,968.

[100]  *Id.*; *see also id.* at 84,015.

## COUNT FOUR
## (APA, 5 U.S.C. § 706(2)(A))

### THE BUREAU'S FAILURE TO PROPERLY WEIGH THE LIMITED BENEFITS OF THE PREPAID RULE AGAINST ITS EXTENSIVE BURDENS WAS ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW

103.    Paragraphs 1 through 102 are incorporated by reference as if set forth fully herein.

104.    When promulgating a rule, the Bureau must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule."[101]  In addition, the APA's duty of reasoned decision-making obligates the Bureau to consider the disadvantages of regulatory decisions.

105.    The Bureau breached those statutory requirements here, as the Bureau did not appropriately consider either the costs to digital wallet providers of complying with the Prepaid Rule or the reduction of access to consumers that may occur if the Prepaid Rule stifles innovation in the digital wallet space.

106.    The Bureau's cost-benefit analysis does not mention the term "digital wallet" or consider how digital wallet offerings will be affected by the imposition of a disclosure regime tailored for a distinct line of products.  Instead, the Bureau unreasonably looked only at the potential costs and benefits of regulating traditional prepaid accounts, relying almost entirely on evidence derived from studies of GPR card usage.[102]  That failure to carry out a congressionally-mandated task, by itself, requires setting aside the Rule.

107.    Moreover, properly evaluated, the limited benefits of imposing the onerous disclosure requirements and substantive restrictions of the Prepaid Rule on digital wallets are

---

[101]  12 U.S.C.§ 5512(b)(2).

[102]  *See* 81 Fed. Reg. at 84,272.

clearly outweighed by the costs incurred by customer confusion and the restriction of consumer choice.  Because most digital wallet users do not and will not ever use their digital wallet accounts in such a manner as to incur fees, the Rule's benefits to digital wallet customers are limited.  Moreover, the accounts consumers link to their digital wallets—including traditional banking accounts and credit card accounts—are already subject to disclosures under EFTA and TILA, further lessening the value of an additional layer of required disclosures.

108.    While the benefits of applying the Prepaid Rule to digital wallets are minimal, the costs are significant.  As PayPal's experience has shown, many customers are confused or misled and ultimately dismayed when confronted with the required short form disclosures, incorrectly believing that they will be charged fees for the usual payment and cash transfer features of their PayPal accounts or not understanding that fees will likely be lower than the amounts presented in short form disclosures.  The loss of both goodwill and enrollments caused by this customer confusion is detrimental to the use of digital wallets, and will deprive consumers of access to innovative, beneficial products.

109.    The 30-day ban on consumers' ability to link credit products offered by PayPal's business partners also imposes costs by making it more difficult for consumers to obtain the benefits of offerings from PayPal and its partner credit card issuers and by stifling innovation and partnerships that can result in expanded functionality and lower fees for consumers of digital wallets and credit products.

110.    Because the Bureau failed appropriately to consider the significant costs and the lack of benefits of requiring digital wallets to comply with the Prepaid Rule, the Rule is, under the APA, arbitrary and capricious and not the product of reasoned decision-making, as well as contrary to Congress's command in the Dodd-Frank Act.

## COUNT FIVE
### (U.S. Cont. amend. I; 5 U.S.C. § 706(2)(B); Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)

## THE RULE VIOLATES THE FIRST AMENDMENT BY REQUIRING PAYPAL TO DELIVER UNNECESSARY, IRRELEVANT, AND MISLEADING MESSAGES TO CONSUMERS

111.    Paragraphs 1 through 110 are incorporated by reference as if set forth fully herein.

112.    The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … contrary to constitutional right."[103]

113.    The Prepaid Rule violates the First Amendment because it requires PayPal to make a series of largely misleading and inapplicable disclosures to its customers that it would not otherwise make and that drown out the speech in which PayPal would prefer to engage.  The disclosures are misleading because the Rule requires use of exact or substantially similar terms in the short form to describe certain fee categories that were designed to address the fee structure for GPR cards rather than digital wallets and because clarifying statements about the nature of the fees are not permitted within the short form.  The disclosures are also misleading because the Rule requires mention of only the highest possible fee amounts under the worst-case scenario without permitting a description about how or when the fees can be lower.  As the Supreme Court has explained, regulations that "compel[] individuals to speak a particular message" constitute content-based speech restrictions because they "alter the content of [the individuals'] speech."[104]  Such restrictions "target speech based on its communicative content" and are

---

[103]  5 U.S.C. § 706(2)(B).

[104]  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quotation marks omitted).

"presumptively unconstitutional," justified "only if the government proves that [the restrictions] are narrowly tailored to serve compelling state interests."[105]

114.    The Bureau has plainly failed to meet that burden here.  Indeed, the Bureau recognized that many of the fees that it required PayPal to include in the short form disclosure shown to customers before they are permitted to acquire a prepaid account did not apply to digital wallets and might not apply for the foreseeable future (if ever).  The Bureau's guesswork hardly constitutes a compelling state interest.

115.    But even if a less stringent standard applies, the Bureau's Prepaid Rule still violates PayPal's First Amendment rights.  In *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), the Supreme Court permitted the government to mandate private commercial speech so long as the speaker was required only to provide "purely factual and uncontroversial information" and the government's disclosure requirements were "reasonably related" to its "interest in preventing deception of consumers" and not "unjustified or unduly burdensome."[106]

116.    The Bureau's Prepaid Rule—by requiring PayPal to "disclose" fees that are largely inapplicable to the vast swath of its digital wallet customers—is not "reasonably related" to its professed goal of providing consumers with information actually relevant to consumers choosing between prepaid account products.  Similarly, prohibiting clarifying disclosures regarding the nature and likely amount of fees in the short form is not "reasonably related" to a goal of ensuring that a well-informed consumer has the necessary information to comparison shop among like product offerings.

---

[105]  *Id.* (quotation marks omitted).

[106]  *Zauderer*, 471 U.S. at 650-651.

117.    The First Amendment violations caused by the Rule entitle PayPal to as-applied equitable relief against the enforcement of the Rule against the company.  An actual controversy exists between Defendants and PayPal over whether application of the Rule to PayPal's otherwise truthful, non-misleading speech violates the First Amendment.  PayPal faces actual and imminent threats to its First Amendment rights through the Rule's currently effective mandate that PayPal provide disclosures that confuse and mislead the public about the nature of PayPal's offerings.  PayPal is accordingly entitled to an injunction against enforcement of the Rule against it and to a declaration that the Rule's application to PayPal is unconstitutional.

## PRAYER FOR RELIEF

118.    WHEREFORE, Plaintiff prays that the Court grant the following relief:

a.      Declare the Rule arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law within the meaning of 5 U.S.C. § 706(2)(A), contrary to the constitutional right under 5 U.S.C. § 706(2)(B), and promulgated in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C);

b.      Vacate the Rule and enjoin the Bureau and all of its officers, employees, and agents from implementing, applying, or enforcing the Rule;

c.      Declare the Rule unconstitutional as applied to PayPal's constitutionally protected commercial speech, and enjoin Defendants from enforcing the Rule against PayPal's constitutionally protected commercial speech;

d.      Award PayPal its costs and reasonable attorney's fees as appropriate; and

e.      Grant such other relief as the Court deems necessary, just, and proper.

Dated:  December 11, 2019                    Respectfully submitted,

                                             */s/ Daniel P. Kearney*
                                             Daniel P. Kearney
                                             D.C. Bar No. 977148
                                             daniel.kearney@wilmerhale.com
                                             Kelly P. Dunbar
                                             D.C. Bar No. 500038
                                             Justin Baxenberg
                                             D.C. Bar No. 1034258
                                             (*D.D.C. Bar Admission Pending*)
                                             James D. Barton
                                             D.C. Bar No. 888283830

                                             WILMER CUTLER PICKERING HALE AND
                                             DORR LLP
                                             1875 Pennsylvania Avenue, NW
                                             Washington, DC 20006
                                             Tel.: (202) 663-6000
                                             Fax: (202) 663-6363

                                             *Counsel for Plaintiff PayPal. Inc.*