**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PAYPAL, INC.,

        Plaintiff,

    v.                                Case No. 1:19-CV-03700-RJL

CONSUMER FINANCIAL PROTECTION
BUREAU and KATHY KRANINGER, in her
official capacity as Director of the Consumer
Financial Protection Bureau,

        Defendants.

**COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 5

    A.   Statutory Background ............................................................................... 5

        1.  Electronic Fund Transfer Act ................................................................. 5

        2.  Truth In Lending Act ............................................................................. 6

        3.  Section 1032 of the Dodd-Frank Act ...................................................... 7

    B.   Prepaid Products ..................................................................................... 7

    C.   The Prepaid Rule ..................................................................................... 8

        1.  Regulation E Amendments ..................................................................... 9

            a.  Coverage of Prepaid Accounts .......................................................... 9

            b.  Disclosure Requirements ................................................................. 12

        2.  Regulation Z Amendments ................................................................... 15

STANDARD OF REVIEW ............................................................................................... 19

ARGUMENT ................................................................................................................... 21

I.   Both EFTA and section 1032 of the Dodd-Frank Act authorize the Rule's short-form disclosure requirements. ............................................................................. 21

    A.   EFTA authorizes the short-form disclosure requirements. ............................ 21

        1.  EFTA does not foreclose regulations standardizing the form of disclosures. ......... 22

        2.  The Bureau's decision to standardize the form of prepaid account disclosures is entitled to deference. .............................................................. 27

    B.   Section 1032 of the Dodd-Frank Act authorizes the short-form disclosure requirements ........................................................................................... 28

II.  Both TILA and section 1032 of the Dodd-Frank Act authorize the waiting period for linking certain credit to a prepaid account. ........................................................ 31

    A.   TILA authorizes the 30-day waiting period. .............................................. 31

        1.  Congress vested the Bureau with broad authority to prescribe rules under TILA ... 31

        2.  Congress did not preclude the Bureau from adopting a waiting period that the Bureau judged would promote informed and voluntary use of credit. .................. 33

3.  The Bureau reasonably determined that the waiting period was an appropriate "additional requirement" that would promote informed and voluntary use of credit. ................................................................................................ 37

B.   Section 1032 of the Dodd-Frank Act authorizes the 30-day waiting period. ................ 40

III.  The Rule is not arbitrary or capricious. .............................................................. 40

A.   The Rule reasonably treats digital wallets with asset accounts the same as other prepaid accounts.......................................................................................... 41

B.   The Rule reasonably applies the short-form disclosure requirements to digital wallets with asset accounts. ........................................................................... 46

C.   The Rule reasonably applies the 30-day waiting period to digital wallets with asset accounts in certain limited circumstances...................................................... 49

IV.  The Bureau appropriately considered the benefits and costs of the Rule........................ 51

V.   The short-form disclosure requirements do not violate the First Amendment................. 57

CONCLUSION..................................................................................... 60

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adirondack Med. Ctr. v. Sebelius*,
   740 F.3d 692 (D.C. Cir. 2014) ................................................................. 25, 35, 36

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
   760 F.3d 18 (2014) .................................................................................. 57, 58, 59

*Am. Petroleum Inst. v. EPA*,
   862 F.3d 50 (D.C. Cir. 2017) ................................................................................ 60

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) .............................................................................. 56

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ............................................................................ 44

*Anderson Bros. Ford v. Valencia*,
   452 U.S. 205 (1981) .............................................................................................. 33

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*,
   392 F. Supp. 3d 22 (D.D.C. 2019) ....................................................................... 23

*Associated Builders & Contractors, Inc. v. Shiu*,
   773 F.3d 257 (D.C. Cir. 2014) .............................................................................. 46

*Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*,
   75 F. Supp. 3d 83 (D.D.C. 2014) ......................................................................... 46

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003) .............................................................................................. 26

*Baystate Franklin Med. Ctr. v. Azar*,
   950 F.3d 84 (D.C. Cir. 2020) ............................................................................... 41

*Chem. Mfrs. Ass'n v. EPA*,
   673 F.2d 507 (D.C. Cir. 1982) ............................................................................. 30

*Chevron U.S.A. Inc. v. Echazabal*,
   536 U.S. 73 (2002) ............................................................................................... 25

*\*Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .................................... 20, 22, 27, 31, 33, 34, 37, 38, 40

iii

*Cigar Ass'n of Am. v. FDA,*
  315 F. Supp. 3d 143 (D.D.C. 2018) ............................................. 46, 56

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ............................................................. 20, 22

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ....................................................... 55

*Clark v. Bonded Adjustment Co.,*
  176 F. Supp. 2d 1062 (E.D. Wash. 2001) ............................................. 36

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
  466 F.3d 134 (D.C. Cir. 2006) ....................................................... 33

*Common Cause v. FEC,*
  842 F.2d 436 (D.C. Cir. 1988) ....................................................... 37

*Conn. Bar Ass'n v. United States,*
  620 F.3d 81 (2d Cir. 2010) ......................................................... 58

*Consumer Elecs. Ass'n v. FCC,*
  347 F.3d 291 (D.C. Cir. 2003) ....................................................... 52

*Consumer Fed'n of Am. v. Dep't of Health & Human Servs.,*
  83 F.3d 1497 (D.C. Cir. 1996) ....................................................... 28

*Council for Urological Interests v. Burwell,*
  790 F.3d 212 (D.C. Cir. 2015) ....................................................... 34

*C-SPAN v. FCC,*
  545 F.3d 1051 (D.C. Cir. 2008) ...................................................... 20

*CSX Transp., Inc. v. Surface Transp. Bd.,*
  754 F.3d 1056 (D.C. Cir. 2014) ...................................................... 25

*Ctr. for Auto Safety v. Fed. Highway Admin.,*
  956 F.2d 309 (D.C. Cir. 1992) ....................................................... 49

*Ctr. for Auto Safety v. Peck,*
  751 F.2d 1336 (D.C. Cir. 1985) ...................................................... 52

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
  563 F.3d 466 (D.C. Cir. 2009) ....................................................... 44

*Cuozzo Speed Techs., LLC v. Lee,*
  136 S. Ct. 2131 (2016) ............................................................................ 20

*Dep't of Commerce v. U.S. House of Representatives,*
  525 U.S. 316 (1999) ................................................................................ 36

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ........................................................................... 58, 59

*Edwards v. Aurora Loan Servs., LLC,*
  791 F. Supp. 2d 144 (D.D.C. 2011) ........................................................ 28

*Ford Motor Credit Co. v. Milhollin,*
  444 U.S. 555 (1980) ........................................................................... 32, 34

*Home Box Office, Inc. v. FCC,*
  567 F.2d 9 (D.C. Cir. 1977) ............................................................... 55, 56

*Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.,*
  240 F. Supp. 3d 206 (D.D.C. 2016) ................................................... 54, 55

*Int'l Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983) ................................................................ 43

*Mangum v. Action Collection Serv., Inc.,*
  575 F.3d 935 (9th Cir. 2009) .................................................................. 36

*MCI Telecomms. Corp. v. AT&T,*
  512 U.S. 218 ............................................................................................ 34

*Mexichem Specialty Resins, Inc. v. EPA,*
  787 F.3d 544 (D.C. Cir. 2015) ................................................................ 48

*Mobile Commc'ns Corp. of Am. v. FCC,*
  77 F.3d 1399 (D.C. Cir. 1996) ................................................................ 35

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................... 20, 41, 42, 43, 45, 47, 51, 52

*Mourning v. Family Publ'ns Serv., Inc.,*
  411 U.S. 356 (1973) ........................................ 31, 32, 33, 37, 39

*Nat'l Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) .............................................................. 52

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*,
   773 F. Supp. 2d 151 (D.D.C. 2011) ............................................................. 33

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) .................................................................................... 27

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) ................................................................................ 58

*Nat'l Mining Ass'n v. Kempthorne*,
   512 F.3d 702 (D.C. Cir. 2008) .................................................................... 26

*Nicopure Labs, LLC v. FDA*,
   266 F. Supp. 3d 360 (D.D.C. 2017) ............................................................. 53

*Northpoint Tech., Ltd. v. FCC*,
   412 F.3d 145 (D.C. Cir. 2005) .................................................................... 38

*Pub. Citizen, Inc. v. FAA*,
   988 F.2d 186 (D.C. Cir. 1993) .................................................................... 55

*Pub. Citizen, Inc. v. NHTSA*,
   374 F.3d 1251 (D.C. Cir. 2004) .................................................................. 48

*Ramaprakash v. FAA*,
   346 F.3d 1121 (D.C. Cir. 2003) .................................................................. 20

*Regions Hosp. v. Shalala*,
   522 U.S. 448 (1998) .............................................................................. 23, 26

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
   687 F.3d 403 (D.C. Cir. 2012) .................................................................... 58

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009) .................................................................... 48

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
   940 F.2d 685 (D.C. Cir. 1991) .................................................................... 35

*Transmission Access Policy Study Grp. v. FERC*,
   225 F.3d 667 (D.C. Cir. 2000) .................................................................... 40

*United States v. 1990 Toyota 4Runner*,
   9 F.3d 651 (7th Cir. 1993) .......................................................................... 37

*Vermont Pub. Serv. Bd. v. FCC,*
  661 F.3d 54 (D.C. Cir. 2011) ............................................................................ 55

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
  471 U.S. 626 (1985) ........................................................................................ 57

*Zepeda v. PayPal, Inc.,*
  2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) .................................................. 42

## **Statutes**

5 U.S.C. § 706(2)(A)-(C) ...................................................................................... 19

12 U.S.C. § 4304 .................................................................................................. 30

12 U.S.C. § 5481 .................................................................................................... 5

12 U.S.C. § 5481(5) .............................................................................................. 40

12 U.S.C. § 5481(12) .............................................................................................. 5

12 U.S.C. § 5481(14) .............................................................................................. 5

12 U.S.C. § 5481(15)(A)(i) .................................................................................... 40

12 U.S.C. § 5481(15)(A)(iv) ................................................................................... 40

12 U.S.C. § 5491(a) ................................................................................................ 5

12 U.S.C. § 5511(a) ................................................................................................ 5

12 U.S.C. § 5512(b)(2)(A) ................................................................................ 52, 53

12 U.S.C. § 5532(a) .................................................................................. 7, 28, 31, 40

12 U.S.C. § 5532(b)(1) .......................................................................................... 29

12 U.S.C. § 5532(d) .............................................................................................. 29

12 U.S.C. § 5532(e) .............................................................................................. 29

12 U.S.C. § 5581 .................................................................................................... 5

12 U.S.C. § 5581(b)(1) ............................................................................................ 5

15 U.S.C. § 1601 .................................................................................................... 6

15 U.S.C. § 1601(a) ..................................................................................... 6, 31, 37

15 U.S.C. § 1604(a) ................................................................................... 31, 32, 34

15 U.S.C. § 1631 .................................................................................................. 30

15 U.S.C. § 1632 .................................................................................................. 30

15 U.S.C. § 1637a ................................................................................................ 30

15 U.S.C. § 1637(*l*) ........................................................................................ 6, 35

15 U.S.C. § 1637(n) ........................................................................................ 6, 35

15 U.S.C. § 1638 .................................................................................................. 30

15 U.S.C. § 1639 .................................................................................................. 30

15 U.S.C. § 1642 ....................................................................................... 6, 35, 38

15 U.S.C. § 1665d ............................................................................................ 6, 35

15 U.S.C. § 1665e ................................................................................................ 35

15 U.S.C. § 1666i-2 ......................................................................................... 6, 35

15 U.S.C. § 1679c ................................................................................................ 30

15 U.S.C. § 1692g(a) ........................................................................................... 30

15 U.S.C. § 1693 ................................................................................................... 5

15 U.S.C. § 1693(b) ........................................................................................... 5, 6

15 U.S.C. § 1693a(4) ........................................................................................... 52

15 U.S.C. § 1693b .................................................................................................. 6

15 U.S.C. § 1693b(a) ..................................................................................... 27, 52

15 U.S.C. § 1693b(a)(1) ............................................................................ 21, 23, 24

15 U.S.C. § 1693b(b) ..................................................................................... 24, 28

15 U.S.C. § 1693b(c) ............................................................................................... 21

15 U.S.C. § 1693c ................................................................................................... 30

15 U.S.C. § 1693c(a) ............................................................................... 6, 21, 22, 24

15 U.S.C. § 1693c(b) ................................................................................................. 6

15 U.S.C. § 1693e(a) ................................................................................................. 6

15 U.S.C. § 1693g .................................................................................................... 6

15 U.S.C. § 1693m(d)(2) ................................................................................... 15, 24

## **Regulations**

12 C.F.R. § 1005.2(b)(3)(i) ...................................................................................... 10

12 C.F.R. § 1005.2(b)(3)(i)(D) ................................................................................. 10

12 C.F.R. § 1005.6 .................................................................................................... 9

12 C.F.R. § 1005.8(a) .............................................................................................. 10

12 C.F.R. § 1005.9(b) .............................................................................................. 10

12 C.F.R. § 1005.10(c) ............................................................................................ 10

12 C.F.R. § 1005.11 .................................................................................................. 9

12 C.F.R. § 1005.18(b)(1) ....................................................................................... 12

12 C.F.R. § 1005.18(b)(2) ....................................................................................... 13

12 C.F.R. § 1005.18(b)(2)(i)-(viii) .......................................................................... 14

12 C.F.R. § 1005.18(b)(2)(viii)-(ix) ................................................................... 13, 48

12 C.F.R. § 1005.18(b)(3) ....................................................................................... 14

12 C.F.R. § 1005.18(b)(6)(i)(A)-(C) ....................................................................... 47

12 C.F.R. § 1005.18(b)(6)(iii) ................................................................................. 13

12 C.F.R. § 1005.18(b)(6)(iii)(A) ............................................................................ 15

12 C.F.R. § 1005.18(b)(7)(i)(A) ............................................................................ 13

12 C.F.R. § 1005.18(b)(7)(ii)(B) ........................................................................... 14

12 C.F.R. § 1005.18(b)(7)(ii)(B)(*l*) ...................................................................... 13

12 C.F.R. § 1005.18(c) .......................................................................................... 10

12 C.F.R. § 1005.18(e) ............................................................................................ 9

12 C.F.R. pt. 1005, Appendix A-10(A)-(E) ......................................................... 15

12 C.F.R. pt. 1005, Supp. I, ¶ 2(b)(3)(i)-6 ............................................... 10, 43, 50

12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(2)-1 ............................................................ 13

12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(3)(i)-1 ................................................... 14, 60

12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(6)(i)(B)-2 ............................................. 15, 48

12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(7)(ii)-1 ...................................................... 14

12 C.F.R. § 1026.61(a) .......................................................................................... 16

12 C.F.R. § 1026.61(a)(2)(i)(A) ............................................................................ 17

12 C.F.R. § 1026.61(a)(5)(iii)(A)-(C) ................................................................... 19

12 C.F.R. § 1026.61(c) ..................................................................................... 16, 17

12 C.F.R. pt. 1026, Supp. I, ¶ 61(a)(1)-4.ii ........................................................ 18

## Other Authorities

*Policy to Encourage Trial Disclosure Programs,*
  78 Fed. Reg. 64389 (Oct. 29, 2013) .................................................................. 29

*Policy to Encourage Trial Disclosure Programs,*
  84 Fed. Reg. 48260 (Sept. 13, 2019) ................................................................. 29

Pub. L. No. 90-321 (1968) ....................................................................... 6, 32, 36

Pub. L. No. 95-630 (1978) ................................................................................ 5, 6

Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................................... 5, 6, 32

S. Rep. No. 95-1273 (1978) ............................................................................... 21, 27

124 Cong. Reg. 3913 (Feb. 21, 1978) ..................................................................... 26

124 Cong. Reg. S.8283 (daily ed. Mar. 23, 1978) .................................................... 26

## INTRODUCTION

Prepaid products in various forms are among the fastest-growing methods for American consumers to make payments, and they are used for billions of transactions annually.  Yet, for years, it was unclear what federal consumer protections applied to many of these products.  To address that regulatory uncertainty and ensure that consumers receive consistent protections, the Consumer Financial Protection Bureau undertook to establish clear rules of the road for this rapidly expanding market.  The end result was a rule entitled "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth In Lending Act (Regulation Z)" (Prepaid Rule or Rule), which took effect in April 2019.  81 Fed. Reg. 83934 (Nov. 22, 2016) (Admin. Record Vol. 1 ("AR1") 240); 83 Fed. Reg. 6364 (Feb. 13, 2018) (AR1 743).

The Rule generally extends to prepaid accounts the same protections—such as limits on consumers' liability for unauthorized transfers and certain rights in the event of account errors— that have long applied to other types of accounts, including checking and savings accounts and some limited types of prepaid products.  As a result of the Rule, consumers now receive clear and consistent protections when they use a wide range of prepaid products—whether a physical general-purpose reloadable (GPR) card bought in a store; a virtual GPR card or other prepaid account acquired online; a card supplied by a third party for disbursement of government benefits, wages, student loan funds, or insurance proceeds; or any other type of prepaid account.

The Prepaid Rule also covers some, but not all, digital wallets—namely, those that come with a prepaid account.  Some digital wallets simply act as a pass-through that allows consumers to store and use payment credentials for other accounts (like credit cards, debit cards, and bank accounts), but cannot store funds.  Those digital wallets are not covered by the Rule.  Other digital wallets, however, also contain their own asset accounts that, like other prepaid accounts,

allow consumers to load funds that can then be used in everyday financial transactions, such as making purchases in stores or online and transferring money to friends and family.  Digital wallets with this sort of prepaid asset account are covered by the Prepaid Rule—and the consumers who use them get the same protections that they get with other prepaid accounts.

In addition to extending Regulation E's preexisting protections to prepaid accounts, the Prepaid Rule also adopts a few requirements specially tailored to prepaid products, including the two provisions principally challenged in this case.  First, the Rule requires companies to give consumers an upfront "short-form" disclosure that provides a snapshot of key fees and other terms of the prepaid account in a standardized form designed to be easy for consumers to quickly review and understand.  And, second, the Rule adopts a 30-day waiting period for linking credit to a new prepaid account in certain limited circumstances—namely, where the Bureau determined that consumers would be able to make better-informed and more deliberate decisions if they had time to separately consider the prepaid account, the credit, and the consequences of linking the two.

Plaintiff PayPal, Inc., brings this suit to challenge the Rule under the Administrative Procedure Act (APA) and the First Amendment.  Its challenges distort the governing statutory framework, the Bureau's reasons for adopting the Rule, and the scope of the Rule itself, and the Court should reject them.

First, Congress delegated the Bureau broad authority to promulgate rules to ensure that consumers understand the terms and conditions of financial products so that they can make informed financial decisions.  The Bureau reasonably exercised this authority in adopting both the short-form disclosure requirements and the 30-day waiting period.  PayPal's claims to the

contrary misconstrue the relevant statutes—and ignore the deference owed the agency's reasonable interpretations under basic administrative law principles.

Second, the Rule also easily satisfies the APA's requirement for reasoned decisionmaking.  The Bureau explained why it declined to carve out digital wallets with asset accounts from the Rule's scope:  Consumers can use those accounts in the same way as other prepaid products—to store funds for use in a wide variety of transactions—so they should receive the same protections.

The Bureau also thoroughly explained the reasons behind the short-form disclosure requirements.  For instance, it explained that specific requirements for a clear and uniform disclosure, rather than more general guidelines that would allow disclosures' content and format to vary from product to product, would make disclosures easier to understand and more likely to be read.  It also explained that it was appropriate to require companies to use the same standardized short-form disclosure even when they do not charge certain fees or offer certain services:  Among other things, it is useful for consumers to know when a service is free or is not offered, and maintaining the same standardized form makes the disclosures more effective.

And it explained its reasons for applying the waiting period to digital wallets with asset accounts in the very limited circumstances covered by the Rule—and in fact undertook a separate rulemaking devoted in part to that very topic.  The waiting period applies only in narrow circumstances—most notably where linking a credit card to the prepaid account would cause terms of either account to vary—and the Bureau explained that, in such circumstances, the waiting period helps ensure that consumers can separately consider the terms of the credit and any changes that linkage would bring, rather than simply linking the credit to the prepaid account essentially by default.  All of those explanations fall comfortably within the bounds of

reasonableness.  While PayPal may not agree with the Bureau's policy judgments, Congress and the APA leave those judgments to the agency.

Third, the Bureau also thoroughly considered the benefits and costs of the Rule in compliance with its statutory obligations.  The preamble's discussion of the Rule's benefits and costs applies equally to the digital-wallet accounts covered by the Rule, and the Bureau also specifically considered how subjecting digital wallets with asset accounts to the same rules as other accounts would bring important benefits—like avoiding a patchwork regime that could leave consumers confused about their rights, giving digital wallet consumers the same protections as consumers of other similar accounts, and enabling digital wallet consumers to learn about account features and fees upfront.

Finally, the Rule's disclosure requirements are entirely consistent with the First Amendment.  It is well established that the First Amendment permits the government to require companies to disclose factual, non-controversial information about the products they are offering in the marketplace.  PayPal's suggestion that the Rule unconstitutionally restricts companies from providing consumers with "clarifying" information distorts the Rule's actual requirements. While companies cannot add detail to the short-form disclosure box itself (as that would risk information overload that would make the disclosure less effective), companies can provide additional information, including clarifying details about when certain fees may be lower or waived, anywhere else they wish, including immediately outside the disclosure box.  Nothing in the First Amendment bars disclosure regulations with that sort of modest restriction on where commercial information may be placed.

## BACKGROUND

### A.  Statutory Background

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) to, among other things, "protect consumers from abusive financial services practices."  Pub. L. No. 111-203, 124 Stat. 1376, 1376.  Title X of that law, known as the Consumer Financial Protection Act, 12 U.S.C. § 5481 *et seq.*, created the Consumer Financial Protection Bureau and gave it primary authority for "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." *Id.* § 5491(a).  Congress directed the Bureau to use this authority to ensure that markets for consumer financial products and services would be "fair, transparent, and competitive."  *Id.* § 5511(a).

The Act gave the Bureau various tools to accomplish its mandate.  For one, Congress transferred to the Bureau the authority to implement 18 preexisting consumer financial statutes, many of which provide for disclosures in addition to other consumer protections.  *Id.* §§ 5581, 5481(12), (14).  As most relevant here, those statutes include the Electronic Fund Transfer Act (EFTA) and the Truth In Lending Act (TILA).  *See id.* §§ 5581(b)(1), 5481(12), (14).

### 1.  *Electronic Fund Transfer Act*

Enacted in 1978, EFTA is designed to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems," with a "primary" objective of providing "individual consumer rights."  15 U.S.C. § 1693(b); *see also* Pub. L. No. 95-630 (1978).  The Act accordingly provides a broad suite of protections to consumers who make electronic fund transfers from their accounts.  *See generally* 15 U.S.C. § 1693 *et seq.*  For instance, EFTA requires financial institutions to disclose "the terms and

conditions of electronic fund transfers involving a consumer's account" and generally to provide advance notice of any disadvantageous change in those terms, *id.* § 1693c(a)-(b); limits consumers' liability for unauthorized transfers, *id.* § 1693g; and allows consumers to stop payment of preauthorized electronic transfers from their accounts, *id.* § 1693e(a).

EFTA initially gave the Board of Governors of the Federal Reserve System (Federal Reserve Board or Board) authority to promulgate rules implementing the Act.  Pub. L. No. 90-321, § 904, *as added by* Pub. L. No. 95-630, § 2001 (1978).  Pursuant to that authority, the Board issued so-called "Regulation E" in 1979, which it amended several times over the years.  *See* 81 Fed. Reg. 83946 (AR1 252).  The Dodd-Frank Act transferred most of the authority to implement EFTA to the Bureau in 2011, and the authority to issue rules under EFTA is now primarily vested in the Bureau.  Pub. L. No. 111-203, §§ 1061(b)(1), 1084(3); *see also* 15 U.S.C. § 1693b.

### 2. *Truth In Lending Act*

The Dodd-Frank Act also transferred from the Federal Reserve Board to the Bureau the authority to issue rules implementing TILA, 15 U.S.C. § 1601 *et seq.*  Pub. L. No. 111-203, §§ 1061(b)(1), 1100A(2).  Congress enacted TILA in 1968 to promote the "informed use of credit" by "assur[ing] a meaningful disclosure of credit terms."  Pub. L. No. 90-321, § 102 (1968), *codified at* 15 U.S.C. § 1601(a).  As originally enacted, TILA focused exclusively on requirements for disclosures and credit advertisements.  *See generally id.* §§ 101-145.  But Congress has amended the Act many times over the years, including to provide a host of substantive protections against "unfair … credit card practices," 15 U.S.C. § 1601(a), such as limits on interest-rate increases and various fees, *id.* §§ 1637(*l*), (n), 1665d, 1666i-2, and a prohibition on issuing credit cards to consumers who have not requested them, *id.* § 1642.

### 3. *Section 1032 of the Dodd-Frank Act*

In the Dodd-Frank Act, Congress also granted the Bureau new authority to ensure effective disclosures about consumer financial products and services.  Specifically, section 1032 of the Act authorizes the Bureau to adopt rules "to ensure that the features of any consumer financial product or service … are fully, accurately, and effectively disclosed to consumers" so that consumers can "understand the costs, benefits, and risks associated with the product or service."  12 U.S.C. § 5532(a).

### B. Prepaid Products

Prepaid products—financial products that allow a consumer to load funds for later use in making purchases and conducting other transactions—have been one of the fastest expanding types of payment instruments in the United States.  AR1 3070.  Those products take various forms.  One of the most prevalent types is the general-purpose reloadable (GPR) card.  Consumers can buy GPR cards at a retail store, over the phone, or online; load (and reload) them with funds; and then use them to access the stored funds at ATMs and to make in-person and online purchases.  81 Fed. Reg. at 83936-37 (AR1 242-43).  The label GPR "card" is something of a misnomer, as GPR cards need not actually involve a physical card and can instead be electronic only.  *Id.* at 83936 (AR1 242).  Consumers can use a smartphone application or other similar means to use such "virtual GPR cards" to conduct transactions online or in stores.  *Id.*

Other prepaid products include those used by third parties to distribute funds to consumers, such as cards used for payroll, student loan disbursements, insurance proceeds, and certain government benefits.  *Id.*

Prepaid products also include some—but not all—digital wallets.  *Id.* at 83943 (AR1 249).  In its most basic form, a digital wallet is not a prepaid product.  Rather, such a digital

wallet allows consumers to digitally store payment credentials for different accounts (such as debit cards, credit cards, and checking accounts) that consumers can then access through a website or mobile application to make purchases online or in stores, to pay bills, and to transfer and receive money. *Id.* Some digital wallets, however, also come with a prepaid asset account that, like GPR cards and other prepaid products, allows consumers to load and store funds and then access the funds to make online and in-store purchases and engage in other transactions. *Id.*

Regulation E (the rule implementing EFTA) has covered payroll cards and certain government benefit prepaid products for many years. *Id.* at 83936 (AR1 242). But, before the Bureau's Prepaid Rule, it was less clear what rules applied to GPR cards and other prepaid products like digital wallets with asset accounts. *Id.*

## C. The Prepaid Rule

Shortly after assuming its authorities under the federal consumer financial laws, the Bureau began considering how to resolve this regulatory uncertainty for the fast-growing prepaid market. The Bureau issued, and considered comments responding to, an advance notice of proposed rulemaking; met with industry, consumer groups, and advocacy organizations; undertook market research and monitoring; conducted focus groups and consumer testing of sample disclosures; and studied 325 publicly available prepaid account agreements, including agreements for digital wallets with asset accounts. 81 Fed. Reg. at 83954, 83956 (AR1 260, 262).

Based on those activities, the Bureau proposed, and in November 2016 finalized, a rule to govern prepaid accounts—titled "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth In Lending Act (Regulation Z)." 81 Fed. Reg. 83934 (Nov. 22, 2016) (2016 Rule) (AR1 240). In January 2018, before the Rule took effect, the Bureau issued

another final rule modifying several aspects of the original rule.  83 Fed. Reg. 6364 (Feb. 13,

2018) (2018 Rule) (AR1 743).  After that rule and an earlier one delayed the effective date to

give industry more time to come into compliance, the Rule took effect on April 1, 2019.  *Id.*; 82

Fed. Reg. 18975 (Apr. 25, 2017) (AR1 698).  This brief refers to the 2016 Rule, as amended by

the 2018 Rule, as the "Prepaid Rule" or the "Rule."

Broadly speaking, the Rule contains two separate components: (1) amendments to

Regulation E, which implements EFTA, and (2) amendments to Regulation Z, which implements

TILA.  The Regulation E amendments generally govern prepaid accounts as such, while the

Regulation Z amendments govern certain types of credit linked to prepaid accounts.

### 1. Regulation E Amendments

The Prepaid Rule's amendments to Regulation E generally extend the regulation's

preexisting protections to prepaid accounts and also create a few specific requirements just for

those types of accounts—including, as most relevant in this case, tailored requirements to

disclose a prepaid account's key fees and other terms before the consumer acquires the account.

#### a. Coverage of Prepaid Accounts

First and foremost, the 2016 Rule amended Regulation E's definition of "account" to

specifically include "prepaid account[s]."  81 Fed. Reg. at 83965 (AR1 271).  By including

prepaid accounts within that definition, the Rule eliminated the previous uncertainty about

whether and when Regulation E's protections applied to these types of accounts.  Now, they

unambiguously do.  So, for example, just like with other asset accounts, consumers generally

now face only limited liability for unauthorized transfers from their prepaid accounts, 12 C.F.R.

§§ 1005.6, 1005.18(e); get various protections in the case of errors, *id.* §§ 1005.11, 1005.18(e);

and have the right to get the financial institution to stop a preauthorized electronic fund transfer

from the consumer's prepaid account, *id.* § 1005.10(c), the right to advance notice about certain changes in account terms, *id.* § 1005.8(a), and the right to receive up-to-date information about their prepaid account's transactions and balance, *id.* §§ 1005.9(b), 1005.18(c).

The Rule sets forth a comprehensive definition of the "prepaid account[s]" now covered by Regulation E.  *Id.* § 1005.2(b)(3)(i).  Among other things, the definition generally includes accounts that are "issued on a prepaid basis" or are "capable of being loaded with funds" after issuance "[w]hose primary function is to conduct transactions with multiple, unaffiliated merchants for goods or services, or at automated teller machines, or to conduct person-to-person transfers."  *Id.* § 1005.2(b)(3)(i)(D).  This definition captures a broad range of accounts that can be loaded with funds and used for transactions—including GPR cards, payroll card accounts, government benefit accounts, certain non-reloadable accounts, student loan disbursement cards, prison release cards, and some digital wallets.  *See id.*

Under the Rule, not all digital wallets are covered.  The Rule's official interpretations, adopted along with the Rule, make this abundantly clear:  To qualify as a "prepaid account," the product "must be capable of holding funds, rather than merely acting as a pass-through vehicle." 12 C.F.R. pt. 1005, Supp. I, ¶ 2(b)(3)(i)-6.  So, as the official interpretations specifically explain, a digital wallet that only stores credentials for a consumer's other accounts and that cannot itself store funds is not a prepaid account.  *Id.*  Rather, a digital wallet is a "prepaid account" subject to the Rule if—and only if—it can itself store funds that consumers can then use to engage in transactions.  *Id.*

So, for example, if a provider offers a digital wallet that only acts as a pass-through for other linked accounts and a distinct asset account that the consumer may opt to add to the

10

wallet—as PayPal currently does[1]—only the distinct asset account is subject to the Rule.  The digital wallet itself is not.  By contrast, if a provider offers a digital wallet product that bundles an asset account with the digital wallet's pass-through capabilities—such that a consumer automatically gets an asset account whenever she signs up for the product—that digital wallet is covered by the Rule because, in that scenario, the asset account and the pass-through feature are combined in a single, inseparable product.  But it is the presence of that asset account, not the digital wallet's pass-through functionality, that brings the digital wallet within the Rule's scope.

Some commenters on the proposed rule urged the Bureau to narrow the Rule's scope to exempt digital wallets altogether.  *E.g.*, Admin. Record Vol. 2 ("AR2") 5867, 5489-90.  Other commenters disagreed, arguing that broad coverage was important to prevent evasion.  *E.g.*, AR2 5548, 7665.

After considering these comments, the Bureau declined to narrow the Rule's scope, not least because carving out certain specific types of products would both create substantial complexity as well as potentially confuse consumers about what protections apply to similar products.  81 Fed. Reg. at 83966, 83971 (AR1 272, 277).  And when a digital wallet not only acts as a pass-through for other accounts but also comes with its own asset account that can store funds, that digital wallet operates just like other prepaid accounts:  A consumer can load (and reload) funds into the account and use those funds to make purchases from a wide variety of merchants and to conduct person-to-person transfers.  *Id.* at 83972 (AR1 278).  Given these

---

[1]    *See* PayPal User Agreement, *available at* https://www.paypal.com/us/webapps/mpp/ua/ useragreement-full (last visited July 6, 2020) (describing "personal PayPal account," a digital wallet that stores payment credentials, and "Cash Account," a separate asset account that can be added to the wallet); *see also* PayPal Cash and PayPal Cash Plus Terms and Conditions, *available at* https://www.paypal.com/us/webapps/mpp/ua/cashagreement-full (last visited July 6, 2020).

similarities, the Bureau concluded that consumers using digital-wallet asset accounts should get the same protections as consumers who use other types of prepaid accounts.  *Id.*  For example, just like other accounts, an asset account tied to a digital wallet could fall victim to erroneous or fraudulent transactions—so consumers holding those accounts should benefit from Regulation E's error-resolution and limited-liability protections, too.  *Id.*  Likewise, the Bureau made the policy judgment that those digital wallet consumers should get the same opportunity as consumers of other prepaid products to learn about the product's fees (or lack thereof) upfront, even though most digital wallets did not charge many fees at the time.  *Id.*

      *b.  Disclosure Requirements*

As relevant in this case, the Rule also adopted new disclosure requirements for prepaid accounts.  The Rule generally requires that financial institutions provide consumers both a "short form" and "long form" disclosure before the consumer acquires a prepaid account.  12 C.F.R. § 1005.18(b)(1).  The two disclosures are designed to work together:  The short form provides a snapshot of key fees and information in a standardized format that lends itself to quick review and comparison-shopping, while the companion long-form disclosure provides comprehensive information about all the fees and features of the account.  81 Fed. Reg. at 84007-08 (AR1 313-14).  PayPal challenges only the short-form disclosure.  *See* PayPal's Mem. in Supp. of Mot. for Summ. J. ("Mem.") at 13-14 (ECF No. 19-1).

The Rule's disclosure requirements aim to ensure that consumers get the information they need to make informed decisions about what products are best for them.  In crafting those requirements, the Bureau recognized that even the most complete and accurate disclosures will not serve this goal unless consumers actually read and understand them.  And, of course, a standardized format can make reviewing a disclosure more straightforward.  81 Fed. Reg. at

84013 (AR1 319). So, the Bureau developed and continually refined different prototype forms, and it conducted multiple rounds of consumer testing that studied consumers' engagement with, and comprehension of, those forms. *Id.* at 83954 (AR1 260); AR1 860-997. Based on that testing, the Bureau developed a short-form disclosure that would provide accurate and useful information in a form that consumers are likely to read and understand. *See, e.g.*, 81 Fed. Reg. at 84013-14, 84276, 84278 (AR1 319-20, 582, 584).

The Rule requires companies to follow specific content and formatting requirements designed to ensure that the short-form disclosures appear in the standardized form proven effective in the Bureau's testing. More specifically, under the Rule, fees must be displayed in a table. 12 C.F.R. § 1005.18(b)(6)(iii). The top "static" section of the table sets forth the seven fees most common for prepaid accounts, with four fees—any periodic fee, per purchase fee, ATM withdrawal fees, and cash reload fees—featured more prominently by appearing on the top line in bolded, slightly larger font. *Id.* § 1005.18(b)(2), (b)(7)(i)(A), (b)(7)(ii)(B)(*1*). To maintain the standardization that makes it easier for consumers to quickly read and understand the disclosures, these entries must appear on the short-form disclosure even if the particular account does not offer the particular service or does not charge for it. 12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(2)-1; 81 Fed. Reg. at 84025 (AR1 331).

Below this, the short form has a "dynamic" section that must disclose how many other types of fees the account charges and list the two that generate the most revenue from consumers (if they exceed a de minimis threshold). 12 C.F.R. § 1005.18(b)(2)(viii)-(ix). As the Bureau explained, this part of the disclosure is particularly important for products with different fee structures, such as digital-wallet asset accounts, which at the time the Rule was adopted

generally did not charge the fees reflected in the short form's "static" top portion.  81 Fed. Reg. at 84041 (AR1 347).

To keep the short form simple, the Rule provides guidelines for clear and concise phrasing designed to be easy for consumers to understand.  *See, e.g.*, 12 C.F.R. § 1005.18(b)(2)(i)-(viii).  The Rule also limits footnotes and caveats within the short form.  This is particularly relevant where a fee could be waived or otherwise vary.  In those instances, the Rule generally requires disclosure of the highest fee that could be charged, followed by an asterisk or other symbol linked to a statement that "This fee can be lower depending on how and where this card is used," or something substantially similar.  *Id.* § 1005.18(b)(3).  The short-form disclosure itself generally cannot describe the specific conditions under which the fee may be lower or waived, but the financial institution can provide those details anywhere else it wants, including immediately outside the short-form disclosure box or elsewhere on the same webpage, mobile screen, or packaging.  *See* 12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(3)(i)-1; *see also* 81 Fed. Reg. at 84064 (AR1 370).

In crafting the short form's standardized format, the Bureau recognized that consumers acquire prepaid accounts in many different ways, including in stores, online, and by phone—and designed the disclosure regime to be adaptable to all these contexts.  81 Fed. Reg. at 84008 (AR1 314).  For instance, the Rule prescribes minimum font sizes to avoid small print—and specifies them in terms of a "point" size for printed disclosures and "pixels" for online.  *Id.* at 84085 (AR1 391); 12 C.F.R. § 1005.18(b)(7)(ii)(B).  Those minimum font sizes were set to accommodate the limited space on "J-hook" packages for prepaid accounts sold in stores, but the Rule also permits providers to use larger font if space permits, like with an online disclosure.  81 Fed. Reg. at 84085 (AR1 391); 12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(7)(ii)-1.  It also explains how to provide

14

disclosures when space is even more tight, like on a mobile phone screen.  12 C.F.R. pt. 1005,

Supp. I, ¶ 18(b)(6)(i)(B)-2.

The Rule includes several model short-form disclosures to help institutions comply.  *See*

81 Fed. Reg. at 84340-44 (AR1 646-50); 12 C.F.R. pt. 1005, Appendix A-10(A)-(E).  As an

example, one such model form looks like this:



To ensure that consumers will reap the benefits of the short form's carefully crafted and tested

design, the Rule requires that disclosures be in a form "substantially similar" to the relevant

model.  12 C.F.R. § 1005.18(b)(6)(iii)(A).  If an institution appropriately uses a model form, it

enjoys a safe harbor from liability.  15 U.S.C. § 1693m(d)(2).

### 2.  *Regulation Z Amendments*

The Prepaid Rule also amended the regulation implementing TILA, known as Regulation

Z, to establish rules for certain credit offered in conjunction with prepaid accounts.  At a high

level, the Rule's amendments to Regulation Z were designed to ensure that, in appropriate

circumstances, the same credit card rules would apply when consumers drew on open-end credit

using a prepaid card as when they drew on such credit by using an ordinary credit card.  The

Rule also imposes a few new requirements for what the regulation terms "hybrid prepaid-credit

cards"—any device (such as a physical card or a non-physical device such as an account number

or mobile application) that can access both a prepaid account and certain types of credit in the

course of transactions to obtain goods, services, or cash, or to conduct person-to-person transfers.

12 C.F.R. § 1026.61(a).

As most relevant to PayPal's claims, one such new provision requires card issuers, in

certain limited circumstances, to wait 30 days after a prepaid account has been registered before

linking certain credit to that account.  In particular, in the narrow circumstances in which the

provision applies, a card issuer must wait 30 days to open a "covered separate credit feature" that

could be accessed by the prepaid card, to make a solicitation or provide an application for such

credit, or to allow certain credit that the consumer already has to become accessible by the

prepaid card.  *Id.* § 1026.61(c).  Recognizing that consumers confront a lot of information when

obtaining and registering a prepaid account, the Bureau adopted this waiting period to separate

the decision to obtain the prepaid account from the decision to link certain credit to it so that the

consumer could better focus on the terms of the credit, the terms of the prepaid account, and the

consequences of linking the two.  81 Fed. Reg. at 84268 (AR1 574).  The Bureau determined that

a 30-day waiting period—as opposed to a 90-day period as some commenters had suggested

(*e.g.*, AR2 5024, 7614)—struck the appropriate balance between enabling consumers to make a

deliberate and informed decision and not unduly restricting consumers who wanted to link credit

covered by the waiting period.  81 Fed. Reg. at 84267 (AR1 573).

This 30-day waiting period applies only in very limited circumstances, however—and will delay a consumer in linking a credit card to a digital wallet only in the rarest of cases. This is because the waiting period applies only to "covered separate credit features"—*i.e.*, separate credit that both (1) can be accessed by the prepaid card in the course of buying goods or services, withdrawing cash, or making person-to-person transfers, and (2) is offered by a party related to the prepaid account issuer—namely, the issuer itself, its affiliate, or its "business partner." *See* 12 C.F.R. § 1026.61(c), (a)(2)(i)(A); 81 Fed. Reg. at 84161, 84244 (AR1 467, 550).

After the 2016 Rule was issued, PayPal expressed concerns about how the 30-day waiting period would apply to digital wallets. AR1 5949-50. In particular, PayPal pointed out that requiring consumers who get a digital wallet that comes with an asset account (and that therefore qualifies as a "prepaid account" subject to the Rule) to wait 30 days to link some credit cards but not others could cause confusion and reduce consumer choice. AR1 5950. PayPal accordingly urged the Bureau to narrow the circumstances in which credit offered by "business partners" would trigger the waiting period. AR1 5951-52.

In response, the Bureau delayed the Rule's effective date to enable it to address these concerns and then released a notice of proposed rulemaking to address this issue (and others) in June 2017. 82 Fed. Reg. 18975 (Apr. 25, 2017) (AR1 698); 82 Fed. Reg. 29630 (June 29, 2017) (AR1 705). In that notice, the Bureau proposed to further narrow the circumstances in which the 30-day waiting period (and other provisions governing covered separate credit features) would apply. In particular, the Bureau proposed to narrow the "business partner" definition to exempt credit for which five conditions were met—namely, where the credit can be accessed through a traditional credit card (which means that Regulation Z's credit card rules already apply to the credit in its own right) (prong 1); the consumer provides separate written authorization to link the

credit to the prepaid card and is not required to link the two (prongs 2 and 3); and linking the accounts does not cause certain terms or other characteristics to vary for either the prepaid account or the credit (prongs 4 and 5).  82 Fed. Reg. at 29649, 29654 (AR1 724, 729).

In its comment on that proposal, PayPal objected only to the fourth and fifth conditions— that, to qualify for the exemption, account terms and other characteristics not vary based on whether the credit and prepaid accounts are linked.  AR2 10516, 10520-21.  It did not take issue with any other prongs of the proposed exemption, nor did any other digital wallet provider.

The Bureau finalized its proposal (with certain revisions not relevant here) in February 2018.  83 Fed. Reg. 6364 (AR1 743).  The Bureau declined to remove the condition that, to qualify for the exemption, providers not vary the terms of the prepaid or credit card account based on whether the accounts are linked.  The Bureau explained that when costs or other terms vary based on whether the accounts are linked, the decision to link becomes more complex and potentially susceptible to undue pressure.  *Id.* at 6397 (AR1 776).  Thus, separating the decision to open a prepaid account from the decision to link credit would, in these circumstances, help make account terms more transparent and ensure that any decision to link accounts reflected the consumer's deliberate choice.  *Id.* at 6414 (AR1 793).

The upshot is this:  Under the current Rule, a consumer must wait 30 days before linking a traditional credit card to a digital wallet only in extremely limited circumstances.  At the threshold, the waiting period never applies to a digital wallet that does not have its own asset account (*i.e.*, that cannot itself store funds), because such a digital wallet is not subject to the Rule at all.  *See* 12 C.F.R. pt. 1026, Supp. I, ¶ 61(a)(1)-4.ii.  So, if a provider offers a digital wallet and an asset account as two separate products (as PayPal does now[2]), 30 days must pass

---

[2]   *See supra* p. 11 note 1.

before credit can be linked to the separate asset account, but the Rule never imposes a waiting period for linking credit—any credit—to the digital wallet.

Where a provider instead offers a digital wallet that comes with an asset account (thus making the digital wallet a "prepaid account" subject to the Rule), the waiting period sometimes applies—but even then, only in two circumstances.  First, the waiting period applies where the prepaid account and the credit card are issued by the same financial institution or affiliates.  This situation arises in the digital wallet context only rarely, if ever, and PayPal did not object to this condition in any of its comments or other feedback.  *See generally* AR1 5949-69; AR2 10334-43, 10515-23, 10616-17.  Second, the waiting period applies to a consumer wanting to link a traditional credit card where the prepaid account issuer and credit card issuer have a business arrangement with each other[3] and vary certain costs or other characteristics of either account based on whether the accounts are linked.[4]

### STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), the court may set aside a rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C.

---

[3]    Issuers have a business "arrangement" under the Rule if they have an agreement that allows the prepaid card to draw on the credit in the course of conducting transactions or if they agree to market their products to each other's customers.  12 C.F.R. § 1026.61(a)(5)(iii)(A)-(C).

[4]    Technically, the waiting period would also apply if the prepaid account issuer or credit card issuer did not obtain the consumer's separate written authorization for the linkage or if either issuer required the prepaid card and the credit to be linked.  But, as the lack of comments taking issue with these requirements shows, these conditions are not particularly relevant in the digital wallet context.  By design, consumers always provide separate written authorization to link credit cards to their digital wallets, and digital wallets are meant to allow consumers to add payment credentials as they wish, not to force consumers to link any particular accounts.

§ 706(2)(A)-(C).  A court's "review under the APA is highly deferential."  *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

When evaluating a claim that a regulation exceeds an agency's statutory authority, courts must apply the framework set forth in *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984).  Under that framework, a court first asks "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  If it has, the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  But if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  In making this assessment, a court asks only whether the agency's construction represents "a reasonable policy choice for the agency to make"; it "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."  *Id.* at 844-45. This framework applies equally to an agency's interpretation of the "scope of [its] statutory authority."  *City of Arlington v. FCC*, 569 U.S. 290, 296-97, 300 (2013); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) ("We interpret Congress' grant of rulemaking authority in light of our decision in *Chevron*.").

A claim that a regulation is arbitrary and capricious is likewise subject to a deferential standard of review, under which a court may not "substitute its judgment for that of the agency" and instead must uphold the agency's action so long as it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A challenge to a rule's constitutionality is reviewed de novo.  *C-SPAN v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008).

20

## ARGUMENT

**I.  Both EFTA and section 1032 of the Dodd-Frank Act authorize the Rule's short-form disclosure requirements.**

EFTA and section 1032 of the Dodd-Frank Act each independently authorized the Bureau to adopt the short-form disclosure requirements that PayPal challenges.

### A.  EFTA authorizes the short-form disclosure requirements.

EFTA provides various protections for consumers who use electronic fund transfer (EFT) services, including a requirement that financial institutions disclose the terms and conditions of EFTs involving a consumer's account, "in accordance with regulations of the Bureau."  15 U.S.C. § 1693c(a).  That provision further requires those disclosures to be in "readily understandable language" and to include certain specified information "to the extent applicable," but otherwise leaves the details to the "regulations of the Bureau."  *Id.*  The statute also more generally delegates broad authority to the Bureau to "prescribe rules to carry out the purposes of" EFTA.  *Id.* § 1693b(a)(1).

Congress regarded this rulemaking authority as "essential to the act's effectiveness."  S. Rep. No. 95-1273, at 26 (1978).  As a Senate Report explained, regulations would "add flexibility to the act" by empowering the responsible agency "to modify the act's requirements to suit the characteristics of individual EFT services" and to "keep pace with new services" that emerge.  *Id.*  To ensure that the responsible agency (originally the Federal Reserve Board, now the Bureau) would have this important flexibility, Congress further specified that regulations under the Act "may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions" that the agency judges to be "necessary or proper" to "effectuate the purposes" of EFTA, to "prevent circumvention or evasion," or to "facilitate compliance."  15 U.S.C. § 1693b(c).

21

The Bureau acted well within its authority under these provisions when it adopted the Rule's short-form disclosure requirements.  PayPal claims that the Bureau exceeded its authority by regulating the form, not just the content, of these disclosures.  Mem. at 20-27.  But *Chevron*'s familiar framework applies to the Bureau's interpretation of the "scope of [its] statutory authority," *City of Arlington*, 569 U.S. at 296-97, 300, so PayPal can prevail on this claim only if it can show either that Congress "unambiguously expressed [its] intent" to bar regulations governing disclosures' form or that the Bureau's conclusion that the statute permitted such regulations did not represent a "reasonable policy choice," *Chevron*, 467 U.S. at 842-43, 845.  It cannot make either showing.  Nothing in the Act forecloses the Bureau from prescribing rules regarding a disclosure's form.  And the Bureau made a reasonable policy choice in concluding that rules standardizing the form of short-form disclosures for prepaid accounts would make those disclosures more effective.  It is therefore entitled to deference.

### 1. *EFTA does not foreclose regulations standardizing the form of disclosures.*

Nothing in EFTA even suggests—let alone "unambiguously" shows—that Congress intended to foreclose regulations that standardize the form that disclosures must take.  The statute says nothing on the topic.  It does not bar regulations regarding the form of disclosures or limit the Bureau's rulemaking authority to regulations "regarding the content" of disclosures, nor does it provide that financial institutions are entitled to provide disclosures in whatever form they wish.  Instead, the Act provides that the terms and conditions of EFTs involving a consumer's account "shall be disclosed … in accordance with regulations of the Bureau."  15 U.S.C. § 1693c(a).  By its plain terms, this provision grants the Bureau authority to fill in the details of how disclosures must be made—whether those details relate to disclosures' content, form, or

both.  And even beyond that, EFTA more generally vests the Bureau with broad authority to prescribe rules to "carry out the purposes" of the Act.  *Id.* § 1693b(a)(1).

PayPal nonetheless contends that the statute in fact "unambiguously" precludes the Bureau from prescribing the form that disclosures must take.  Mem. at 20.  Its contentions do not hold water.

a. At the outset, PayPal badly errs in suggesting (Mem. at 20-21) that the fact that the statute does not itself "prescribe the *form* that … disclosures must take" implies that Congress must have intended to give financial institutions "flexibility" on the form of their disclosures—and thus must have meant to bar the Bureau from prescribing regulations governing disclosures' form.  That simply does not follow.  Congress's silence is just that—silence.  And even if PayPal's interpretation of Congress's silence were "plausible," it is certainly not the "only possible interpretation."  *See Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998).  Indeed, the far more plausible explanation is that Congress thought that prescribing requirements regarding disclosures' form was a task better suited for the administrative agency that could bring its expertise and research capacity to bear in determining whether and when form requirements would be useful and, if so, what those requirements should be.  PayPal therefore cannot show at *Chevron* step one that Congress's silence on the form of disclosures unambiguously reflects any intent to foreclose the Bureau from adopting form requirements that would further the statute's purposes.  *See Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*, 392 F. Supp. 3d 22, 39-40 (D.D.C. 2019) (Leon, J.) ("[T]o resolve this case at *Chevron* step one, I would have to find that plaintiffs' view is not just plausible, but rather that it is the only possible interpretation." (internal quotations omitted)).

b. Nor does the statute's provision regarding "optional" model clauses demonstrate such an intent. *Contra* Mem. at 20-22. That provision requires the Bureau to "issue model clauses for optional use by financial institutions." 15 U.S.C. § 1693b(b). The statute further specifies that those model clauses should be designed "to facilitate compliance" with the Act's disclosure requirements and "to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." *Id.* Using such a "model clause" provides a safe harbor from liability: If a financial institution uses the model, it will not be held liable for "failure to make disclosure in proper form." *Id.* § 1693m(d)(2).

Contrary to PayPal's claim, the direction for the Bureau to adopt "optional" model clauses was not meant to preserve financial institutions' discretion to make disclosures in their own way even if the Bureau determined that a standardized format would make disclosures more effective. Rather, with that provision, Congress ensured that even if the agency left open ambiguities about how information should be disclosed, financial institutions would still have a surefire way of complying: If they used the model, they would not be held liable. *See id.* For example, if a regulation required "clear and conspicuous" disclosure of certain terms (without detailing precisely how to disclose them), an institution could use the model form and rest assured that it would not face liability if a court later determined that a term it disclosed was not sufficiently "conspicuous." In other words, PayPal is right that the model-clause provision reflects a "careful compromise." Mem. at 21 (quotations omitted). But that compromise was to generally give the Bureau discretion to determine how detailed disclosure requirements should be, 15 U.S.C. §§ 1693b(a)(1), 1693c(a), while at the same time requiring it to issue model

clauses that would protect financial institutions from the uncertainty that might otherwise arise if the Bureau's regulations left details unspecified.

To support its contrary interpretation, PayPal reads the instruction that the Bureau "shall issue" optional model clauses to mean that the Bureau "shall not" issue mandatory ones or even adopt requirements governing the form that disclosures must take. *See* Mem. at 20-21, 26. But as the D.C. Circuit pointed out in an analogous context, this argument "rests on a logical fallacy." *CSX Transp., Inc. v. Surface Transp. Bd.*, 754 F.3d 1056, 1063 (D.C. Cir. 2014) (rejecting argument that by requiring agency to use simplified method for reviewing railroad rates in certain cases, Congress precluded agency from using simplified method in other cases). The "fact that the [agency] *must*" do something (here, adopt optional model clauses to provide industry a guaranteed means of compliance) does not imply "that it *must not*" do something else (adopt mandatory disclosure requirements that make disclosures more effective by specifying their form). *Id.* at 1064 (emphases in original). Rather, "the statute represents a floor, not a ceiling for the [agency's] discretion." *Id.* Here, "Congress required the [Bureau], at a minimum," to adopt model clauses that financial institutions could use at their option to protect themselves from liability; "nothing in that requirement circumscribed the [agency's] discretion" to require disclosures to take a particular form. *Id.*

At bottom, PayPal's argument rests on the interpretative canon *expressio unius est exclusion alterius*, or "expressing one item of an associated group or series" (optional model clauses) "excludes another left unmentioned" (mandatory requirements for a disclosure's form). *See, e.g.*, *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (quotations and alteration omitted). But that canon is a "feeble helper" in the administrative law context, *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014), and even at full force applies only if "it is

fair to suppose that Congress considered the unnamed possibility and meant to say no to it,"
*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).  For the reasons explained above, it is
not "fair to suppose" that by requiring optional model forms that would always give financial
institutions a guaranteed way to comply, Congress meant to bar the Bureau from adopting
detailed requirements for the form of disclosures if it determined that such rules would make the
disclosures more effective.[5]  And even if it were "plausible" to read the statute as circumscribing
the agency's authority in that way, that is certainly not the "only possible interpretation"—so
PayPal cannot show that Congress unambiguously barred the Bureau from adopting mandatory
requirements for disclosures' form.  *See Regions Hosp.*, 522 U.S. at 460.

c. Apparently recognizing that there is at least "ambiguity" as to whether EFTA permits
detailed requirements about disclosures' form, PayPal next contends that the statute should be
construed to bar such requirements so as to avoid First Amendment concerns.  Mem. at 24 n.4.
But courts will abandon *Chevron* deference and reject an agency's interpretation only if that
interpretation "presents serious constitutional difficulties"; the "mere mention of a possible
constitutional problem" is not enough.  *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711
(D.C. Cir. 2008).  PayPal's First Amendment challenge does not meet that bar.  *See infra* section
V.

---

[5]   Nor does the legislative history that PayPal cites support its view of Congress's intent.  As
PayPal points out, the initial bill would have only authorized, and not required, the agency to
issue model forms and clauses—but when financial institutions objected, Congress amended the
bill to require such models.  124 Cong. Rec. 3913, 3918 (Feb. 21, 1978); 124 Cong. Rec. S.8283
(daily ed. Mar. 23, 1978).  This shows that Congress wanted to protect financial institutions by
giving them a guaranteed way to comply.  But it in no way suggests that Congress meant to
ensure that financial institutions would never have to follow detailed requirements governing
disclosures' form, even if the agency chose to adopt them.  Indeed, such detailed requirements
would be wholly consistent with Congress's desire to give financial institutions certainty.  And
the other legislative history materials that PayPal cites simply repeat what the statute already tells
us—that Congress required the Bureau to adopt "optional" model clauses.  *See* Mem. at 22.

### 2. *The Bureau's decision to standardize the form of prepaid account disclosures is entitled to deference.*

Because EFTA does not foreclose (much less unambiguously foreclose) the Bureau from regulating the form of disclosures, the Rule's requirements governing the form of the short-form disclosures are entitled to deference so long as they represent "a reasonable policy choice for the agency to make." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (quoting *Chevron*, 467 U.S. at 845). They do.

EFTA empowers the Bureau to adopt regulations to "effectuate the purposes of" the Act, 15 U.S.C. § 1693b(a), and the short-form disclosure requirements undoubtedly serve that goal. In adopting EFTA, Congress recognized that "consumers can make meaningful choices … only when adequately informed as to their options," so it mandated disclosures, while "leav[ing] to the [agency's] regulations the full extent … of disclosure." S. Rep. No. 95-1273, at 27, 29 (1978). The short-form disclosure requirements, including the detailed requirements regarding the disclosure's form, are entirely consistent with this purpose. The Bureau determined that a clear and consistent disclosure format would make it easier for consumers to quickly understand an account's terms and to compare different options, thereby enabling consumers to make better-informed decisions. *See, e.g.*, 81 Fed. Reg. at 84013, 84078 (AR1 319, 384). This reflects an entirely reasonable determination that the detailed requirements would "effectuate the purposes" of EFTA by making disclosures more effective.

Contrary to PayPal's suggestion (Mem. at 24-25), the fact that (some) other regulations requiring disclosures under EFTA leave the form of disclosures unspecified does not imply that it was unreasonable for the Bureau to adopt more detailed requirements in the Prepaid Rule. Congress delegated to the Bureau the authority to decide how detailed any given disclosure requirements should be, and the standardized disclosures of the Prepaid Rule and other more

27

general disclosure requirements both fit comfortably within the bounds of that delegated authority.

There is likewise no merit to PayPal's glancing suggestion (Mem. at 22-23, 24) that by requiring the short-form disclosure to include services for which there is no fee, the Bureau failed to follow EFTA's instruction to "take account of variations in the services and charges under different electronic fund transfer systems" and, "as appropriate, … issue alternative model clauses for disclosure of these differing account terms." 15 U.S.C. § 1693b(b).  By its express terms, this provision instructs the Bureau to take account of variations and issue alternative model clauses for differing terms only "as appropriate"—language that "limits the [agency's] obligation and evinces a Congressional intent to afford discretion in the decision." *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 153 (D.D.C. 2011); *see also, e.g.*, *Consumer Fed'n of Am. v. Dep't of Health & Human Servs.*, 83 F.3d 1497, 1503 (D.C. Cir. 1996) (concluding that where statute required agency to consider certain factors "as appropriate," agency had discretion not to consider factor at all).  The Bureau reasonably determined that the "variation" by entities that do not charge fees for certain services did not warrant a separate disclosure format, but instead was adequately accounted for by having those entities disclose that a service costs "$0."

## B. Section 1032 of the Dodd-Frank Act authorizes the short-form disclosure requirements.

In addition, section 1032(a) of the Dodd-Frank Act, 12 U.S.C § 5532(a), independently authorizes the Prepaid Rule's short-form disclosure requirements.  That provision authorizes the Bureau to "prescribe rules to ensure that the features of any consumer financial product or service … are fully, accurately, and effectively disclosed to consumers in a manner that permits consumers to understand the costs, benefits, and risks." 12 U.S.C. § 5532(a).  The short-form

28

disclosure requirements fall within this broad grant of authority. The Bureau reasonably determined that the standardized requirements for those disclosures' form would make disclosures more effective, *see* 81 Fed. Reg. at 84013, 84078 (AR1 319, 384), and that determination is entitled to deference.

PayPal objects that section 1032 also contains a provision for "option[al]" model forms (Mem. at 27 n.6), but that objection has no more force under the Dodd-Frank Act than it does under EFTA. In section 1032, Congress empowered the Bureau to include with any disclosure rule "a model form that may be used at the option of the covered person for provision of the required disclosures" and provided that institutions that use a model would enjoy a safe harbor from liability. 12 U.S.C. § 5532(b)(1), (d). Like EFTA's provision for optional model clauses, this provision reflects no intent by Congress either to limit the Bureau's authority to prescribe detailed disclosure requirements or to guarantee financial institutions "flexibility" in how they make their disclosures. *Contra* Mem. at 20-21, 27 n.6. Indeed, in section 1032, Congress did provide for financial institutions to have some flexibility, just not the flexibility PayPal seeks: If an entity thinks that it can do better than a model form, it may try out a disclosure that deviates from the relevant requirements on a trial basis—but only "subject to … standards and procedures" that the Bureau specifies, and only with the Bureau's approval.[6] 12 U.S.C. § 5532(e). This is hardly consistent with a congressional plan to give companies unfettered flexibility to make disclosures in whatever form they wish. Rather, as with EFTA, the model-form provision is not meant to give entities such flexibility, but to empower the Bureau to give

---

[6]   Pursuant to this provision, the Bureau adopted a Policy to Encourage Trial Disclosure Programs in 2013, 78 Fed. Reg. 64389 (Oct. 29, 2013), and revised that policy in 2019 to further encourage entities to try out different disclosures, 84 Fed. Reg. 48260 (Sept. 13, 2019).

entities a guaranteed and straightforward way of complying even when regulations leave some details unspecified.

PayPal also errs in contending that the Dodd-Frank Act does not authorize disclosures for prepaid accounts because EFTA more specifically governs disclosures for such accounts and thus displaces the more general Dodd-Frank Act authority.  Mem. at 27 n.6.  The specific-controls-the-general canon that PayPal invokes does not apply where the general and more specific statute "do not contradict one another."  *Chem. Mfrs. Ass'n v. EPA*, 673 F.2d 507, 512 (D.C. Cir. 1982).  There is no contradiction between EFTA's authorization of disclosure rules for prepaid accounts (or other accounts involved in EFTs) and the Dodd-Frank Act's authorization of disclosure rules for consumer financial products and services more generally; rather, that is mere "regulatory overlap."  *Id.* (holding that statutes did not conflict, and specific/general canon did not apply, where one statute authorized regulation of solid waste and another statute authorized regulation of mining waste more specifically).  Besides, it strains credulity to suggest that Congress intended for the authority in section 1032 to yield whenever another statute imposes or authorizes disclosure requirements for a particular category of consumer financial product.  That would take disclosures for a whole host of financial products off the table—from mortgages, credit cards, student loans, and most any other type of consumer credit to savings and other deposit accounts, credit repair services, and debt collection.  *See, e.g.*, 15 U.S.C. §§ 1631, 1632, 1637a, 1638, 1639, 1679c, 1692g(a), 1693c; 12 U.S.C. § 4304.  There is no basis to think that Congress intended for section 1032 to sweep so narrowly.

## II. Both TILA and section 1032 of the Dodd-Frank Act authorize the waiting period for linking certain credit to a prepaid account.

The Bureau also had authority to adopt the 30-day waiting period that PayPal challenges. That provision is authorized by two separate statutory provisions: section 105(a) of TILA, 15 U.S.C. § 1604(a), and section 1032(a) of the Dodd-Frank Act, 12 U.S.C. § 5532(a).

### A. TILA authorizes the 30-day waiting period.

TILA vests the Bureau with unusually broad authority to prescribe rules to effectuate TILA's purposes, and that authority permits the Bureau to impose a waiting period for linking certain credit to a prepaid account. Contrary to PayPal's contentions, nothing in the statute precluded—let alone unambiguously precluded—the Bureau from adopting the waiting-period provision at issue here. Under *Chevron*, because "Congress has not directly addressed the precise question at issue," the provision is valid so long as it is based on a "reasonable interpretation" of the statute. *Chevron*, 467 U.S. at 843-44. It is. The Bureau reasonably determined that requiring 30 days to elapse before certain credit could be linked to a prepaid account effectuates TILA's purposes by promoting the informed and voluntary use of credit, and it reasonably interpreted TILA's rulemaking provision to authorize this requirement. Those determinations are entitled to deference.

### 1. Congress vested the Bureau with broad authority to prescribe rules under TILA.

Congress enacted TILA to ensure "meaningful disclosure of credit terms" and "avoid the uninformed use of credit," and it expanded the Act over the years to protect consumers against "inaccurate and unfair credit billing and credit card practices" as well. 15 U.S.C. § 1601(a). In advancing these purposes, Congress recognized that credit markets were complex and constantly evolving, so it did not itself "attempt[] to list comprehensively" all types of practices that might be prohibited. *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 373 (1973). Instead, it

"determined to lay the structure of the Act broadly and to entrust its construction to an agency with the necessary experience and resources to monitor its operation." *Id.* at 365.

To that end, in section 105(a) of TILA, 15 U.S.C. § 1604(a), Congress granted the Federal Reserve Board (and now the Bureau) authority to "prescribe regulations to carry out the purposes of" the Act. Pub. L. No. 90-321, § 105 (1968); 15 U.S.C. § 1604(a). Congress further ensured that this authority would be particularly broad to enable the agency to promote the Act's purposes as market practices changed. In the original enactment, Congress provided that regulations under TILA:

> may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the [Federal Reserve] Board are necessary or proper to effectuate the purposes of this title, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

Pub. L. No. 90-321, § 105. When Congress transferred this rulemaking authority from the Federal Reserve Board to the Bureau in the Dodd-Frank Act, it further clarified the breadth of this authority, specifying that regulations under TILA may also "contain such additional requirements" that the Bureau judges to meet the standard Congress specified—namely, to be "necessary or proper" to effectuate TILA's purposes, to prevent evasion, or to facilitate compliance. Pub. L. No. 111-203, § 1110A(4)(A), *codified at* 15 U.S.C. § 1604(a).

The Supreme Court has emphasized that this rulemaking provision, even before the Dodd-Frank Act's amendment, "delegate[s] expansive authority to [the responsible agency] to elaborate and expand the legal framework governing commerce in credit." *Ford Motor Credit Co. v. Millhollin*, 444 U.S. 555, 559-60 (1980). As the Court explained, this "broad grant of rulemaking authority" reflects Congress's judgment that it should "rely on" the agency, which could bring to bear "the expert's familiarity with industry conditions which members of

[Congress] cannot be expected to possess." *Mourning*, 411 U.S. at 372-73 (quotations omitted). The Supreme Court has therefore admonished that, "absent some obvious repugnance to the statute, the [agency's] regulation implementing [TILA] should be accepted by the courts." *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981).  As a result, courts afford the Bureau "a special degree of deference" at step two of the *Chevron* analysis.  *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 166 (D.D.C. 2011) (citing, *inter alia*, *Mourning*, 411 U.S. at 369-71).

### 2. Congress did not preclude the Bureau from adopting a waiting period that the Bureau judged would promote informed and voluntary use of credit.

The waiting-period provision passes step one of *Chevron*'s test because "Congress has not directly addressed the precise question at issue."  *Chevron*, 467 U.S. at 843.  TILA does not impose a waiting period for linking credit to a prepaid account, but it does not foreclose such a waiting period either.  On the contrary, TILA broadly authorizes the Bureau to adopt "additional requirements" that promote informed use of credit—and nothing in the statute precludes (much less unambiguously precludes) such "additional requirements" from including a waiting period designed to ensure that consumers have time to learn about and consider the terms of credit they may link to a prepaid account.

To be sure, where a statute grants an agency less expansive rulemaking authority, courts often conclude that the agency may not adopt new requirements that do not interpret or otherwise implement some specific statutory provision.  *See, e.g.*, *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139-40 (D.C. Cir. 2006) (holding authority to "promulgate such regulations and guidelines as [agency] deems proper to implement the provisions of [the Act]" did not authorize regulations not rooted in specific provision).  This is because agencies are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed

appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n. 4 (1994). But where Congress authorizes an agency to adopt additional requirements, it makes clear that the means it deems appropriate are not limited to the specific requirements that Congress itself prescribed. *See, e.g.*, *Council for Urological Interests v. Burwell*, 790 F.3d 212, 219-20 (D.C. Cir. 2015) (holding that statute did not unambiguously preclude agency from banning certain rates for equipment leases even though statute itself "ma[de] no reference to [such] rates," and even though "Congress may not have originally intended" to ban such rates, because statute authorized agency to adopt "other requirements" that would serve Congress's goals).

That is just the case here. In TILA, Congress made crystal clear that the means it deemed appropriate for pursuing the Act's purposes included not just the specific requirements that Congress itself prescribed, but also any "additional requirements" or "adjustments" that the Bureau might determine would likewise serve the goals that Congress set forth. *See* 15 U.S.C. § 1604(a). Given this clearly expressed intent to authorize the Bureau to "elaborate and expand" on TILA's framework governing credit, *Ford Motor Credit*, 444 U.S. at 560, the mere fact that Congress did not enact a waiting period itself cannot be taken as evidence—let alone "unambiguous[]" evidence—that Congress intended for no such waiting period to apply, *Chevron*, 467 U.S. at 843.

PayPal's arguments to the contrary cannot withstand scrutiny. PayPal principally contends that TILA is a "disclosure statute" that does not authorize "substantive restriction[s]" on credit. Mem. at 28, 30. But, for one, even if TILA were only about disclosures (it is not), the waiting period *does* serve the statute's goal of providing for effective disclosures that promote the informed use of credit: The waiting period gives consumers the chance to separately

34

consider disclosures about the terms of the linked credit, and to make a deliberate decision about whether to accept those terms—rather than simply linking credit by default when registering a prepaid account.

Besides, TILA is hardly just a "disclosure statute."  In claiming otherwise, PayPal surveys the legislative history of TILA's original 1968 enactment.  Mem. at 29-30.  But that history is wholly irrelevant because while TILA may have focused almost exclusively on disclosures when it was originally enacted in 1968, Congress has amended it many times since then to include a host of "substantive" restrictions as well—such as a ban on issuing a consumer a credit card unless the consumer has requested it, 15 U.S.C. § 1642; a requirement that credit card issuers assess a consumer's ability to repay, *id.* § 1665e; limits on fees, *id.* §§ 1637(*l*), (n), 1665d; and restrictions on interest-rate increases, *id.* § 1666i-2.  With all these substantive provisions, TILA's structure in no way suggests that Congress meant for credit to be regulated through disclosures only.

Nor is there any merit to PayPal's contention that Congress's express imposition of these particular substantive restrictions implies that it intended to exclude any others.  Mem. at 32. The D.C. Circuit has repeatedly rejected just this sort of "*expressio unius*" argument in the administrative law context, explaining that it "offers 'too thin a reed to support the conclusion that Congress has clearly resolved an issue.'"  *Adirondack Med. Ctr.*, 740 F.3d at 697 (quoting *Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1405 (D.C. Cir. 1996)); *see also, e.g.*, *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) (explaining that *expressio unius* canon "has little force in the administrative setting").  And, the court has explained, any *expressio unius* inference is an especially "poor indicator of Congress's intent" where, as here, there is "a broad grant of authority contained within the same statutory scheme."

*Adirondack Med. Ctr.*, 740 F.3d at 697.  PayPal's suggestion that Congress implicitly foreclosed the waiting period (or other arguably "substantive" requirements) by expressly imposing certain substantive requirements itself simply cannot be squared with TILA's broad authorization for the Bureau to make "adjustments" and adopt "additional requirements" to further the Act's purposes.

PayPal nonetheless contends that the authority to adopt "additional requirements" is not so broad as to authorize the waiting-period provision.  Mem. at 31.  For support, PayPal emphasizes that TILA's rulemaking provision is captioned "Disclosure guidelines," which PayPal takes to signal that Congress intended to authorize only rules requiring disclosures. Mem. at 31.  But putting aside the fact that the waiting period *does* serve TILA's disclosure goals, this argument fails for a more basic reason:  That caption was added by the body that codifies the U.S. Code—not Congress.  *See, e.g.*, Pub. L. No. 90-321, § 105 (1968) (captioning rulemaking provision "Regulations").  A caption that Congress never approved of course sheds no light on Congress's intent.  *See, e.g.*, *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 939-40 (9th Cir. 2009) ("[T]he mere addition of a title by the Law Revision Counsel cannot change the meaning or intent of a statutory provision."); *Clark v. Bonded Adjustment Co.*, 176 F. Supp. 2d 1062, 1068 (E.D. Wash. 2001) (disregarding caption that was added by codifiers, not Congress).

PayPal also contends that Congress must not have actually intended to expand the Bureau's authority by authorizing it to adopt "additional requirements" because the Dodd-Frank Act's legislative history does not mention such an intent.  Mem. at 31.  But drawing meaning from silence in legislative history is warranted only where a change would be so significant that it is fair to suppose that Congress would have discussed it had it intended the change.  *Cf. Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (finding silence in

legislative history significant where challenged interpretation "would arguably be the single most significant change in [statutory regime] since its inception"); *Common Cause v. FEC*, 842 F.2d 436, 447 (D.C. Cir. 1988) (same where party claimed a "major statutory revision").  This change is not.  The amendment authorizing the Bureau to adopt "additional requirements" only modestly expands or clarifies the broad authority that Congress had already delegated decades before.  *See Mourning*, 411 U.S. at 365-66.  Particularly for a modest change like this, "a silent legislative history does not license [courts] to read a clause out of a statute."  *United States v. 1990 Toyota 4Runner*, 9 F.3d 651, 653 (7th Cir. 1993).

In short, nothing in TILA reflects any congressional intent—much less "unambiguously expressed intent," *Chevron*, 467 U.S. at 843—to preclude the Bureau from adopting the waiting period at issue here.

### 3.   The Bureau reasonably determined that the waiting period was an appropriate "additional requirement" that would promote informed and voluntary use of credit.

Because Congress did not foreclose the waiting-period provision at issue here, that provision is entitled to deference under step two of the *Chevron* analysis so long as it is reasonable.  *Chevron*, 467 U.S. 843.  It is:  Consistent with the rulemaking authority in § 1604(a), the Bureau determined that the waiting period was an appropriate "additional requirement" that would "effectuate the purposes" of TILA by promoting the informed and voluntary use of credit.  81 Fed. Reg. at 84267-68 (AR1 573-74).  That determination falls well within the bounds of reasonableness.

There is no dispute that TILA's purposes include promoting the informed and voluntary use of credit, *see* 15 U.S.C. § 1601(a), and the Bureau reasonably determined that the waiting period would do just that.  As the Bureau explained, requiring 30 days to elapse before credit can be linked to a new prepaid account would enable consumers to focus more effectively on the

37

terms of the credit and the consequences of linking it to a prepaid card—thereby allowing consumers to become better informed and to make more considered decisions. 81 Fed. Reg. at 84268 (AR1 574). Without the waiting period, card issuers could market credit when consumers obtain or register a prepaid account. *Id.* Given that consumers are already providing a host of information in that process, they might be inclined to simply link credit by default, without making a deliberate choice. *Id.* Moreover, offering credit during the prepaid-account-registration process could cause some consumers to believe they must link the credit to get the protections that come along with account registration. *Id.* The Bureau accordingly determined that consumers would be able to make more deliberate and informed decisions about whether to link credit if they separately considered the terms of the credit at a distinct point in time. *Id.* This "'reasonable' explanation of how [the waiting period] serves the statute's objectives is the stuff of which a 'permissible' construction is made." *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 863).[7]

Indeed, PayPal does not dispute the reasonableness of this explanation as a general matter, and instead contends only that the waiting period does not promote informed use of credit when the consumer already has the credit that she wants to link to a prepaid account. Mem. at

---

[7]    In addition to determining that the waiting period was an appropriate "additional requirement" under § 1604(a), the Bureau also concluded that the provision was an appropriate "adjustment" of the requirement that Congress set forth in 15 U.S.C. § 1642. That conclusion, too, was based on a reasonable interpretation of the statute. Section 1642 bars providers from issuing a credit card "except in response to a request or application therefor." This provision thus ensures that consumers get a credit card only if they affirmatively choose it. The waiting period adjusts this provision by providing that certain credit cards cannot be issued unless in response to a request or application made at least 30 days after the prepaid account is registered. (Linking covered credit to a prepaid card turns the prepaid card into a hybrid prepaid-credit card, so linking even preexisting credit amounts to the issuance of a new credit card.) Consistent with the purpose of § 1642, this adjustment ensures that the consumer is not simply obtaining the credit card essentially by default at the time he registers the prepaid account, but is making an affirmative and considered decision to get it. *See* 81 Fed. Reg. at 84268 (AR1 574).

32.  PayPal is mistaken.  Even where a consumer already chose to obtain particular credit, linking that credit to a prepaid account can itself have consequences that are worthy of independent consideration.  For instance, one of the few circumstances in which the waiting period applies is where linking the credit would cause account terms to change.  *See supra* pp. 18-19.  In those circumstances, the waiting period ensures consumers have the opportunity fully to consider those changes.  83 Fed. Reg. at 6402, 6405 (AR1 781, 784).

Even where account terms do not change, linking credit to a prepaid account means that the prepaid card is no longer a guaranteed way for the consumer to ensure she is spending only funds she already has.  Indeed, consumers often choose prepaid accounts precisely because they help control spending, and linking credit (preexisting or not) to a prepaid card eliminates this potentially important benefit.  81 Fed. Reg. at 84159, 84268 (AR1 465, 574).  In these circumstances, the waiting period ensures that consumers have time to consider whether making credit accessible via their prepaid card is right for them, or whether they would be better off keeping their credit and prepaid card separate.  At any rate, even if PayPal could posit some specific circumstances in which the waiting period would not serve its intended purposes, that would "not impair" its validity.  *Mourning*, 411 U.S. at 373.  A rule may properly apply to some "who do not participate in the conduct the legislation was intended to deter or control"— because, without that flexibility, "many clear violators [could] escape regulation entirely."  *Id.* at 373-74 (upholding rule requiring credit disclosures by "some creditors who do not charge for credit").

Because the Bureau reasonably determined that the waiting-period provision would promote informed and voluntary use of credit, and because that provision otherwise reflects a

reasonable interpretation of § 1604(a), *Chevron* bars the courts from "disturb[ing] it." *Chevron*, 467 U.S. at 845.

### B. Section 1032 of the Dodd-Frank Act authorizes the 30-day waiting period.

The waiting period is also authorized by section 1032(a) of the Dodd-Frank Act, 12 U.S.C. § 5532(a). That provision authorizes the Bureau to adopt rules "to ensure that the features of any consumer financial product or service"—such as credit or a prepaid card, *see* 12 U.S.C. § 5481(5), (15)(A)(i), (iv)—"are fully, accurately, and effectively disclosed." The Bureau determined that the waiting period would make disclosures about both the potentially linked credit and the prepaid account more "effective" by giving consumers space to focus on each independently. 81 Fed. Reg. at 84268 (AR1 574). As explained above, that determination was reasonable, and it is therefore likewise entitled to deference. *See supra* section II.A.3; *see also Chevron*, 467 U.S. at 844.

PayPal's sole response is that section 1032(a) authorizes only rules that require disclosure of information. Mem. at 33 n.7. But that is not what the statute says, and PayPal does not even acknowledge the Bureau's determination that the waiting period would make disclosures more effective, let alone explain why it was unreasonable for the Bureau to interpret the provision as authorizing it to make disclosures more effective in this particular way.

### III. The Rule is not arbitrary or capricious.

PayPal also cannot meet its "heavy" burden to show that the Rule is arbitrary or capricious in any respect. *See Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000) (describing burden to make arbitrary-and-capricious challenge as "heavy"). Review under the arbitrary-and-capricious standard is "narrow" and "very deferential." *Id.* Under that standard, a court must "uphold the agency's action if the agency 'examined the

relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (quoting *State Farm*, 463 U.S. at 43) (alterations and internal quotations omitted). A rule is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. In conducting arbitrary-and-capricious review, "a court is not to substitute its judgment for that of the agency." *Id.*

The Bureau's decision not to exclude digital wallets with asset accounts from the Prepaid Rule's scope easily withstands arbitrary-and-capricious review. The Bureau explained its reasons for including such digital wallets within the Rule's coverage, and that decision—both generally and for purposes of the short-form disclosure requirements and 30-day waiting period specifically—falls comfortably within the bounds of reasonableness.

### A. The Rule reasonably treats digital wallets with asset accounts the same as other prepaid accounts.

The Bureau carefully considered comments urging the Bureau to narrow the Rule's scope to exclude digital wallets with asset accounts (as well as comments supporting broad coverage), and it explained why it declined to do so. For one, the Bureau made the judgment that carving out specific types of products would create substantial and unwarranted regulatory complexity and risk leaving consumers confused about what protections applied to which products. *See* 81 Fed. Reg. at 83966, 83971 (AR1 272, 277). Moreover, the Bureau found no good reason to exclude digital wallets with asset accounts from the Rule's scope because such digital wallets share a key feature with other online and physical prepaid products: A consumer can load funds

41

into the account, use those funds to make purchases in stores and online and to conduct other

transactions, and can reload more funds later.  *Id.* at 83972 (AR1 278).  Given this fundamentally

similar functionality, the Bureau explained that consumers using digital-wallet asset accounts

should get the same protections as consumers who use other types of prepaid accounts.  *Id.*

Those protections are all the more important, the Bureau explained, given that more and more

consumers have begun to use digital wallets to conduct daily financial transactions.  *Id.* at 83968

(AR1 274).

    This reasoning easily meets *State Farm*'s requirement for a "satisfactory explanation,"

*State Farm*, 463 U.S. at 43.  And, indeed, PayPal offers no reason why digital wallets with asset

accounts should not be subject to Regulation E as a general matter, including, for example, why

they should not generally receive the same error-resolution and limited-liability protections as

other prepaid accounts.  In fact, PayPal seems to concede that digital-wallet asset accounts

*should* be subject to Regulation E generally.  *See* Mem. at 38 (objecting to decision to subject

such accounts to regulation "above and beyond the general requirements of Regulation E").  But,

before the Prepaid Rule, whether Regulation E applied to digital wallets with asset accounts was

unclear.  *See Zepeda v. PayPal, Inc.*, No. 10-2500, 2017 WL 1113293, *11 (N.D. Cal. Mar. 24,

2017) (noting that "PayPal arguably is not" subject to EFTA); AR1 4811.  The Prepaid Rule

eliminates that regulatory uncertainty and defines clear protections for consumers who use

prepaid accounts.

    In nevertheless contending that the Rule's coverage of digital wallets with asset accounts

is arbitrary and capricious, PayPal argues that the Bureau improperly (1) ignored "key

differences" between digital wallets and prepaid products like GPR cards and (2) subjected

digital wallets with asset accounts to the Rule absent any "real-world evidence" that consumers

faced harm from such products.  Mem. at 33, 38.  Neither contention finds support in the record or the APA.

1.  First, while it is arbitrary and capricious to fail "even to consider" potentially relevant differences between the subjects of a regulation, PayPal cannot credibly contend that the Bureau fell short on that front.  *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983) (finding agency decision arbitrary and capricious where agency "fail[ed] even to consider … differences"); *cf. also State Farm*, 463 U.S. at 43 (explaining that rule is arbitrary and capricious if agency "entirely failed to consider" important facts).  PayPal objects (Mem. at 36) that the Bureau ignored the "crucial distinction" between GPR cards and digital wallets—namely, that GPR cards store funds, while digital wallets allow consumers "to access payment credentials"—but this objection rests on a sleight of hand:  The Rule does *not* regulate digital wallets that only allow consumers to store and access credentials for other accounts.  12 C.F.R. pt. 1005, Supp. I, ¶ 2(b)(3)(i)-6.  Rather, the Rule applies to a digital wallet if and only if the wallet also has its own asset account that can hold funds.  *Id.*  As the Bureau reasonably concluded, digital wallets with such asset accounts—which, like other prepaid accounts, consumers can use to store funds for use in a wide variety of transactions—are sufficiently similar to other prepaid accounts to warrant consistent regulatory treatment.

True, the record showed some differences between the asset accounts that come with (some) digital wallets and other prepaid accounts like GPR cards—at the time, digital wallets' asset accounts tended to charge fewer fees, and consumers were less likely to use them as a substitute for a checking account, and in some cases may not have used them at all (opting instead to use only the digital wallet's stored-payment-credentials functionality).  But the Bureau considered those differences and reasonably concluded that they did not make digital-wallet asset

43

accounts so "fundamentally dissimilar" as to warrant different regulatory treatment.  81 Fed.

Reg. at 83967-68, 84015 (AR1 273-74, 321).  Rather, in the Bureau's judgment, the fact that

consumers could use digital wallets' asset accounts the same way as GPR cards and other

prepaid accounts—to load funds for use in conducting transactions—made them similar enough

that consumers should get the same protections for both, including disclosures about account

terms and changes and limited-liability and error-resolution rights.  *Id.* at 83968, 83972 (AR1

274, 278).

There is likewise no basis for PayPal's contention that the Bureau's reasons for applying

the Rule to digital wallets with asset accounts were mere "ipse dixit."  Mem. at 35.  The Bureau

pointed to the concrete—and indisputable—similarities between digital wallets' asset accounts

and other prepaid accounts in explaining why it was not excluding digital wallets with asset

accounts from the Rule's scope.  81 Fed. Reg. at 83972 (AR 278).  That specific and

straightforward explanation is a far cry from the type of "conclusory" assertion that will fail

arbitrary-and-capricious review.  *Cf. Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-51 (D.C.

Cir. 2014) (explanation was too conclusory where it said "nothing about 'why' [the agency]

made the determination").  PayPal objects that the Bureau cited no "study," "expert research," or

"focus group" supporting its decision to treat digital wallets with asset accounts the same as

other prepaid accounts.  Mem. at 35.  But this was a policy judgment, not a factual determination

requiring evidence.  *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 484

(D.C. Cir. 2009) (distinguishing "policy judgments" from "[f]indings of ascertainable fact" that

must be supported by "substantial evidence").  And there is no dispute that sufficient evidence

supported the (entirely uncontroversial) factual finding on which this policy judgment was

based—that consumers can use digital-wallet asset accounts, like other prepaid accounts, to load and reload funds for use in various types of transactions.

PayPal may have preferred a different policy. But to prevail on its arbitrary-and-capricious challenge, PayPal must show that the Bureau's reasons for giving digital-wallet asset accounts the same protections as other prepaid accounts was "so implausible that it could not be ascribed to a difference in view." *State Farm*, 463 U.S. at 43. It cannot make that showing.

2. PayPal fares no better in contending that the Bureau impermissibly included digital wallets with asset accounts within the Rule's scope absent evidence that there was any "problem" with those products that needed solving. Mem. at 38. To begin, PayPal's premise is wrong: Before the Rule, it was unclear what protections applied to digital wallets' asset accounts—for instance, whether they were subject to Regulation E's limited-liability and error-resolution protections, and what information providers were required to disclose. The Prepaid Rule solved this problem by making clear that prepaid accounts were "accounts" subject to Regulation E generally—and it extended Regulation E's protections to a broad range of prepaid products to avoid a patchwork regulatory regime that could leave consumers confused about what protections applied to which products. *See* 81 Fed. Reg. at 83966, 83971 (AR1 272, 277). Consistent with this goal, the Bureau made the judgment that consumers who conduct transactions with digital wallets' asset accounts should get the same protections as consumers who use other types of prepaid accounts. *Id.* at 83972 (AR1 278).

In any event, contrary to PayPal's contention, even if the only "problems" in the market involved other types of prepaid accounts, that would not have precluded the Bureau from extending the Rule's protections to digital wallets with asset accounts as well. "The APA does not … require agencies to tailor their regulations as narrowly as possible to the specific concerns

45

that generated them." *Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92

(D.D.C. 2014) (upholding regulation that applied to small and large online sellers even though

"agency had only received reports of mistreatment by large online sellers").  Likewise, to the

extent that PayPal objects that the Bureau did not make specific findings about how each of the

Rule's protections would help consumers using digital wallets with asset accounts in particular,

the Bureau "had no obligation to make such … particularized finding[s]." *Associated Builders &*

*Contractors, Inc. v. Shiu*, 773 F.3d 257, 264 (D.C. Cir. 2014) (upholding regulation that applied

to government contractors where agency "explain[ed] the need" for regulation to correct problem

"in the workforce population as a whole," even though it did not explain the need with respect to

government contractors specifically).  Rather, the Bureau was permitted to "extrapolate[] from

its experience with other … products" to conclude that regulation is appropriate for a similar

product.  *Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 161 (D.D.C. 2018) (holding that

agency properly extrapolated from its experience with cigarettes to determine that warnings were

appropriate for cigars and pipe tobacco).

### B. The Rule reasonably applies the short-form disclosure requirements to digital wallets with asset accounts.

PayPal fares no better in challenging the Bureau's decision not to exempt digital wallets

with asset accounts from the Rule's short-form disclosure requirements specifically.  The Bureau

reasonably explained why it found such an exemption unwarranted.  81 Fed. Reg. at 84015 (AR1

321).  For one, creating individualized disclosure regimes for very specific categories of prepaid

accounts would create just the type of patchwork regulatory regime that the Bureau aimed to

avoid.  *Id.*  Further, the Bureau explained that consumers acquiring digital wallets with asset

accounts should have the same opportunity to learn about the account's fees (or lack thereof) as

did consumers acquiring other types of prepaid accounts.  *Id.*  While most digital-wallet asset

accounts did not impose many fees at the time, knowing that a service is free is itself useful.  *Id.* at 84015, 84025 (AR1 321, 331).  Moreover, if providers started charging more fees on digital wallets' asset accounts in the future, consumers should know about those fees, too—without the Bureau having to revise the Rule first.  *Id.* at 83972 (AR1 278).  These reasons easily amount to the "satisfactory explanation" that the APA demands.  *See State Farm*, 463 U.S. at 43.

PayPal, however, claims that digital-wallet asset accounts are so different from other types of prepaid accounts that it is irrational to require the same disclosures for them.  Mem. at 36-37.  But, again, this argument can succeed only if PayPal could show that the Bureau's explanation was "so implausible that it could not be ascribed to a difference in view."  *State Farm*, 463 U.S. at 43.  It cannot make that showing.

PayPal claims that it "makes no sense" to apply the short-form disclosures to electronic products because those disclosures were designed for "in-person comparison shopping."  Mem. at 37.  Not so.  In fact, the Bureau designed the short-form disclosure to give consumers useful and readily understandable information no matter how a consumer acquired the account— whether in a store, online, over the phone, through some other channel, or even across multiple channels.  *See, e.g.*, 81 Fed. Reg. at 84014 (AR1 320); *see also* 12 C.F.R. § 1005.18(b)(6)(i)(A)- (C) (providing for written, electronic, or oral disclosures, depending on how the consumer acquires the account).  Variations in how information is disclosed can make the information harder to digest, no matter whether a consumer is considering accounts in a store or online—so, the Bureau standardized the disclosures across the board to make it easier for consumers to choose the best accounts for them.  81 Fed. Reg. at 84014 (AR1 320).  At the same time, it tailored the Rule to accommodate differences between in-store, online, and other channels, for

example by permitting special formatting for electronic disclosures.  *Id.* at 84008 (AR1 314); *see also, e.g.*, 12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(6)(i)(B)-2.

There is likewise no merit to PayPal's claim (Mem. at 37) that it is irrational to require short-form disclosures for digital wallets with asset accounts because, at the time of the rulemaking, those accounts generally did not charge the fees listed on that disclosure's top line (or did not offer those features at all).  *Other* parts of the disclosure are specifically designed to capture fees for products like digital-wallet asset accounts that have different fee structures.  *See* 81 Fed. Reg. at 84041 (AR1 347); 12 C.F.R. § 1005.18(b)(2)(viii)-(ix).  As the Bureau explained, a standardized format, with the same layout listing the same fees across the same top line, makes the disclosure easier for consumers to read and understand.  81 Fed. Reg. at 84025 (AR1 331).  Besides, it is useful for consumers to know when a feature is free or not offered.  *Id.* And, of course, if digital wallet providers started charging these fees in the future (as PayPal already has for one of its products[8]), those top-line disclosures would become all the more important.[9]  *Id.*

---

[8]    *See* PayPal Cash Plus Short Form Disclosure, *available at* https://www.paypalobjects.com/marketing/ua/pdf/US/en/PayPal_Cash_Plus_Short_Form_Disclosure.pdf?locale.x=en_US (last visited July 6, 2020); *see also* PayPal Cash and PayPal Cash Plus Terms and Conditions, *available at* https://www.paypal.com/us/webapps/mpp/ua/cashagreement-full (last visited July 6, 2020).

[9]    PayPal challenges this aspect of the Bureau's reasoning as impermissible "speculation." Mem. at 39-40.  But it was not speculative for the Bureau to note the mere *possibility* that digital wallet providers could charge fees in the future—nothing prevents them from doing so.  Besides, "[p]redictions regarding the actions of regulated entities are precisely the type of policy judgments that courts routinely and quite correctly leave to administrative agencies."  *Pub. Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1260-61 (D.C. Cir. 2004) (quotations omitted).  Agencies, moreover, "can, of course, adopt prophylactic rules to prevent potential problems before they arise," for "[a]n agency need not suffer the flood before building the levee."  *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 560-61 (D.C. Cir. 2015) ("[I]n situations in which an agency must make a judgment in the face of a known risk of unknown degree, the 'agency has some

PayPal asserts that disclosing that a service costs "$0" or is not offered is "misleading." Mem. at 37. But that unsupported assertion not only strains credulity; it is also refuted by the Bureau's consumer testing, which showed that nearly all participants understood that "N/A" meant a feature was not offered and that "$0" meant a feature was free. AR1 868, 882-83, 888; *see also* AR1 881, 889, 906.

Finally, although PayPal emphasizes that its customers rarely actually used their digital wallets' asset accounts (Mem. at 34), that hardly makes it arbitrary and capricious to require providers to disclose those accounts' terms. The fact that many consumers may not actually use their digital wallets' asset accounts suggests only that these consumers may not have affirmatively wanted the account that came bundled with their digital wallet; it is no reason to deny those consumers information about the accounts they are receiving—let alone to deny information about those accounts to the consumers who *do* use them. 81 Fed. Reg. at 84015 (AR1 321).

### C. The Rule reasonably applies the 30-day waiting period to digital wallets with asset accounts in certain limited circumstances.

PayPal also cannot prevail on its claim that the Bureau acted arbitrarily and capriciously in declining to exempt the digital wallets otherwise subject to the Rule from the 30-day waiting period. Notably, PayPal does not suggest that the Bureau failed to consider how that provision would apply to digital wallets in particular. *See* Mem. at 33-40. Nor could it. The Bureau

---

leeway reasonably to resolve uncertainty, as a policy matter, in favor of more regulation or less.'" (quoting *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 316 (D.C. Cir. 1992)). In any event, this objection is beside the point, because (as explained above) the Bureau determined that there were good reasons to require the same disclosures for all prepaid accounts, including those tied to digital wallets, regardless of whether those accounts ever charged the top-line fees.

undertook an entire rulemaking devoted in part to that precise issue.  83 Fed. Reg. 6364 (AR1 743).

Instead, in its single paragraph challenging the waiting-period provision on arbitrary-and-capriciousness grounds, PayPal argues only that the rationale for this provision—that it separates the decision to obtain and register a prepaid account from the decision to obtain or link certain credit to that account so that consumers can focus more effectively on each decision and make a more informed and deliberate decision—does not apply to digital wallets.  Mem. at 37-38.  In particular, PayPal reasons that, for many consumers, the "whole point" of acquiring a digital wallet is to link credit cards to it—so, these consumers do not need time to separately consider whether to make that choice.  *Id.* at 38.  But this objection overlooks the fact that the waiting period applies only in very limited circumstances in which the Bureau reasonably determined that separate consideration was warranted.

For one, the waiting period only even potentially applies if the digital wallet comes with an asset account.  A consumer for whom the "whole point" of a digital wallet is to link credit cards always has the option of signing up for a digital wallet that cannot store funds and instead only stores credentials for credit cards and other accounts.  Those digital wallets are not "prepaid accounts" subject to the Rule, so the waiting period never applies to them.  *See* 12 C.F.R. pt. 1005, Supp. I, ¶ 2(b)(3)(i)-6; *see also supra* pp. 10-11, 18-19.

Second, even when a consumer acquires a digital wallet with an asset account subject to the Rule, a consumer must wait to link a traditional credit card only in very limited circumstances—most notably, where linkage will cause certain terms or conditions of either the prepaid account or credit card account, or both, to vary.  *See supra* pp. 18-19.  Those variations can be complex.  For example, a creditor might apply one interest rate, grace period, and set of

fees if a consumer uses the traditional credit card to access the credit, but a different interest rate, grace period, and set of fees if the consumers makes the exact same purchase by instead drawing on the same credit through the linked prepaid card.  *See* 83 Fed. Reg. at 6406 (AR1 785).  As the Bureau explained, the waiting period ensures that the consumer has time to learn about and understand these consequences and to consider the pros and cons of linking the two accounts.  *Id.* at 6397 (AR1 776).  Without the delay, consumers could be more likely just to link the accounts by default at the time they register their prepaid accounts—when they are already providing a host of information—without understanding and considering these complexities.  *See* 81 Fed. Reg. 84268 (AR1 574); 83 Fed. Reg. at 6397 (AR1 776).  The waiting period thus helps ensure that any decision to link accounts in these circumstances reflects the consumer's informed and deliberate choice.  83 Fed. Reg. at 6414 (AR1 793).

PayPal does not even acknowledge this reasoning, let alone explain why it falls short of the "satisfactory explanation" that the APA requires, *State Farm*, 463 U.S. at 43.  And, indeed, the Bureau's reasons meet that standard.  At bottom, although PayPal may wish the Bureau had made a different policy choice, its objection reflects no more than a "difference in view" inadequate to sustain an arbitrary-and-capricious challenge.  *Id.*

## IV. The Bureau appropriately considered the benefits and costs of the Rule.

In an analysis spanning 40 pages in the Federal Register, the Bureau thoroughly considered the benefits and costs of the Prepaid Rule, in accordance with the requirement in section 1022 of the Dodd-Frank Act that the Bureau "consider … the potential benefits and costs" of its rules "to consumers and covered persons," including any potential reduction in consumers' access to consumer financial products and services and the impact on smaller

depository institutions and consumers in rural areas.  12 U.S.C. § 5512(b)(2)(A).  PayPal cannot

prevail on its claim to the contrary.

In challenging the Bureau's consideration of the Rule's benefits and costs, PayPal's

"burden to show error is high."  *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040

(D.C. Cir. 2012).  As with arbitrary-and-capriciousness review more generally, courts are not to

"substitute [their] judgment for that of the agency" when the agency assesses "the costs and

benefits of alternative policies."  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir.

2003) (Roberts, J.).  Instead, the Court's role is "to determine 'whether the decision was based on

a consideration of the relevant factors and whether there has been a clear error in judgment.'"

*Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (quoting *State Farm*, 463 U.S.

at 43).

PayPal cannot meet its high burden to show any problem with the Bureau's discussion of

the Rule's benefits and costs.  PayPal objects that the Bureau (1) did not discuss the benefits and

costs for covered digital wallets specifically, and (2) ignored industry concerns about unique

costs for those digital wallets as a result.  *See* Mem. at 40-43.  These contentions fail.

a. The Bureau considered the Rule's benefits and costs as required by the Dodd-Frank

Act, so PayPal's objection that the Bureau did not address the benefits and costs specifically for

digital wallets fails.[10]  To begin, as PayPal appears to concede (Mem. at 42 n.8), this challenge

---

[10]   PayPal contends that cost-benefit consideration is required not only by the Dodd-Frank Act,
but also separately by EFTA and the APA.  Mem. at 40-41.  But the EFTA cost-benefit
requirement that PayPal cites does not apply to the Bureau.  By its plain terms, the provision
requires "the Board"—*i.e.*, the Federal Reserve Board—to consider certain costs and benefits
when exercising the authority it retains to promulgate certain (limited) rules under EFTA.  15
U.S.C. § 1693b(a) ("In prescribing such regulations, the *Board* shall … consider[] the costs and
benefits …." (emphasis added)); *see also id.* § 1693a(4) (defining "Board" to mean Federal
Reserve Board).  This particular cost-benefit requirement does not also apply to the Bureau,
whose organic statute already requires it to consider the costs and benefits for the rules it

does not apply to the 30-day waiting period because the Bureau *did* address the benefits and costs of that provision for covered digital wallets specifically in the 2018 amendments to the Rule. 83 Fed. Reg. at 6413-14 (AR1 792-93).

As for the rest of the Rule, this challenge is likewise unavailing. For one, the Bureau did address the benefits and costs of applying the Rule to digital wallets with asset accounts specifically—including, as discussed above, the benefits of avoiding a patchwork regulatory regime that could leave consumers confused, ensuring that consumers who get digital-wallet asset accounts enjoy the same protections as consumers of other similar types of accounts, and giving digital wallet consumers information upfront about an account's fees or lack thereof. 81 Fed. Reg. at 83966, 83971-72 (AR1 272, 277-78). Although this digital-wallet-specific discussion did not appear in the section entirely devoted to assessing the Rule's benefits and costs as required by section 1022 of the Dodd-Frank Act, that section expressly incorporated the discussion elsewhere in the preamble by reference. *Id.* at 84269 (AR1 575).

Second, even putting that incorporated discussion aside, nothing in section 1022 (or any other provision) requires the Bureau to separately discuss the benefits and costs of applying a rule to each specific type of product that the rule covers. *See generally* 12 U.S.C. § 5512(b)(2)(A). Indeed, "there is no legal support for the proposition that every product or industry affected by a rulemaking is entitled to a separate cost-benefit analysis." *Nicopure Labs*, 266 F. Supp. 3d at 407.

---

promulgates under any federal consumer financial law, including EFTA. *See* 12 U.S.C. § 5512(b)(2)(A). And the Court need not decide whether the APA by its own force would require consideration of costs and benefits if the Dodd-Frank Act did not because the Dodd-Frank clearly does impose such a requirement. *Cf. Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 400-01 (D.D.C. 2017) (concluding that APA did not require agency to "undertake a cost-benefit analysis" when statute being implemented imposed no such obligation).

The general discussion of the Rule's benefits and costs applies equally to the digital-wallet accounts subject to the Rule—and that is all that the Dodd-Frank Act (or APA) requires. *Cf. Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 220-21 & n.7 (D.D.C. 2016) (concluding that agency met its APA obligations where it did not provide specific reasons for declining to exempt pawn loans from regulation and instead gave broadly applicable reasons for declining to narrow the rule's scope generally).  For instance, the Bureau explained that the short-form disclosure requirements would benefit consumers by making it easier for consumers to find, understand, and compare information about different products' terms.  81 Fed. Reg. at 84271-72 (AR1 577-78).  This, in turn, would better inform consumers about their choices, allow them to pick the best product for them, and even encourage companies competing in the market to provide ever better products.  *Id.* at 84276 (AR1 582).  The Bureau also anticipated that the requirements could benefit companies that charge lower fees, *id.* at 84287 (AR1 593)—indeed, as PayPal itself acknowledged, its products would compare favorably to other prepaid products, AR2 5880.

As for costs, the Bureau considered that institutions would incur costs of developing disclosures (which the Bureau anticipated would be minimal given that the Bureau was providing native design files as well as source code for web-based disclosures), keeping them up-to-date as account terms changed, and delivering the disclosures to consumers.  81 Fed. Reg. at 84280-86 (AR1 586-92).  This included a specific discussion of the (fairly minor) costs for providers that would be delivering disclosures electronically.  *Id.* at 84282-83 (AR1 588-89).

These benefits and costs are just as relevant for consumers and providers of covered digital wallets, so even if there were a "lack of specificity" regarding digital wallets in particular, that would "not 'demonstrate that the agency's decision was not based on a consideration of the

relevant factors.'"  *Huntco*, 240 F. Supp. 3d at 221 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 258 (D.C. Cir. 2003)).

b. Contrary to PayPal's contention (Mem. at 42-43), the Bureau also appropriately considered industry comments that the Rule would impose unique costs in the context of covered digital wallets by "stifl[ing] innovation" and "confus[ing] and alarm[ing]" consumers.  Mem. at 42-43.  The comments about innovation that PayPal cites raised only nonspecific concerns stating, without elaboration, that unspecified aspects of the Rule would chill unspecified forms of innovation in the digital wallet space.  Mem. at 42; *see also* AR2 5267-68, 5862, 10435.  It is unclear how the agency could meaningfully respond to such "conclusory comments," and it had no obligation to do so.  *Vermont Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 63 (D.C. Cir. 2011); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (holding that agency did not have to respond to "comments stating without elaboration" that rule would have certain adverse effects); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) ("[C]omments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response.").

As for PayPal's contention that the Bureau failed to consider comments arguing that the short-form disclosures would "confuse and alarm" potential customers and cause them to "abandon[] the signup process" (Mem. at 43), it is just wrong on the facts.  The Bureau specifically addressed that concern, including in the preamble's dedicated discussion of benefits and costs pursuant to section 1022.  81 Fed. Reg. at 84283 (AR1 589).  In particular, the Bureau disagreed that disclosures would confuse consumers who acquire their products online, given that consumer testing showed that other consumers had no trouble understanding the disclosures.  *Id.*  PayPal faults the Bureau for not specifically testing the disclosures "in an electronic setting"

(Mem. at 43), but as the Bureau explained, there was no reason to think that putting the same information on a screen rather than on paper (with appropriate formatting adjustments) would make it any less understandable.  81 Fed. Reg. at 84283 (AR1 589).  Neither PayPal nor any other commenter offered any study or other evidence suggesting that the disclosures would be any less clear for consumers acquiring digital wallets with asset accounts or other online products, and nothing required the Bureau to "undertake such studies" itself.  *Cigar Ass'n of Am.*, 315 F. Supp. 3d at 162; *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("[I]n the absence of available evidence, Congress does not require the agency to conduct its own studies.").

And while PayPal commented that a disclosure stating that a feature costs "$0" would somehow confuse digital wallet customers into thinking they would have to pay, it provided no evidence to support that deeply counter-intuitive assertion.  AR2 5880-81.  The Bureau acted reasonably in discounting this wholly speculative concern and instead concluding that consumers acquiring digital wallets with asset accounts would be no more confused than others, who the Bureau's testing showed had no trouble understanding that "$0" meant a service was free.  AR1 882-83, 881, 889, 906; *see also Home Box Office*, 567 F.2d at 35 n.58 (agency not required to respond to "purely speculative" comments).

Finally, as for PayPal's concern that the Rule's disclosures could cause consumers to "abandon[] the signup process" (Mem. at 43), the Bureau explained that if consumers decide not to get an account because they are more informed, that is a consumer benefit, not a cost.  81 Fed. Reg. at 84283 (AR1 589).  This reasoning applies with full force to consumers who decide not to get a particular digital wallet when a disclosure helps them realize that the product comes with an asset account they do not want or need.

**V. The short-form disclosure requirements do not violate the First Amendment.**

The Rule's short-form disclosure requirements do not violate the First Amendment.  As the Supreme Court has explained, commercial speech receives First Amendment protection principally because of "the value to consumers of the information such speech provides"—so an entity's "constitutionally protected interest in *not* providing any particular factual information … is minimal." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).  Laws compelling commercial speech are therefore subject to a more lenient constitutional test.  In particular, under *Zauderer*, the government can require disclosure of "purely factual and uncontroversial information" so long as the requirement is "reasonably related" to a government interest and is not so "unjustified or unduly burdensome" as to "chill[] protected commercial speech." *Zauderer,* 471 U.S. at 651; *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 21-22, 27 (2014) ("*AMI*").

The Rule's short-form disclosure requirements readily satisfy that test.  PayPal does not (and could not) dispute that the short-form disclosure requirements relate to purely factual and uncontroversial information.  And a reasonably crafted mandate to disclose purely factual and uncontroversial information will "almost always" satisfy the "reasonably related" prong of the *Zauderer* test.  *AMI*, 760 F.3d at 26.  The disclosure requirements here are no exception.  Those requirements advance the government's interest in ensuring that consumers get easily-digestible information about the fees and other terms of prepaid accounts so that they can make better-informed financial decisions.[11]  And the "reasonably related" requirement is "self-evidently

---

[11]   PayPal does not and could not dispute the adequacy of this interest.  *Cf. AMI*, 760 F.3d at 23-24 (upholding requirement to disclose meat's country of origin where requirement advanced government's interest in, among other things, "enabling customers to make informed choices based on characteristics of the products they wished to purchase").

satisfied" where, as here, the government advances such an interest in assuring that consumers receive particular information about attributes of the product or service being offered by requiring companies to disclose that information. *Id.* at 26.  Finally, the short-form disclosure requirements are not so burdensome as to restrict or chill protected speech:  Where, as here, a rule "simply regulates the manner of disclosure," it does not impose an impermissible "burden on speech."  *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 415 (D.C. Cir. 2012).

PayPal offers four reasons why the short-form disclosures nonetheless offend the First Amendment.  It is wrong at each turn.  First, it contends that the *Zauderer* standard does not apply at all, and that the disclosure requirements must instead pass strict scrutiny. Mem. at 44. But the sole case it cites to support applying strict scrutiny to a disclosure mandate involved a law requiring pro-life crisis pregnancy centers to disclose that other clinics offered abortions. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018).  There, *Zauderer* did not apply because the challenged disclosures (1) did not relate to the services that the clinics themselves provided, but to services available elsewhere, and (2) involved abortion, "anything but an 'uncontroversial' topic." *Id.* at 2372.  Neither problem is present here, where the disclosures relate to the products that entities themselves provide and deal with the terms of prepaid accounts, hardly a topic of controversy.

Second, PayPal contends that the Bureau did not meet its burden to show that it was addressing a "real" problem or that the regulation would be effective in "alleviat[ing]" that problem.  Mem. at 45 (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)).  Even assuming that this requirement for justifying *restrictions* on speech also applies to a *disclosure* mandate,[12]

---

[12]   Case law suggests it does not.  *See Conn. Bar Ass'n v. United State*s, 620 F.3d 81, 97-98 (2d Cir. 2010) ("[W]hile the First Amendment precludes the government from restricting commercial speech without showing that 'the harms it recites are real and that its restriction will

the Bureau met its burden.  The Bureau found that variations in how the terms of prepaid accounts were disclosed made it challenging for consumers to quickly find and evaluate that information and to make informed decisions.  *E.g.*, 81 Fed. Reg. at 84078 (AR1 384).  And, as the D.C. Circuit has held, the government necessarily meets its burden to demonstrate "a measure's effectiveness" where, like here, it "uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait" to inform their purchasing decisions.  *AMI*, 760 F.3d at 26 (citing *Edenfield*, 507 U.S. at 770-71); *see also id.* at 23-24.

Third, PayPal argues that, for the digital wallets covered by the Rule, the short-form disclosure requirements are not "reasonably related" to the interest in enabling consumers to make better-informed decisions because the fees featured most prominently on the short form are "largely inapplicable."  Mem. at 44.  But requiring companies to disclose when a particular feature is free or not offered serves the government's interest in providing consumers easy-to-digest information for multiple reasons, *see supra* p. 48, not least because knowing that a product does not charge a fee (or does not offer a feature at all) helps consumers understand the product and facilitates informed decision-making.  PayPal asserts that disclosing that certain fees are "$0" or that a feature is not offered is "likely to confuse" consumers (Mem. at 44), but it cites no evidence to support this assertion, which the Bureau's testing refutes in any event.  *See supra* p. 49.

Finally, PayPal contends that it does not serve the government's interest to "prohibit[] … clarifying disclosures" about when fees may be lower or waived.  Mem. at 45.  But the Rule does not prohibit such clarifications; it just requires that any clarification be made outside the short-

---

in fact alleviate them to a material degree,' *Edenfield v. Fane*, 507 U.S. [at 770-71], it does not demand evidence or empirical data to demonstrate the rationality of mandated disclosures in the commercial context." (certain quotations and citation omitted)).

form disclosure box itself.  *See* 12 C.F.R. pt. 1005, Supp. I, ¶ 18(b)(3)(i)-1; *see also supra* p. 14.

This limited restriction on where a clarification can be placed preserves the short form's

simplicity and avoids information overload, and thus is reasonably related to the interest in

providing consumers with information they can quickly and easily digest.

*       *       *

PayPal's challenges find no support in the governing statutes, the record, the APA, or the

Constitution.  The Court should reject them.  But even if the Court concluded that some

challenge had merit, that would not warrant the wholesale invalidation of the Rule that PayPal

seeks.  Indeed, PayPal makes no argument why, if it prevailed on its challenges to the Rule's

short-form disclosure requirements or waiting-period provision, that would warrant setting the

Rule aside in its entirety.  It would not.  When one portion of a rule is invalid, a court should

"sever and affirm" the remainder so long as it "can say without any substantial doubt that the

agency would have adopted the severed portion on its own."  *Am. Petroleum Inst. v. EPA*, 862

F.3d 50, 71 (D.C. Cir. 2017), *decision modified on reh'g*, 883 F.3d 918 (D.C. Cir. 2018) (internal

alterations and quotations omitted).  There is no doubt here, much less a "substantial" one, that

the Bureau would have adopted the remainder of the Prepaid Rule—which extends a host of

important protections to prepaid accounts—even if it could not have adopted the separate

provisions that PayPal challenges or applied them to digital wallets' asset accounts.[13]

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Bureau on all

of PayPal's claims.

---

[13]   In the event that the Court found some aspect of the Rule invalid, the Bureau would
appreciate the opportunity to provide supplemental briefing addressing the appropriate remedy in
light of the Court's holding on the merits.

Dated: July 7, 2020                    Respectfully submitted,

MARY McLEOD
  *General Counsel*
JOHN R. COLEMAN
  *Deputy General Counsel*
STEVEN Y. BRESSLER
  *Assistant General Counsel*
  /s/ Kristin Bateman
KRISTIN BATEMAN (Cal. Bar No. 270913)
  *Senior Counsel*
JULIA SZYBALA (D.C. Bar No. 1008962)
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Legal Division
Washington, D.C. 20552
Telephone: (202) 435-7821
Fax: (202) 435-7024
Kristin.Bateman@cfpb.gov

*Counsel for Defendants Consumer Financial*
*Protection Bureau and Kathy Kraninger*