UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAYPAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 19-3700 (RJL) |
| | ) | |
| CONSUMER FINANCIAL | ) | |
| PROTECTION BUREAU, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

(December 30th, 2020) [Dkt. # 19, 20]

Plaintiff PayPal, Inc. ("PayPal" or "plaintiff") brought this suit on December 11, 2019 against the Consumer Financial Protection Bureau and Kathy Kraninger, in her official capacity as Director of the Consumer Financial Protection Bureau, (collectively, "defendants" or the "Bureau") under the Administrative Procedure Act and First Amendment. Plaintiff alleges that two provisions—a short-form disclosure requirement and a thirty-day credit linking restriction—of the Bureau's regulations governing prepaid products are unlawful. PayPal moved for summary judgment on May 6, 2020, and the Bureau cross-moved for summary judgment on July 7, 2020. Pl.'s Mot. for Summ. J. [Dkt. # 19] ("Pl.'s Mot."); Defs.' Cross-Mot. for Summ. J. [Dkt. # 20] ("Defs.' Mot."). The parties' motions are now ripe for review. For the following reasons, plaintiff's motion for summary judgment [Dkt. # 19] is **GRANTED**, and defendants' motion for summary judgment is [Dkt. # 20] is **DENIED**. Further, the short-form disclosure requirement under

1

12 C.F.R. § 1005.18(b) is **VACATED** to the extent it provides *mandatory* disclosure clauses. And the thirty-day credit linking restriction under 12 C.F.R. § 1026.61(c)(1)(iii) is also **VACATED**.

## BACKGROUND

PayPal is a provider of digital wallets. Pl.'s Mot. at 5; Defs.' Mot. at 11. Digital wallets permit consumers to electronically store and access payment credentials—such as credit cards, debit cards, and checking accounts—that will enable consumers to make purchases and transfer money. Pl.'s Mot. at 5 (AR 5862, 5868, 5874); Defs.' Mot. at 7-8 (AR 249).

This case concerns the Bureau's regulation of a certain subset of PayPal's products: digital wallets that qualify as "prepaid products." Prepaid products are financial products that permit a consumer to load funds onto the product for later use in making purchases or performing other transactions. Pl.'s Mot. at 8; Defs.' Mot. at 7. While many digital wallets do *not* store funds and, therefore do *not* qualify as prepaid products, some do and—under the Bureau's regulatory scheme—qualify as prepaid products. Pl.'s Mot. at 6 (AR 249, 5862); Defs.' Mot. at 7-8 (AR 249).

### A. The Prepaid Rule.

In May of 2012, the Bureau issued an advance notice of proposed rulemaking "seeking comment, data, and information from the public about … prepaid cards" for the purpose of "determin[ing] how best to implement consumer protection rules for this product." Pl.'s Mot. at 12 (AR 1-3); Defs.' Mot. at 8.

2

After the comment period, the Bureau issued a proposed rule in December of 2014 and a final rule in November of 2016. Pl.'s Mot. at 13 (AR 4-238 (proposed rule)); *id.* at 16 (AR 240-693 (final rule)); Defs.' Mot. at 8 (AR 240). After delaying implementation of the final rule, the Bureau issued amendments to the rule in February of 2018. Pl.'s Mot. at 18 (AR 743-828); Defs.' Mot. at 8-9 (AR 743); *see also* (AR 698-704) (delaying implementation of the final rule). The final rule, as amended, ("prepaid rule" or "rule") took effect on April 1, 2019. Pl.'s Mot. at 18 (AR 743); Defs.' Mot. at 8-9 (AR 743).

The prepaid rule applies to some—but not all—digital wallets. To qualify as a prepaid product, a product "must be capable of holding funds, rather than merely acting as a pass-through vehicle." 12 C.F.R. pt. 1005, Supp. I ¶ 2(b)(3)(i)-6. Therefore, digital wallets that only hold payment credentials—and do not store funds—or digital wallets with distinct asset accounts (i.e. ones that are not bundled with the digital wallet) are *not* a prepaid account subject to the prepaid rule. *Id.*

Here, PayPal challenges two provisions of the prepaid rule: the short-form disclosure requirement and the thirty-day credit linking restriction.

***Short-Form Disclosure Requirement.*** The Bureau promulgated the short-form disclosure requirement as an amendment to the Electronic Fund Transfer Act. Under this amendment, the Bureau requires providers to disclose specific information about fees associated with their prepaid product in a standardized form. 12 C.F.R. § 1005.18(b)(6)(iii). Specifically, the rule requires that a provider disclose the seven most common fees associated with prepaid products in a table format with four fees—periodic fee, per purchase fee, ATM withdrawal fees, and cash reload fee—featured prominently at

the top. *Id.* § 1006.18(b)(2), (b)(7)(i)(A), (b)(7)(ii)(B)(*1*).  The Bureau included a number of other requirements for the short-form disclosure, including where and how a provider can use footnotes and caveats and the font or pixel size of the text.  *Id.* §§ 1005.18(b)(3), 1005.18(b)(7)(ii)(B).  Most importantly, the specific format and language of the disclosures in short-form disclosure requirement is *mandatory.*  *Id.* § 1005.18(b)(2) ("[A] financial institution *shall provide* a disclosure setting forth the following fees and information for a prepaid account ....") (emphasis added).

   ***Thirty-Day Credit Linking Restriction.***  The prepaid rule also amended the Truth in Lending Act by establishing rules for certain credit offered in conjunction with prepaid accounts.   Relevant here, the prepaid rule requires credit card issuers, in limited circumstances, to wait thirty days after a consumer registers a prepaid account before linking credit to that account.  12 C.F.R. § 1026.61(c)(1)(iii).  This provision applies only to "covered separate credit features," which is separate credit that both: (1) can be accessed by the prepaid card in the course of buying goods or services, withdrawing cash, or making person-to-person transfers; and (2) is offered by a party related to the prepaid account issuer—either the issuer itself, its affiliate, or its business partner.  *Id.* §§ 1026.61(c), (a)(2)(i)(A).

   As applied to digital wallets, if a provider—such as PayPal—offers a digital wallet and a separate asset account, the consumer must wait thirty days before linking a credit account to the separate asset account, but the consumer does *not* have to wait to link credit to the separate digital wallet.  Defs.' Mot. at 18-19.  If a provider offers a digital wallet that *includes* an asset account, the thirty-day credit linking restriction applies in two

scenarios: (1) when the same financial institution or affiliates issue the prepaid account and the credit card; or (2) where the prepaid account issuer and the credit card issuer have a business relationship *and* vary certain costs or other characteristics of either account based on whether the accounts are linked.[1] *See* Defs.' Mot. at 19 (AR 5949-69, 10334-43, 10515-23, 10616-17).

### B. Statutory Scheme.

The Bureau relied on three statutes in promulgating the prepaid rule: the Electronic Fund Transfer Act, the Truth in Lending Act, and the Dodd-Frank Act. The following is a brief description of each.

***The Electronic Fund Transfer Act***. The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*, "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *Id.* § 1693(b). EFTA primarily provides for individual consumer rights but includes obligations on some financial service providers, too. *Id.*

As relevant here, EFTA requires financial institutions to disclose "[t]he terms and conditions of electronic fund transfers involving a consumer's account" and notice concerning disadvantageous changes in those terms. *Id.* §§ 1693c(a)-(b). The terms must—"to the extent applicable"—cover certain information "in readily understandable language," including "any charges for electronic fund transfers." *Id.* § 1693c(a).

---

[1] There are other limited scenarios in which the waiting period would apply, but those scenarios are not relevant here.

In order to "facilitate compliance with the disclosure requirements," Congress directed the Bureau to "issue *model* clauses for *optional* use by financial institutions." *Id.* § 1693b(b) (emphasis added).  When creating these model clauses, the Bureau is obligated to "take account of variations in the services and charges under different electronic fund transfer systems" and—where needed—"issue alternative model clauses for disclosure of these differing account terms." *Id.*  A financial institution is *not* obligated to use the model clauses under § 1693b(b), but EFTA provides a safe harbor from liability for financial institutions that "utilize[e] an appropriate model clause issued by the Bureau," *id.* § 1693m(d)(2).

The Bureau has general rulemaking authority to "prescribe rules to carry out [EFTA's] purposes," but the Bureau must "take into account, and allow for, the continuing evolution of electronic banking services and technology utilized in such services" and "conside[r] the costs and benefits to financial institutions, consumers, and other users of electronic fund transfers." *Id.* § 1693b(a).

***The Truth in Lending Act.***  The purpose of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, is to promote the "informed use of credit" by "assur[ing] a meaningful disclosure of credit terms." 15 U.S.C. § 1601(a).  These disclosures are designed to allow "the consumer … to compare more readily the various credit terms available to him" and "protect the consumer against inaccurate and unfair … practices." *Id.*

Under TILA, the Bureau is given broad power to prescribe regulations, which "may contain … additional requirements, classifications, differentiations, or other provisions"

that are "necessary and proper" to "effectuate [TILA's] purposes," "prevent circumvention

... thereof," or "facilitate compliance therewith." *Id.* § 1604(a).

   ***The Dodd-Frank Act.***   In the wake of the 2008 financial crisis, Congress passed the

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), which

created the Consumer Financial Protection Bureau for the purpose of increasing

transparency in consumer financial products, among other initiatives.   Pub. L. 111-203,

124 Stat. 1376 (Jul. 21, 2010); S. Rep. No. 111-176, at 11.   Relevant here, § 1032 of the

Dodd-Frank Act gives the Bureau authority to adopt rules "to ensure that the features of

any consumer financial product or service ... are fully, accurately, and effectively disclosed

to consumers" so that consumers can "understand the costs, benefits, and risks associated

with the product or service." 12 U.S.C. § 5532(a).

## ANALYSIS

### I.    Standard of Review

   "[W]hen review is based upon the administrative record"—as is the case here—

"[s]ummary judgment is an appropriate procedure for resolving a challenge to a federal

agency's administrative decision." *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002)

(quotations and citation omitted).   In such cases, the district court "sits as an appellate

tribunal" and "the entire case ... is a question of law." *Am. Biosci., Inc. v. Thompson*, 269

F.3d 1077, 1083 (D.C. Cir. 2001) (quotations omitted).

   The Administrative Procedure Act ("APA") requires a district court to "hold

unlawful and set aside agency action[s]" that are "in excess of statutory jurisdiction,

authority, or limitations."   5 U.S.C. § 706(2)(C).   When a party argues that an agency

exceeded its statutory authority, the court must employ the familiar two-step process under *Chevron U.S.A. Inc. v. Natural Res. Def. Council Inc. (Chevron)*, 467 U.S. 837, 842 (1984). *See also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) ("We interpret Congress' grant of rulemaking authority in light of our decision in *Chevron*.") (citation omitted). First, the court must ask "whether congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-43. If—after employing traditional tools of statutory interpretation—a court determines that Congress has directly spoken to the precise issue, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 843 n.9. If, however, the "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

## II.    The Bureau Acted Outside of its Statutory Authority by Promulgating Mandatory Disclosure Clauses.

PayPal first argues that the prepaid rule's short-form disclosure requirement exceeds the Bureau's statutory authority because Congress only authorized the Bureau to adopt model, optional disclosure clauses—*not* mandatory disclosures clauses like the short-form disclosure requirement. Pl.'s Mot. at 20-27. The Bureau counters that the short-form disclosure requirement is lawful because EFTA and the Dodd-Frank Act authorize the Bureau to issue—or at least do not foreclose it from issuing—rules mandating the form of a disclosure. Defs.' Mot. at 21-30. Unfortunately for the Bureau, Congress has unambiguously spoken on this specific issue, and the short-form disclosure requirement

exceeds the authority Congress granted to the Bureau under EFTA and the Dodd-Frank Act.  How so?

Well, first, the plain language of the statute effectively precludes it!  While EFTA requires providers to disclose the "terms and conditions of electronic fund transfers," including "any charges for electronic fund transfers," 15 U.S.C. § 1693c(a)(4), it does *not* require that providers adhere to a specific form for these disclosures.  Rather, Congress directed the Bureau to "issue *model* clauses for *optional* use by financial institutions."  15 U.S.C. § 1693b(b) (emphasis added).  Indeed, Congress underscored the need for flexibility by requiring the Bureau to "take account of variations in the services and charges under different electronic fund transfer systems" and "issue alternative model clauses" for different account terms where appropriate.  *Id.*  Congress also included a safe harbor provision that protects providers from liability when the providers "utilize an appropriate model clause issued by the Bureau."  *Id.* § 1693m(d)(2).  Therefore, the plain text of EFTA specifically provides for how the Bureau must issue disclosure clauses and how providers may use them: the Bureau must issue *model* clauses that providers *may* utilize.  Put simply, the plain text does not permit the Bureau to issue *mandatory* clauses.

The legislative history supports this reading.  The original Senate bill did not require the Board to issue model forms and clauses.  124 Cong. Rec. 3913, 3918 (Feb. 21, 1978). When financial institutions objected, Senator Brooke proposed an amendment that would "*require* the [Board] to issue *model* clauses for disclosure of EFT terms and conditions" in order to provide businesses assured means of complying with the statute.  Amendment on S. 2546, 124 Cong. Rec. S8284 (daily ed. March 23, 1978) (emphasis added).  The Senate

report likewise emphasizes the voluntary nature of the model clauses. *See* S. Rep. No. 95-915, at 4 (1978) ("To facilitate compliance with th[e] [disclosure] requirement, the [Board] is required to promulgate model clauses for standard disclosures. While use of such clauses would be optional, a financial institution which utilized an appropriate model clause would be assured of compliance with the act's requirements."). Thus, Congress intended to provide flexibility to the providers by ensuring that the Bureau issued *example* disclosure clauses that the providers could utilize (and limit liability under the safe harbor provision) or ignore (and instead issue their own disclosure at their own risk).[2]

In response, the Bureau argues that it is permitted to issue mandatory clauses under its general rulemaking authority in EFTA or the Dodd-Frank Act and because nothing expressly *prohibits* the Bureau from doing so. *See* Defs.' Mot. at 21-26. But basic principles of statutory construction render this argument meritless.

As an initial matter, I cannot presume—as the Bureau does—that Congress delegated power to the Bureau to issue mandatory disclosure clauses just because Congress did not specifically prohibit them from doing so. Indeed, "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Railway Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29

---

[2] The Bureau's attempt to characterize this statutory interpretation as a reliance on the interpretative canon *expression unius est exclusion alterius* is unconvincing. *See* Defs.' Mot. at 25-26. Once Congress determined that the Bureau must issue disclosures, the only option was whether such disclosures would be optional or mandatory. Congress spoke on that issue, choosing optional use and providing flexibility for the providers.

F.3d 655, 671 (D.C. Cir. 1994), *amended*, 38 F.3d 1224 (D.C. Cir. 1994).  And "[a]n agency's general rulemaking authority plus statutory silence does not … equal congressional authorization." *Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020).  The Bureau must, therefore, identify Congress's *authorization* to impose mandatory disclosure clauses.

The Bureau attempts to find such authorization in its power "to prescribe rules to carry out [EFTA's] purposes" and its authority to require providers to disclose the "terms and conditions" of electronic fund transfers.  Defs.' Mot. at 21-22.  This argument, however, fails for three reasons.

First, the Bureau wants this Court, in essence, to read these provisions in a vacuum. Please!  *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex. rel. Wilson*, 559 U.S. 280, 290 (2010) ("Courts have a duty to construe statutes, not isolated provisions.") (quotations omitted).  The Bureau's reading of § 1693b and § 1693c *ignores* the other provisions within the statute that speak specifically to how the Bureau can issue disclosures and how providers must use them.  *See* 15 U.S.C. § 1693b(b) (requiring the Bureau to issue "optional" disclosures); *Id*. § 1693m(d)(2) (providing a safe harbor for providers who utilize the Bureau's model disclosure clause).

Second, it is a canon of statutory construction that "the specific governs the general," including when applied "to statutes … in which a general authorization and a more limited, specific authorization exist side-by-side."  *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  As applied here, when it comes to the Bureau's authority to issue disclosures, Congress's specific requirement that the Bureau

issue *optional*, *model* disclosure clauses governs the Bureau's general rulemaking authority under § 1693b. The same can be said for the Bureau's reliance on § 1693c. Section 1693c authorizes the Bureau to require providers to disclose the "terms and conditions" of electronic funds transfers "in accordance with regulations of the Bureau." 15 U.S.C. § 1693c. But this cannot be read to control over the neighboring provision that specifies how the Bureau can regulate disclosure clauses.[3]

Third, the Bureau's reading of EFTA fails to give meaning to "all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted). If Congress intended the Bureau to have the power to issue mandatory disclosure clauses, then the provisions requiring that the Bureau issue optional, model clauses and providing a safe harbor would be inoperative or—at the very least—insignificant.[4]

The Bureau's attempt to rely on its general rulemaking authority under the Dodd-Frank Act is similarly unavailing. The Dodd-Frank Act authorizes the Bureau to "prescribe

---

[3] Tellingly, the Bureau does not identify any prior regulation under EFTA in which it mandated the form of the disclosure clauses. *See Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who would presumably be alert to exercise it, is equally significant in determining whether such power was actually conferred.") (citation omitted).

[4] The Bureau attempts to argue that the model clause and safe harbor provisions act as a "floor, not a ceiling for the [agency's] discretion." Defs.' Mot. at 25 (citing *CSX Transp. Inc. v. Surface Transp. Bd.*, 754 F.3d 1056, 1063 (D.C. Cir. 2014)). But there are no indications in the text of EFTA that Congress intended the model clause and safe harbor provisions to act as a floor. And—unlike the statute in *CSX Transportation*—reading EFTA as a floor would effectively render other provisions surplusage. *See id.*

rules to ensure that the features of any consumer financial product or service … are fully, accurately, and effectively disclosed to consumers ….” 12 U.S.C. § 5532(a).  But, here too, the Bureau forgets that the specific statute “controls over a general one,” so that the general statute does not nullify the provisions of the specific statute.  *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (citation omitted).  Despite the Bureau’s attempt to argue to the contrary, there is a conflict between the Dodd-Frank Act—as the Bureau attempts to apply it here—and the specific disclosure provisions in EFTA: EFTA specifies the manner in which the Bureau can issue disclosure clauses and the Dodd-Frank Act cannot be read to provide carte blanche to the Bureau to ignore it.

The bottom line is thus clear: Congress did not provide statutory authority—under either EFTA or the Dodd-Frank Act—for the Bureau to issue mandatory disclosure clauses.  And the Bureau’s attempt to transform its general rulemaking power into such authority runs afoul of basic principles of statutory construction.  Consequently, this is a case where Congress has spoken directly on the specific issue of whether the Bureau can issue mandatory disclosure clauses.  It cannot.[5]

The remaining question, therefore, is whether the short-form disclosure requirement also exceeds the Bureau’s statutory authority by effectively creating mandatory disclosure

---

[5] The Bureau also argues that its interpretation of the statute should be afforded deference under *Chevron* step two because the statute is ambiguous. Defs.’ Mot. at 27-28.  Not so. I need not find that Congress expressly prohibited the agency’s activity to conclude that there is no ambiguity.  *U.S. Telecom Ass’n v. FCC*, 359 F.3d 554, 556 (D.C. Cir. 2004) (“[T]he failure of Congress to use ‘Thou Shalt Not’ language doesn’t create a statutory ambiguity of the sort that triggers *Chevron* deference.”).

clauses? Undoubtedly so!  The short-form disclosure requirement is *not* a model form that providers have the option of utilizing, as required by EFTA.  *Compare* 15 U.S.C. § 1693b(b) (requiring the Bureau to issue optional disclosure clauses) *with* 12 C.F.R. § 1005.18(b)(1)(i) (requiring providers to use the Bureau's disclosure clause).  Rather, it is *mandatory* and provides the specific form, structure, and contents of disclosures that providers *must* use.   12 C.F.R. § 1005.18(b).   Therefore, the short-form disclosure requirement under 12 C.F.R. § 1005.18(b) exceeds the bounds of the Bureau's statutory authority to the extent is requires providers to utilize the Bureau's disclosure clauses.  As such, I must set it aside as well.  5 U.S.C. § 706(2)(c).

### III.     The Bureau Acted Outside of its Statutory Authority by Promulgating a Substantive Restriction on Consumers' Access to or Use of Credit Linked to Prepaid Products.

PayPal also attacks the thirty-day credit linking restriction, arguing that the Bureau exceeded its statutory authority by creating a substantive restriction on a consumer's access to and use of credit under the guise of a disclosure rule.  Pl.'s Mot. at 28-33.  The Bureau contends that its general rulemaking power—under either TILA or the Dodd-Frank Act— provides the statutory authority for the thirty-day credit linking restriction.  Defs.' Mot. at 31-40.   Here too, the Bureau once again reads too much into its general rulemaking authority.  The thirty-day credit linking restriction is not merely a disclosure requirement, it is a ban on a consumer's access to and use of credit that exceeds the Bureau's authority under TILA and the Dodd-Frank Act.  How so?

14

Again, I begin with the text of the statute.   The Bureau points to its general rulemaking authority under § 1604(a) of TILA.   Defs.' Mot. at 31-33.   Section 1604(a) states:

> The Bureau shall prescribe regulations to carry out the purposes of this subchapter.   … [S]uch regulations may contain such additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

15 U.S.C. § 1604(a).

Doubtless, this is a broad grant of authority.   But it is not without limitations!   Indeed, the statute makes clear that any additional requirements must be "necessary or proper to effectuate [TILA's] purposes."   *Id.*   The purpose of TILA—of course—is to "assure a meaningful disclosure of credit terms" in order to protect consumers from "inaccurate and unfair credit … practices."   *Id.* § 1601(a).   Here, Congress has spoken specifically on the means the Bureau can effectuate TILA: the "*disclosure of credit terms*."[6]   *Id.* (emphasis added).   And "[t]he means chosen by Congress to effectuate legislation matter[]."   *Merck*, 385 F. Supp. 3d at 94.   Consequently, when Congress delegated authority to the Bureau to prescribe "additional requirements, classifications,

---

[6] There are some provisions of TILA, however, that provide discrete, explicit obligations or restrictions on credit.   *See, e.g.*, 15 U.S.C. § 1639c (providing minimum standards for residential mortgage loans); *id.*. § 1650 (preventing unfair and deceptive practices in private educational lending).   But Congress provided no such specific provision concerning restrictions to consumers' access to credit when linking credit to prepaid products, much less any provision providing *the Bureau* with the authority to promulgate such regulations.

differentiations, or other provisions," 15 U.S.C. § 1604(a), it delegated authority to issue additional requirements for the disclosure of credit terms.  Disclosing the terms of credit does *not* mean, however, regulating the terms of credit.

Further, the Bureau's authority to provide "additional requirements" as it deems "necessary or proper" does not provide the Bureau with unfettered discretion.  "[M]ere reference to 'necessary' or 'appropriate' in a statutory provision authorizing an agency to engage in rulemaking does not afford the agency authority to adopt regulations as it sees fit with respect to all matters covered by the agency's authorizing statute." *N.Y. Stock Exch. v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) (citing *Michigan v. EPA*, 135 S. Ct. 2669, 2706-07 (2015)).  And any "additional requirements" must still be within the confines of the means authorized by Congress.[7]

The Bureau's argument that the thirty-day credit linking restriction is permitted because Congress did not explicitly prohibit it is, again, meritless.  As stated above, courts cannot presume congressional authority based on congressional silence.  *Railway Labor Execs.' Ass'n*, 29 F.3d at 671.  And "the mere absence of an express statutory restriction is not a blank check to regulate on any subject matter that might conceivably advance a legislative purpose." *Merck*, 385 F. Supp. 3d at 94.

---

[7] The Bureau's reliance on *Council for Urological Interests v. Burwell*, 790 F.3d 212 (D.C. Cir. 2015) is misplaced.  Defs.' Mot. at 34.  That case involved an agency's promulgation of "additional requirements" to an existing, substantive statutory scheme: the Stark Law. *Council for Urological Interests*, 790 F.3d at 215-16.  Here, the Bureau has promulgated regulations in a disclosure statute that are untethered to the means authorized by Congress.

The legislative history also makes clear that the Bureau's authority under TILA is limited to disclosure of credit terms and does not extend to regulation of a consumer's access to or use of credit.  The Senate Banking Committee explained that TILA would "not in any way regulate the credit industry" or seek "to impede or retard the growth of consumer credits."  S. Rep. No. 90-392 at 1-2 (1967); *see also* H.R. Rep. No. 90-1040 at 7 (1967) ("[TILA] provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended.").

Not surprisingly, courts have consistently read TILA as a disclosure statute—not a statute that allows the bureau to substantively regulate credit.  *See e.g.*, *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011) ("Congress passed TILA to promote consumers' 'informed use of credit' by requiring 'meaningful disclosure of credit terms ....'"); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980) ("The concept of 'meaningful disclosure' ... animates TILA ....").  Indeed, while courts have warned that the statute should be construed "liberally to ensure achievement of the[] goals" of TILA, they have similarly made clear that TILA "provides for full disclosure of credit terms rather than regulation of the terms or conditions under which credit may be extended."  *Johnson v. McCrackin-Sturman Ford, Inc.*, 527 F.2d 257, 262 (3d Cir. 1975) (citation omitted); *see also Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1120 (9th Cir. 2009) ("TILA is only a 'disclosure statute' and 'does not substantively regulate consumer credit ....'").

As a fallback, the Bureau asserts that § 1032(a) of the Dodd-Frank Act provides the statutory authority for the thirty-day credit linking restriction.  *See* Defs.' Mot. at 40 (citing 12 U.S.C. § 5532(a)).  But the Bureau makes a similar error here as it did when trying to

17

assert this same provision as authority for the short-form disclosure requirement. Congress spoke to how the Bureau was to effectuate TILA: through the disclosure of credit terms. 15 U.S.C. §§ 1601(a), 1604(a). Put simply, the Bureau cannot cite the general rulemaking power under the Dodd-Frank Act as authority to override Congress's legislative directive and, instead, promulgate substantive regulations on a consumer's access to or use of credit when linking credit to a prepaid account. *See Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) ("An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.").

As such, the Bureau has failed to raise any argument here demonstrating that Congress authorized it to promulgate substantive regulations on a consumer's access to and use of credit in prepaid accounts. To the contrary, the statutory language and legislative history of TILA establish that the Bureau's authority under TILA is limited to *disclosure* of credit terms.[8]

The remaining question for PayPal's challenge is whether the regulation is a substantive limitation on credit—which would fall outside the Bureau's power—or a disclosure requirement—which would fall within the purview of the Bureau's authority. There is no doubt that the thirty-day credit linking restriction is a *substantive* regulation

---

[8] The Bureau, again, argues that the Court should afford it deference under *Chevron* step two. Defs.' Mot. at 37-40. But, having found that Congress has directly spoken to the precise issue, I "must give effect to the unambiguously expressed intent of Congress," without reaching step two. *Chevron*, 467 U.S. at 843.

banning a consumer's access to and use of credit.  On its face, the thirty-day credit linking restriction does *not* direct credit card issuers to *disclose* terms related to linking a credit card to a prepaid product.  *See* 12 C.F.R. § 1026.61(c)(1)(iii).  Rather, it restricts when the credit provider can allow the consumer to access the credit on the prepaid product.  *Id.*

In the final analysis, the Bureau attempts to disguise the thirty-day credit linking restriction as merely a disclosure requirement by arguing that it furthers TILA's purpose by "giv[ing] consumers the chance to separately consider disclosures about the terms of the linked credit, and to make a deliberate decision about whether to accept those terms." Defs.' Mot. at 34-35.  That dog won't hunt!  An agency is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT & T*, 512 U.S. 218, 231 n.4 (1994).  The Bureau cannot simply rely on the overarching purpose of the statute without giving credence to *how* Congress intended the agency to fulfill the statute's purpose.  And the fact that a consumer may have more time to consider credit terms does not transmute an unlawful ban on a consumer's access to credit into a lawful disclosure requirement.

Having determined that neither TILA nor the Dodd-Frank Act provide the Bureau with the authority to promulgate substantive regulations on when consumers can access and use credit linked to prepaid accounts—and having determined that the thirty-day credit linking restriction is such a substantive regulation and *not* a disclosure requirement—the

thirty-day credit linking restriction provision under 12 C.F.R. § 1026.61(c)(1)(iii) is outside

the scope of the Bureau's statutory authority and must be set aside.  5 U.S.C. § 706(2)(c).[9]

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for summary judgment [Dkt.

# 19] is **GRANTED**, and defendants' motion for summary judgment [Dkt. # 20] is

**DENIED**.  Further, 12 C.F.R. § 1005.18(b) is hereby **VACATED** to the extent that the

short-form disclosure requirement provides mandatory disclosure.  And the thirty-day

credit linking restriction under 12 C.F.R. § 1026.61(c)(1)(iii) is hereby **VACATED**.  An

order consistent with this decision accompanies this Memorandum Opinion.


RICHARD J. LEON
United States District Judge

---

[9] Because I vacate the short-form disclosure requirement and the thirty-day credit linking restriction for exceeding the Bureau's statutory authority, I need not reach the issues of whether these provisions are arbitrary and capricious, whether the Bureau failed to perform a cost-benefit analysis, or whether the short-form disclosure requirement violates the First Amendment.