# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAYPAL, INC.,<br>2211 North First Street<br>San Jose, CA 95131,<br><br>*Plaintiff*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>and<br><br>ROHIT CHOPRA, in his official capacity as<br>Director, Consumer Financial Protection<br>Bureau,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 19-3700 (RJL) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## RENEWED MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 5

I.      The Role Of Digital Wallets In The Financial Technology Ecosystem ............................. 5

        A.      The Capacity To Store Funds Is An Ancillary Feature Of Digital Wallets ............ 6

        B.      Most Digital Wallet Consumers Do Not Pay Any Usage Fees ............................... 6

        C.      Digital Wallets Are Categorically Different From GPR Cards .............................. 7

II.     Statutory And Regulatory Background .............................................................................. 9

        A.      The Electronic Fund Transfer Act .......................................................................... 9

        B.      Regulation E .......................................................................................................... 10

III.    The Prepaid Rule ............................................................................................................. 11

        A.      The Bureau Issues An Advance Notice Of Proposed Rulemaking That Never
                References Digital Wallets .................................................................................... 12

        B.      The Bureau Issues A Proposed Rule Sweeping Many Digital Wallets Into The
                Definition Of Prepaid Accounts ........................................................................... 12

        C.      The Bureau Finalizes A Rule That Fails To Properly Distinguish Digital Wallets
                From Other Prepaid Accounts .............................................................................. 14

STANDARD OF REVIEW ........................................................................................................... 18

ARGUMENT ................................................................................................................................. 19

I.      The Prepaid Rule's Heightened Regulatory Requirements Are Arbitrary And
        Capricious As Applied To Digital Wallets ...................................................................... 19

        A.      The Bureau Had No Rational Justification For Subjecting Digital Wallets To A
                Regulatory Regime Designed For GPR Cards ...................................................... 19

        B.      The Bureau Lacked A Well-Founded, Non-Speculative Basis For Subjecting
                Digital Wallets To Heightened Regulation ........................................................... 24

II.     The Bureau Failed To Perform Appropriate Cost-Benefit Analysis Regarding
        Application Of The Prepaid Rule To Digital Wallets ...................................................... 28

        A.      The Bureau Is Obligated To Consider The Costs And Benefits Of Regulation .... 28

        B.      The Bureau's Cost-Benefit Analysis All But Ignores Digital Wallets ................. 29

III.    The Prepaid Rule Violates The First Amendment ........................................................... 35

CONCLUSION .............................................................................................................................. 39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)..................................................................................38

*American Hospital Association v. Azar*,
    468 F. Supp. 3d 372 (D.D.C. 2020) .........................................................36

*American Hospital Association v. Azar*,
    983 F.3d at 541 (D.C. Cir. 2020) .......................................................36, 38

*American Meat Institute v. U.S. Department of Agriculture*,
    760 F.3d 18 (D.C. Cir. 2014).....................................................................37

*Amerijet International, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014).................................................................21

*Animal Legal Defense Fund, Inc. v. Perdue*,
    872 F.3d 602 (D.C. Cir. 2017)...................................................................19

*Business Roundtable v. Securities and Exchange Commission*,
    647 F.3d 1144 (D.C. Cir. 2011)....................................................21, 29, 31

*Carlson v. Postal Regulatory Commission*,
    938 F.3d 337 (D.C. Cir. 2019)...................................................................22

*Central Hudson Gas & Electrc Corp. v. Public Service Commission of New York*,
    447 U.S. 557 (1980)..................................................................................37

*Chamber of Commerce v. Securities and Exchange Commission*,
    412 F.3d 133 (D.C. Cir. 2005)...................................................................29

*Cigar Association of America. v. U.S. Food and Drug Administration*,
    436 F. Supp. 3d 70 (D.D.C. 2020) ...........................................................26

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)..................................................................................18

*City of Chicago v. Federal Power Commission*,
    458 F.2d 731 (D.C. Cir. 1971)...................................................................25

*Constellation Mystic Power, LLC v. Federal Energy Regulatory Commission*,
    45 F.4th 1028 (D.C. Cir. 2022)...........................................................18, 21

*District Hospital Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015) ................................................................22

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ..............................................................................36

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ..............................................................................21

*GPA Midstream Association v. United States Department of Transportation*,
    No. 22-1148, 2023 WL 3471113 (D.C. Cir. May 16, 2023) ............................20, 30

*Horsehead Resource Development Co., Inc. v. Browner*,
    16 F.3d 1246 (D.C. Cir. 1994) ...............................................................27

*International Ladies' Garment Workers' Union v. Donovan*,
    722 F.2d 795 (D.C. Cir. 1983) ...............................................................20

*Judulang v. Holder*,
    565 U.S. 42 (2011) ................................................................................18

*Merck & Co. v. U.S. Department of Health and Human Services*,
    962 F.3d 531 (D.C. Cir. 2020) ...............................................................24

*Metlife, Inc. v. Financial Stability Oversight Council*,
    177 F. Supp. 3d 219 (D.D.C. 2016) ...............................................28, 29

*Michigan v. Environmental Protection Agency*,
    576 U.S. 743 (2015) ........................................................................4, 28

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm
    Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ....................18, 19, 25

*National Community Reinvestment Coalition v. Consumer Financial Protection Bureau*,
    No. 20-2074, 2022 WL 4447293 (D.D.C. Sept. 23, 2022) ....................19, 31, 32

*National Fuel Gas Supply Corp. v. Federal Energy Regulatory Commission*,
    468 F.3d 831 (D.C. Cir. 2006) ...............................................................26

*National Institute of Family and Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ................................................................35, 36, 37

*National Shooting Sports Foundation, Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) .........................................................25, 34

*Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency*,
    859 F.2d 156 (D.C. Cir. 1988) .........................................................27, 28

*New York v. U.S. Department of Health and Human Services*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019)................................................................25

*Nicopure Labs, LLC v. Food and Drug Administration*,
   266 F. Supp. 3d 360 (D.D.C. 2017)................................................................34

*Nicopure Labs, LLC v. Food and Drug Administration*,
   944 F.3D 267 (D.C. Cir. 2019)................................................................34

*Otay Mesa Property, L.P. v. U.S. Department of the Interior*,
   344 F. Supp. 3d 355 (D.D.C. 2018)................................................................27

*PayPal, Inc. v. Consumer Financial Protection Bureau*,
   58 F.4th 1273 (D.C. Cir. 2023)................................................................ *passim*

*PayPal, Inc. v. Consumer Financial Protection Bureau*,
   512 F. Supp. 3d 1 (D.D.C. 2020)................................................................2, 17

*Perez v. Mortgage Bankers Association*,
   575 U.S. 92 (2015)................................................................31

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)................................................................35

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)................................................................35, 38

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
   471 U.S. 626 (1985)................................................................35, 36

**Federal Statutes**

5 U.S.C. § 706................................................................3, 18, 19

12 U.S.C.
   § 5512................................................................4, 29, 32, 34
   § 1693................................................................9
   § 1693................................................................9
   § 1693b................................................................10, 29
   § 1693c................................................................9, 10, 11

Pub. L. No. 95-630, 92 Stat. 3728 (1978)................................................................9

Pub. L. No. 111-203, 124 Stat. 1376 (2010)................................................................10

**Regulations**

12 C.F.R.

§ 205......................................................................................................................10
§ 1005....................................................................................................................10
§ 1005...............................................................................................................10, 16
§ 1005.4.................................................................................................................11
§ 1005.7...........................................................................................................10, 11

**Other Authorities**

PayPal Holdings, Inc., Form 10-K (Feb. 7, 2019) .........................................................11

PayPal Holdings, Inc., Form 10-K (Feb. 11, 2016) .......................................................11

## INTRODUCTION

Plaintiff PayPal, Inc. has brought this action to challenge a Consumer Financial

Protection Bureau ("CFPB" or "Bureau") rule that imposes onerous and ill-fitting regulations on

providers of "digital wallets."  Generally speaking, a digital wallet is an Internet-based financial

product that allows consumers to electronically store and access various payment credentials (for

example, credit card credentials) for use in online transactions.  PayPal is a major provider of

digital wallet products and a global leader in facilitating innovative digital and mobile payments

on behalf of consumers and merchants.

The regulation at issue here is the "Prepaid Accounts Under the Electronic Fund Transfer

Act (Regulation E) and the Truth in Lending Act (Regulation Z)" Rule ("the Prepaid Rule," "the

Final Rule," or "the Rule").[1]  Effective in 2019, the Prepaid Rule was the result of a long-

running CFPB initiative to regulate "prepaid cards," also known as "general purpose reloadable

cards" ("GPR cards").  GPR cards are typically plastic cards that consumers acquire at brick-

and-mortar retailers, load with cash, and use to pay for purchases.  Rather than subjecting GPR

cards to the preexisting baseline protections for consumer asset accounts set forth in

Regulation E, the Bureau determined that GPR cards warrant heightened—and more exacting—

regulation.

Although the Bureau designed the Prepaid Rule in all important respects for GPR cards,

the Bureau—with scant explanation—chose to sweep many digital wallets into a single

---

[1]  References to "the Rule" correspond to several related final rules that collectively implement
the regulations at issue here.  *See* AR1 240-693 (Nov. 22, 2016) (Final Rule); AR1 698-704
(Apr. 25, 2017) (delaying implementation of the Final Rule by six months); AR1 743-828 (Feb.
13, 2018) (amending the Final Rule and delaying its implementation until April 1, 2019).
Citations to volume 1 of the Administrative Record ("AR"), excerpts of which were filed in
connection with the parties' original motions for summary judgment, *see* Dkt. 25, are denoted
"AR1," and citations to volume 2 of the AR are denoted "AR2."

regulatory regime governing "prepaid accounts."  In particular, the Bureau extended the Prepaid Rule to digital wallets that happen to be capable of storing funds.  In doing so, the Bureau seized on immaterial overlap between GPR cards and many digital wallets—namely, their shared capacity to hold consumers' funds—in an attempt to justify adopting a one-size-fits-all regulatory regime.  The Bureau's decision to do so was a prime example of regulatory overreach. In subjecting digital wallets to a regime crafted specifically for GPR cards, the Bureau overlooked extensive record evidence demonstrating that GPR cards differ from digital wallets in fundamental ways; it ignored repeated warnings from digital wallet providers that the Rule's requirements were ill-suited to the ways that consumers actually acquire and use digital wallets; it identified no evidence of consumer harm from digital wallets that demanded any regulatory fix; and it failed to explain at all why Regulation E's baseline protections did not suffice to address any risks that digital wallets might pose to consumers.

The result of these agency missteps was to impose on many digital wallet providers and consumers a stringent set of special prescriptions designed for GPR cards that are deeply inappropriate for digital wallets and are likely to perplex rather than empower consumers.  As most relevant here, the Rule created a highly prescriptive, one-size-fits-all fee disclosure designed entirely around the fees charged by GPR cards that was likely to significantly confuse digital wallet customers about the fees (or lack of fees) applicable to their products.[2]  This so-called "short-form" disclosure requires providers to convey fee information in a specified order

---

[2] The Bureau also imposed, based on GPR-card-related concerns, a 30-day ban on digital wallet consumers' ability to link their accounts to certain credit cards, including cards the consumers had previously or independently acquired, thus frustrating their use of a core digital wallet feature.  This Court held that the credit-linking restriction exceeded the Bureau's authority, *PayPal, Inc. v. CFPB*, 512 F. Supp. 3d 1, 12 (D.D.C. 2020), *rev'd and remanded on other grounds*, 58 F.4th 1273 (D.C. Cir. 2023), a ruling that the Bureau has not challenged and thus remains undisturbed.

and format, mandates the listing of only the highest fee amounts that could be incurred in worst-case scenarios while prohibiting clarifying annotations and explanations within the disclosure when fees can be lower or avoided altogether, and even prescribes the allowable font size, down to mandating the number of pixels providers must use.

In earlier stages of this litigation, the Bureau claimed that the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, authorized the agency to mandate the short-form disclosure requirement, a conclusion with which the D.C. Circuit ultimately agreed, *PayPal, Inc. v. CFPB*, 58 F.4th 1273 (D.C. Cir. 2023). Nonetheless, the short-form disclosure mandate is contrary to law under the Administrative Procedure Act ("APA") for several other reasons, each of which requires the Court to set aside the Final Rule:

*First*, the Bureau's extension of the Prepaid Rule to digital wallets was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); Dkt. 1 at 34-36 (Compl. ¶¶ 94-102). From the start, the Bureau's rulemaking initiative was driven by policy concerns about GPR cards—their rapid growth, their associated fees, and their potential to fall between gaps in the Bureau's regulatory framework. Indeed, the Bureau's advance notice of proposed rulemaking did not even mention digital wallets. The end result was a complex regulatory regime crafted for GPR cards: one that requires disclosure of the types of fees usually charged by GPR cards (but not digital wallets) and that mandates a short-form disclosure designed to help consumers shop for plastic GPR cards in retail locations (not consumers acquiring digital wallets online). The Bureau then proceeded to apply this GPR card-focused regulation to many digital wallets without ever meaningfully analyzing whether digital wallets presented any of the concerns that animated the rulemaking in the first place. Compounding its error, the Bureau did not even attempt to explain why any risks posed by digital wallets could not be adequately addressed by the preexisting baseline protections for consumer asset accounts set forth in Regulation E. The Bureau's

extension of the short-form requirement in the Prepaid Rule to digital wallets was arbitrary and capricious, and the Court should set the Rule aside.

*Second*, the Bureau defied its statutory obligations under the APA and the Dodd-Frank Act to perform a reasoned cost-benefit analysis. In addition to the general duty that the APA imposes on agencies to consider the consequences of their actions, *see Michigan v. EPA*, 576 U.S. 743, 752 (2015), the Dodd-Frank Act expressly commands the Bureau to perform a rigorous cost-benefit analysis, *see* 12 U.S.C. § 5512(b)(2). The Bureau failed to satisfy those requirements here, because the agency did not thoroughly or appropriately consider either the costs to digital wallet providers of complying with the Prepaid Rule or the Rule's stifling of innovation in the digital wallet space and the resulting reduction of consumers' abilities to access the benefits of such financial products. Dkt. 1 at 37-38 (Compl. ¶¶ 103-110). Indeed, the Bureau's cost-benefit analysis of the short-form disclosure mandate does not mention the term "digital wallet" at all, much less grapple with real-world concerns that the Rule would "confuse and alarm" consumers by forcing providers to disclose largely irrelevant and inapplicable fees tailored to an entirely different product. AR2 5880; *see also* AR2 5860-5890 (PayPal Comment Letter (Mar. 23, 2015)). This mistake, too, demands vacatur of the Rule.

*Third*, the Rule violates the First Amendment because it commands PayPal to make misleading and inapplicable disclosures to its customers, dictates how that information is to be conveyed, and restricts it from offering relevant clarifying context regarding the mandated disclosures. Under the Rule, PayPal must highlight to consumers the highest possible fee amounts even if, in the vast majority of cases, PayPal customers will pay lower fees or no fees at all. Compounding concerns with that compelled speech, PayPal is not permitted to provide customers, within the short-form disclosure, the information necessary to accurately describe the fees they might actually encounter. The Rule thus at once compels and restricts speech of digital

wallet providers in ways that are very likely to confuse consumers about the nature of PayPal's

product.  The Bureau has identified no substantial, evidence-based interest to justify this type of

presumptively unconstitutional content-based speech restriction, nor has it demonstrated that

applying the short-form disclosure requirement to digital wallets is reasonably related to its

regulatory interests.  *See* Dkt. 1 at 39-41 (Compl. ¶¶ 111-117).  Accordingly, the Court should

vacate the Rule's short-form requirement as applied to digital wallets and enjoin the enforcement

of the requirement against PayPal.

## BACKGROUND

**I.    THE ROLE OF DIGITAL WALLETS IN THE FINANCIAL TECHNOLOGY ECOSYSTEM**

For more than two decades, PayPal has been the leading provider of an innovative

financial product: the digital wallet.  *See, e.g.*, AR2 5861.  Like its physical counterpart, a digital

wallet electronically stores a consumer's payment credentials.  Upon opening a digital wallet

account—a process that takes place entirely on the Internet—a consumer may elect to connect a

digital wallet with one or more traditional payment devices (or "funding instrument[s]")

including credit cards, debit cards, and bank accounts.  AR2 5862, 5868, 5874.  The payment

credentials uploaded by the consumer—such as account numbers, expiration dates, and personal

identifying information—are securely stored in the digital wallet just as a credit card might be

stored in a physical wallet.  AR2 5862.  Later, when a consumer wishes to use a particular

payment method to make a payment or to transfer funds, the digital wallet provider accesses the

relevant credentials on the consumer's behalf and effects the transaction.  AR2 5868.  The

counterparty never views or accesses the payment credentials; a digital wallet provider like

PayPal handles the entire process, effecting the transaction without revealing the consumer's

sensitive payment information to the merchant or entity on the other side of the exchange.  In this

way, digital wallet providers serve as trusted intermediaries between the consumer and anyone—friends, merchants, complete strangers—with whom a consumer transacts. *See* AR2 5869.

### A.    The Capacity To Store Funds Is An Ancillary Feature Of Digital Wallets

Although some digital wallets, including PayPal's, have the capacity to store a consumer's funds (as opposed to payment credentials), this is merely an ancillary feature of a digital wallet—as the Bureau recognized. *See* AR1 249 (noting that all digital wallets store payment credentials, while only some store funds); *see also* AR2 5862 ("[D]igital wallets are used primarily not to access funds, but rather to access payment credentials."). A consumer need not hold *funds* in her digital wallet to pay for purchases or to send money to others; the digital wallet already contains the *credentials* necessary to effect the payment regardless of whether the wallet holds a balance. As explained to the CFPB during the rulemaking, "[n]early 100% of PayPal's US consumer accounts are linked to at least one payment card or bank account as a funding source," and "most [consumers] never carry a balance." AR2 5862, 5865. Furthermore, as PayPal explained, the "vast majority of consumer transactions" in the United States "are funded by stored payment credentials." AR2 5868.

Moreover, when a consumer does carry a balance in a digital wallet, it is often because the consumer has received funds from someone else, not because the consumer herself added funds to the digital wallet for later use. *See* AR2 5868. Upon receiving funds from a transaction using a digital wallet, a consumer can choose to leave the funds in the digital wallet; use the funds to pay for other transactions; or transfer the funds to a bank account linked to the wallet.

### B.    Most Digital Wallet Consumers Do Not Pay Any Usage Fees

Like "most digital wallets available today," AR1 278, PayPal generally does not charge fees for the typical usage of its digital wallet product. PayPal does not, for example, charge any fees to obtain a digital wallet, to maintain a digital wallet, to make purchases from merchants

using credentials stored in a digital wallet, to send money to friends using a digital wallet funded by a linked bank account or balance, or to obtain customer service relating to a digital wallet. *See* AR2 5864, 5871-5872.  In addition, when a consumer receives funds from someone else and stores those funds in the digital wallet, PayPal does not charge a fee to transfer those funds to a linked bank account or debit card using the default service, which usually takes one to three business days to complete.  *See* AR2 5871-5872.  The administrative record made clear that PayPal imposed a fee only in rare circumstances—like cross-border multi-currency transactions and expedited (rather than standard) balance transfers—and only after notifying the consumer of the relevant charge and obtaining her express consent.  AR2 5864.

The absence of consumer fees is no accident:  PayPal's business model, like those of other digital wallet providers, is based on charging fees to *merchants* receiving payments, not consumers making payments.  AR2 5864.  By accepting payments via PayPal, small businesses can assuage consumer concerns about their ability to keep payment information secure.  AR2 5869 ("Consumers … can recognize PayPal's brand and entrust us with their financial data, whereas they might not have trusted the merchant to do so.").  Many large companies, too, allow customers to pay using digital wallets like PayPal, recognizing that in a time when data breaches are common, consumer confidence in transaction security is invaluable.

## C. Digital Wallets Are Categorically Different From GPR Cards

GPR cards—the Bureau's intended target—are very different from digital wallet products.  "[O]ne of the most common and widely available … prepaid products," GPR cards are designed to store funds and often serve as "substitutes for traditional checking accounts."  AR1

242.  As PayPal explained throughout the administrative process, digital wallets and prepaid cards "are fundamentally different products with different consumer use cases."  AR2 5862.

*Acquisition.*  A GPR card is typically a physical card that is purchased by a consumer at brick-and-mortar retail locations, such as drugstores and supermarkets.  AR1 245.  GPR cards are usually glued to packaging that contains details about the card.  The product is typically presented on a display rack, hanging by a "J-hook."  *Id*.  A digital wallet, by contrast, is a purely digital, Internet-based product obtained exclusively through a website or mobile application.

*Functionality.*  The core function of a GPR card is to store a consumer's funds so that the consumer may use the card in an electronic transaction, *see* AR1 243, much as a traditional debit card might be used, *see* AR1 1998 ("[GPR] prepaid cards look and work like bank debit cards except no bank is required."); *see also* AR1 1997-2014 (Consumer Reports, *Prepaid Cards: How They Rate 2014* (Nov. 2014)).  By contrast, "digital wallets are used primarily not to access *funds*, but rather to access payment *credentials*," thereby allowing the digital wallet provider to complete transactions on the customer's behalf.  AR2 5862 (emphases added).

*Funding.*  "[T]he essence of traditional prepaid cards is indeed pre-funding."  AR2 5865.  To pay for transactions using a GPR card, consumers generally must load the card with funds in advance using cash or by a transfer from another account.  AR1 243.  In contrast, a consumer can use a digital wallet to pay for transactions without ever having an account balance; most consumers never carry a balance; and for those that do, the balance is usually the result of receiving funds from someone else rather than a consumer adding funds to their own digital wallet.  *See, e.g.*, AR2 5868.

*Providers' business model.*  There are also "vast differences" between the "business models and consumer fee structures" of digital wallet providers and prepaid card issuers.  AR2 5871.  In general, GPR card issuers generate revenue by charging consumers various fees for

basic services.  *See* AR2 552 (describing numerous fees charged by major issuers of GPR cards); *see also* AR2 547-562 (*Comments of the Staff of the Bureau of Consumer Protection* (July 23, 2012)).  These fees often include charges to open an account, maintain an account, make individual purchases, load or reload funds onto the card, or obtain customer service.  *See, e.g.*, AR2 552; AR1 243 (describing fees for "online bill pay," "speak[ing] to a customer service agent," "receiv[ing] a written copy of their account history," and "obtain[ing] balance information at ATMs").  PayPal described during the rulemaking process that PayPal's core product did not charge any of these consumer-facing fees, imposing fees only in rare circumstances, and with the consumer's express knowledge and consent.  *See* AR1 278; AR2 5864, 5871-5872.  Instead, as noted, digital wallets' "transaction revenue is generated primarily from fees charged to merchants, not to consumers."  AR2 5881.

## II.    STATUTORY AND REGULATORY BACKGROUND

For more than forty years, a statute known as the Electronic Funds Transfer Act ("EFTA") and its implementing regulation, Regulation E, have regulated electronic fund transfers involving certain types of consumer accounts.

### A.    The Electronic Fund Transfer Act

Enacted in 1978, EFTA, 15 U.S.C. § 1693 *et seq.*, "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems."  *Id.* § 1693(b); *see* Pub. L. No. 95-630, 92 Stat. 3728 (1978).  Although EFTA's "primary objective … is the provision of individual consumer rights," 15 U.S.C. § 1693(b), the statute also imposes certain duties on certain providers of financial services.  As relevant here, providers must disclose "[t]he terms and conditions of electronic fund transfers … at the time the consumer contracts for an electronic fund transfer."  *Id.* § 1693c(a).  The disclosures must be "in readily understandable language" and must cover certain categories

9

of information, "to the extent applicable." *Id.* Among other details, a provider is required to disclose "any charges for electronic fund transfers." *Id.* § 1693c(a)(4).

EFTA permits the Bureau to "prescribe rules to carry out the [statute's] purposes," 15 U.S.C. § 1693b(a)—rules now codified in what has become known as "Regulation E."[3] 12 C.F.R. § 1005 *et seq.* The Bureau's delegated authority is subject to important limits. First, the Bureau must "take into account, and allow for, the continuing evolution of electronic banking services and the technology utilized in such services." 15 U.S.C. § 1693b(a). Second, the Bureau must "consider[] the costs and benefits to financial institutions, consumers, and other users of electronic fund transfers." *Id.* Third, "to the extent practicable," the Bureau must "demonstrate that the consumer protections of the proposed regulations outweigh the compliance costs imposed upon consumers and financial institutions." *Id.*

### B.  Regulation E

Promulgated pursuant to statutory authority under EFTA, Regulation E has long provided baseline protections for certain consumer asset accounts, such as checking and savings accounts. From its inception, many of the provisions of Regulation E included general disclosure requirements that track those set forth in EFTA. For example, under a section of Regulation E titled "Initial Disclosures," relevant financial institutions have been required to disclose, "as applicable," "[a]ny fees imposed by the financial institution for electronic fund transfers or for the right to make transfers." 12 C.F.R. § 1005.7(b)(5); *see also* 15 U.S.C. § 1693c(a)(4) (providers must disclose "to the extent applicable" "any charges for electronic fund transfers or

---

[3] At the time of EFTA's enactment, the authority to prescribe regulations was delegated to the Board of Governors of the Federal Reserve ("the Board"). Upon the passage of the Dodd-Frank Act in 2010, most rulemaking authority under EFTA transferred from the Board to the Bureau, Pub. L. No. 111-203, § 1084, 124 Stat. 1376, 2081 (2010), and Regulation E was renumbered from 12 C.F.R. § 205 *et seq.* to 12 C.F.R. § 1005 *et seq.* *See* AR1 252 n.116.

for the right to make such transfers").  Likewise, institutions have been required to provide "[a] summary of the consumer's right to stop payment of a preauthorized electronic fund transfer and the procedure for placing a stop-payment order."  12 C.F.R. § 1005.7(b)(7); *see also* 15 U.S.C. § 1693c(a)(5).  Regulation E mirrors EFTA in requiring that these disclosures be "clear and readily understandable," but otherwise does not prescribe the layout, formatting, or verbiage. 12 C.F.R. § 1005.4(a)(1); 15 U.S.C. § 1693c(a) ("disclosures shall be in readily understandable language").  Instead, an appendix to Regulation E offers a series of optional model disclosures for institutions to use.  12 C.F.R. § 1005, App. A.

PayPal has long acknowledged that its activities are "subject to federal consumer protection law and regulations," including (in certain respects) EFTA and Regulation E.[4]  PayPal does not challenge the lawfulness of those requirements; it does not contend that EFTA is inapplicable to its digital wallet product; and it would not have challenged a limited rulemaking by the Bureau to clarify that Regulation E's baseline protections apply to digital wallet products. Rather, PayPal challenges the Bureau's application of a heightened, prescriptive short-form disclosure mandate to its digital wallet offerings.

## III.    THE PREPAID RULE

From the beginning, the Bureau's rulemaking process focused almost exclusively on developing a regulatory regime specific to GPR cards.  During this process, PayPal explained the numerous reasons why "[d]igital wallets do not present the same consumer risks" as GPR cards and why the Bureau's GPR-card-based regime was a poor fit for digital wallets.  AR2 5865.

---

[4] *See, e.g.*, PayPal Holdings, Inc., Form 10-K (Feb. 7, 2019), at 21; *see also* PayPal Holdings, Inc., Form 10-K (Feb. 11, 2016), at 19.

PayPal's exhortations were not heeded, resulting in a Final Rule that arbitrarily sweeps digital wallets into a regulatory regime designed for a wholly different product.

### A.    The Bureau Issues An Advance Notice Of Proposed Rulemaking That Never References Digital Wallets

In 2012, the Bureau issued an Advance Notice of Proposed Rulemaking ("ANPR") with the described purposes of "seeking comment, data, and information from the public about [GPR] prepaid cards."  *See* AR1 1; *see also* AR1 1-3 (ANPR).  The Bureau claimed that it was interested in this "specific type" of prepaid card because it represented "one of the fastest growing segments of the overall prepaid market," and, in light of the "risk of consumer harm," the Bureau was "seeking information to determine how best to implement consumer protection rules for this product."  AR1 1-2.  Moreover, the Bureau highlighted the fact that Regulation E "generally d[id] not apply to GPR cards" which, the Bureau feared, could "contribute to market distortions" and "consumer confusion" should the Bureau fail to impose a "comprehensive federal regulatory regime" on that product.  AR1 2.  The ANPR did not mention digital wallets. *See* Dkt. 17 at 12 (¶ 53) (CFPB admission that "ANPR does not use the term 'digital wallets'").

### B.    The Bureau Issues A Proposed Rule Sweeping Many Digital Wallets Into The Definition Of Prepaid Accounts

Despite the ANPR's focus on GPR cards, the Bureau, with little explanation, issued an expansive proposed rule that also applied to digital wallets.  *See* AR1 4-238 (Proposed Rule).

The proposed rule's requirements applied to "prepaid accounts," a term the Bureau defined broadly.  The Bureau explained that digital wallets—which it spent only three paragraphs describing and analyzing in a 200-page proposed rule preamble—would fall within the term's ambit, so long as consumers had a mere ability "to store funds in [them] directly." AR1 13, 32.  Further, the Bureau acknowledged a preference to regulate broadly:  It wanted to "cast a wide net in including products within the proposed definition of prepaid account" and to

apply requirements "evenly across like products."  AR1 31.  Why and how the Bureau considered a digital wallet a "like product" to a GPR card received cursory discussion.  Although it acknowledged that "there may be significant variations in how funds are held in digital wallets and how payments are processed by digital wallets," the Bureau failed to identify or explain any of those relevant "variations."  AR1 13.

In addition, the Bureau never acknowledged that, unlike the regulatory gap it had identified for GPR cards in the ANPR, "Regulation E already applie[d] to PayPal accounts" in certain circumstances, AR2 5862, or that the "[c]redit cards and debit cards stored in digital wallets" were "already governed by Regulation Z and Regulation E," respectively, AR2 5863.

The Bureau's proposal to sweep digital wallets into a regulatory regime built for GPR cards was especially consequential in light of the Rule's short-form disclosure requirement, which mandated that extensive disclosures be provided to consumers before consumers acquire a prepaid account.  These "short form" disclosures would require a prepaid account issuer to "highlight[] four types of fees"—the "periodic fee, per-purchase fees, ATM withdrawal fees, and the cash reload fee"—at the top of the short form, "even if such fees [we]re $0 or if they relate[d] to features not offered for a particular prepaid account product."  AR1 51-52.  The requirement, in other words, mandated fee disclosures regardless of their relevance to the product.

It was not hard to discern that the short-form disclosure was designed for GPR cards. The Bureau offered several examples of how the short-form might help a consumer, all of which show that the requirement was designed for plastic GPR cards sold in brick-and-mortar retail stores.  The proposed rule described, for example, how the short form would facilitate comparison shopping by a consumer "tak[ing] a package containing a prepaid account access device off of a J-hook in a retail store," AR1 52, because the mandated font sizes would allow the short form to "fit on most packaging material currently used in retail locations," AR1 77.

13

Moreover, the Bureau extensively described the focus groups and consumer testing it had used to workshop the short-form disclosure. AR1 24-26. Although all sixty-nine of the Bureau's study participants "self-identified as having used a prepaid card," there is no mention in the proposed rule's preamble that the participants had any experience with digital wallets. *See id.*

The Bureau received significant comments highlighting deep flaws in the proposed rule. For example, commenters objected to the application of the short-form disclosure regime to digital wallets. For instance, commenters warned that for "free products," like most digital wallets, "repeatedly disclosing '$0' or 'N/A' risks consumer confusion and imposes substantial cost without a commensurate consumer benefit, or any benefit at all." AR2 10434; *see also* AR2 10434-10437 (*Financial Innovation Now Comment Letter* (Aug. 11, 2017)). Commenters explained that these disclosures—designed for GPR cards—were a "fundamental mismatch in the digital wallet context." AR2 10435.

### C. The Bureau Finalizes A Rule That Fails To Properly Distinguish Digital Wallets From Other Prepaid Accounts

On November 22, 2016, the Bureau finalized the Prepaid Rule, in a publication spanning more than 450 pages in the *Federal Register*. *See* AR1 240-693 (Final Rule). As relevant here, the Bureau acknowledged—and then summarily rejected—both PayPal's explanation of the differences between digital wallets and GPR cards and its request to exclude digital wallets from the pre-acquisition disclosure requirements. The Bureau also offered a cost-benefit analysis of its rulemaking efforts that failed to adequately consider—or, indeed, to consider at all—the impact of the Final Rule on digital wallet providers and consumers.

To start, the Bureau summarily rejected PayPal's position that digital wallets were different in kind from other prepaid accounts, asserting in conclusory terms that it was "not convinced" that digital wallets were "fundamentally dissimilar to other types of prepaid

14

accounts." AR1 274. The Bureau admitted that, unlike GPR cards and other forms of prepaid accounts, "digital wallets currently on the market" did "not charge usage fees," but attempted to justify the extension of the Prepaid Rule to digital wallets by speculating that this "may not hold true in the future." *Id.* "If" such "fees d[id] become standard" in the future—a contingency for which the Bureau identified no evidence—the Bureau asserted that consumers should "know what those fees are and when they will be imposed." AR1 278.

Next, the Bureau rejected PayPal's explanation that "prepaid cards and digital wallets are too different to effectively standardize disclosures across both industries." AR2 5879. In lieu of providing reasoning to support its decision, the Bureau asserted that "consumers of digital wallets should have the same opportunity to review fees (or lack thereof) in the short-form disclosure as consumers of other prepaid accounts." AR1 321. The Bureau also reiterated that, although digital wallet providers did not charge usage fees, "this may not hold true in the future," *id.*, overlooking the fact that the absence of usage fees for digital wallets is the result of the unique functionality and business model underlying this product. Finally, the Bureau was "not persuaded that there are sufficient factors distinguishing digital wallets from other types of prepaid accounts" to justify "treating digital wallets differently." *Id.* The Bureau did not explain why the numerous distinctions PayPal raised were irrelevant, nor did the Bureau elaborate on any reasoning underlying its conclusion. *See id.* What is more, the Bureau did not even attempt to survey what disclosures digital wallet providers were already providing or assess the adequacy of those disclosures.

Finally, although the Bureau recognized its obligation under the Dodd-Frank Act to "consider[] the potential benefits, costs, and impacts" of its Rule, the Bureau's efforts to produce the mandated cost-benefit analysis did not so much as mention the term "digital wallet." AR1

577-614. The Bureau wholly failed to explain how any of its cost-benefit analysis applied to digital wallets—a product the Bureau sought to regulate with no evidence of consumer harm.[5]

The Rule took effect on April 1, 2019. *See* AR1 743. As expected, the detailed requirements for the short-form disclosure reflected the Bureau's stated goal of facilitating comparison shopping for GPR cards in brick-and-mortar retail locations, emphasizing the most significant fees for those types of accounts. Indeed, the Rule "illustrates how the formatting requirements could be implemented," *PayPal, Inc.*, 58 F.4th at 1276:



| Monthly fee | Per purchase | ATM withdrawal | Cash reload |
|---|---|---|---|
| **$5.99*** | **$0** | **$0** in-network<br>**$1.99** out-of-network | **$3.99*** |

| | |
|---|---|
| ATM balance inquiry (in-network or out-of-network) | $0 or $0.50 |
| Customer service (automated or live agent) | $0 or $0.50* per call |
| Inactivity (after 12 months with no transactions) | $1.00 per month |

**We charge 4 other types of fees.** Here are some of them:

| | |
|---|---|
| [Additional fee type] | $1.00* |
| [Additional fee type] | $3.00 |

* This fee can be lower depending on how and where this card is used.

**No overdraft/credit feature.**
Not FDIC insured. Register your card for other protections.

For general information about prepaid accounts, visit *cfpb.gov/prepaid*.
Find details and conditions for all fees and services inside the package, or call **800-234-5678** or visit *xyz.com/prepaid*.

*Id.* (reproducing image from 12 C.F.R. pt. 1005, app. A-10(d)).

---

[5] After issuing the Rule, the Bureau proposed substantive amendments to the 30-day credit linking restriction not relevant here. *See* AR1 705-742. PayPal submitted comments responding to the Bureau's proposal. AR2 10515-10523 (Aug. 14, 2017). Notwithstanding PayPal's objections, the Bureau finalized its proposed amendment in February 2018. *See* AR1 743-828.

IV.    **PROCEDURAL HISTORY**

PayPal filed this action under the APA in December 2019.  *See* Dkt. 1.  Both parties

moved for summary judgment.  *See* Dkt. 19 (PayPal's Motion for Summary Judgment), Dkt. 20

(CFPB's Cross-Motion for Summary Judgment).  As in this motion, PayPal argued that the

Prepaid Rule is arbitrary and capricious as applied to digital wallets, that the Bureau failed to

perform the statutorily required cost-benefit analysis regarding the extension of the Prepaid Rule

to digital wallets, and that the Prepaid Rule violates the First Amendment.  *See* Dkt. 19.  PayPal

also argued that the Bureau lacked statutory authority to impose both the short-form disclosure

mandate as well as a provision that would have imposed a 30-day ban on linking a newly

acquired prepaid account, including digital wallets, with certain credit products.  *Id.*

This Court agreed with PayPal that the CFPB exceeded its authority in adopting the

short-form disclosure mandate and the 30-day credit linking ban and therefore vacated those

restrictions.  *See PayPal, Inc. v. CFPB*, 512 F. Supp. 3d 1, 12 (D.D.C. 2020).  The Court

reserved on "whether [the Rule is] arbitrary and capricious, whether the Bureau failed to perform

a cost-benefit analysis, or whether the short-form disclosure requirement violates the First

Amendment."  *Id.* at 12 n.9.

The Bureau appealed the Court's invalidation of the short-form disclosure mandate but

did not challenge its holding that the agency lacked authority to impose the 30-day credit linking

ban.  *See* Appellants' Statement of Issues To Be Raised, *PayPal, Inc. v. CFPB*, No. 21-5057

(D.C. Cir. Apr. 9, 2021).  On appeal, the D.C. Circuit did "not address the district court's

conclusion that the CFPB lacks statutory authority to impose mandatory clauses," *PayPal, Inc.*,

58 F.4th at 1278 n.3, in part because the Bureau conceded at oral argument that it "lacks the

statutory authority to issue mandatory model clauses," *id.* at 1277.  Instead, the D.C. Circuit held

that "the Prepaid Rule does not impose mandatory model clauses" at all because it does not

17

compel the use of "specific, copiable language" and merely sets forth "content [and] formatting requirements." *Id.* at 1278. The D.C. Circuit thus reversed this Court's judgment, acknowledging that "[o]n remand, the district court may consider PayPal's other challenges to the Rule, including the APA and constitutional claims, which remain to be addressed." *Id.* at 1280.

## STANDARD OF REVIEW

The APA requires this Court to "hold unlawful and set aside agency action[s]" that are "in excess of statutory jurisdiction, authority, or limitations"; that are made "without observance of procedure required by law"; or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C), (D).

This Court's review of whether the Rule is arbitrary and capricious requires a "searching and careful" analysis. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Agency action is arbitrary and capricious when, among other things, the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Similarly, an agency's failure to "cogently explain why it has exercised its discretion in a given manner" will compel vacatur. *Id.* at 48-49. These standards allow some deference to an agency, but this Court retains a critical role in "ensuring that [the] agenc[y] [has] engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). "Deference," in other words, "does not mean carte blanche"; an agency "must at all times demonstrate the markers 'of principles and reasoned decisionmaking supported by the evidentiary record." *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1043 (D.C. Cir. 2022).

**ARGUMENT**

I.    **THE PREPAID RULE'S HEIGHTENED REGULATORY REQUIREMENTS ARE ARBITRARY AND CAPRICIOUS AS APPLIED TO DIGITAL WALLETS**

As applied to digital wallets, the Prepaid Rule's short-form disclosure is unlawful because the Bureau's decision to subject many digital wallets to a more burdensome EFTA disclosure regime—one designed for a very different product, namely, GPR cards—was arbitrary and capricious.  *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("Agency action may be consistent with the agency's authorizing statute and yet arbitrary and capricious under the APA."); *Nat'l Cmty. Reinvestment Coal. v. CFPB*, No. 20-2074, 2022 WL 4447293, at *18 (D.D.C. Sept. 23, 2022) ("statutory authority to [promulgate a certain rule] does not fully vindicate the agency's decisionmaking reflected therein"); 5 U.S.C. § 706(2)(A).  The APA demands reasoned decisionmaking, obligating an agency to "articulate a satisfactory explanation" for its actions, *State Farm*, 463 U.S. at 43, and to "cogently explain why it has exercised its discretion in a given manner," *id.* at 48.

The Bureau failed those requirements in at least two ways: by capriciously eliding key differences between digital wallets and GPR cards with a one-size-fits-all approach and by imposing significant regulations based on unfounded speculation about digital wallets.

A.    **The Bureau Had No Rational Justification For Subjecting Digital Wallets To A Regulatory Regime Designed For GPR Cards**

A fundamental category error lies at the heart of the Prepaid Rule's application to digital wallets.  In determining the scope of the Rule, the Bureau defined regulated "prepaid accounts" broadly to include GPR cards *and* many digital wallets—products with different functionalities, consumer uses, and business models.  By failing meaningfully to account for the differences between those products and subjecting them to the same onerous regulatory regime without justification, the Bureau violated the APA.  The Bureau's failure to grapple with "these

19

differences" "was not reasoned decisionmaking." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983); *see also GPA Midstream Ass'n v. United States Dep't of Transp.*, No. 22-1148, 2023 WL 3471113, at *8, --- F.4th ---- (D.C. Cir. May 16, 2023) (emphasizing that "comparable risk" posed by certain pipelines targeted by agency regulations does not mean that pipelines "are similar in all important respects" and concluding that the agency failed to consider how differences would "make compliance far more difficult and expensive than the [agency] recognized").

As PayPal and other commenters made clear to the Bureau, GPR cards and digital wallets are different products:  The former serves as a payment method while the latter functions principally as a repository for payment methods.  Although there are "some high-level similarities between prepaid cards and digital wallets"—for example, both allow consumers to "store funds and to make payments at a large number of merchants"—the products are "fundamentally different with different consumer use cases."  AR2 5862.

As explained above, GPR cards are generally "purchased at retail locations" and then "loaded" by the consumer "with funds through a variety of means."  AR1 242; *see supra* pp. 8-9. This allows a GPR card to stand in for a "traditional checking account[]."  AR1 242.  Issuers typically generate revenue by charging consumers fees.  In comparison, digital wallets are "used primarily not to access funds, but rather to access payment credentials such as consumers' credit, debit, and prepaid cards … and bank accounts."  AR2 5862.  Simply put, digital wallets are designed primarily to store payment methods and thus to facilitate commercial exchanges, not to store funds.  Although digital wallets may permit users to maintain a positive balance, "[u]nlike a prepaid card, consumers are not required to pre-load funds, and most never do pre-load a balance," AR2 5868.  In the "rare cases" that users do store a balance, they do so in small amounts—for PayPal customers, the record reflected the average balance was only $6.00—and

"only briefly." *Id.* Digital wallet providers, moreover, do not typically charge consumer-facing fees for the product's core functionality. These are not small distinctions. At least without evidence to the contrary, given these differences, it does not make sense to conclude that GPR cards should be regulated the same way as digital wallets.

Over PayPal's repeated objections and in the face of this record evidence, the Bureau nonetheless established a regulatory regime that arbitrarily treats dissimilar products as if they were the same: A "prepaid account" is defined to include "a range of products including GPR cards … and digital wallets." AR1 274. Rather than carefully assessing the different characteristics of GPR cards and digital wallets and rigorously analyzing the need for and type of regulation appropriate for each, the Bureau opted for Procrustean regulation, seizing on any similarities between the two products to justify a uniform approach. Asserting that it was "not convinced by the argument that digital wallets … [we]re fundamentally dissimilar to other types of prepaid accounts," the Bureau claimed that "to the extent that [digital wallets] are used to access funds the consumer has deposited into the account in advance," "the Bureau believes digital wallets operate very much like a prepaid account." *Id.* That assertion is doubly flawed.

*First*, the Bureau's claim that it was "not convinced" that GPR cards and digital wallets are dissimilar is pure "ipse dixit." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir. 2011). The APA demands that an "agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). To satisfy this requirement, "conclusory statements will not do; an 'agency's statement must be one of reasoning.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

The Bureau's justifications for its approach are a model of conclusory reasoning, and certainly do not bear "markers 'of principles and reasoned decisionmaking supported by the evidentiary record." *Constellation Mystic Power*, 45 F.4th at 1043. The Bureau cited no study

supporting its conclusion, pointed to no expert research suggesting that consumers use GPR cards and digital wallets similarly, and referenced no focus group encouraging it to regulate the two products similarly; indeed, it cited nothing at all other than its own "belie[f]." AR1 274. In addition, the Bureau's assertion is contrary to the evidence that was before it. Apart from extensive comments provided by digital wallet providers like PayPal, *see, e.g.*, AR2 729-742; AR2 5861-5890, and Google, *see, e.g.*, AR2 5267-5271—which described the differences between digital wallets and GPR cards—the record contained probative evidence from the Bureau itself on this point. A 2015 report published by the CFPB explained that "a 'digital wallet'" was a vehicle by which "[b]ank accounts, credit cards, debit cards, and prepaid cards can be accessed." AR1 1602. In other words, the Bureau acknowledged that digital wallets were a mechanism by which a consumer accesses a GPR card, not a GPR card itself. That "unexplained inconsistenc[y]" renders the Rule arbitrary and capricious. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (collecting authority).

*Second*, to the extent that the Bureau elected to regulate GPR cards and digital wallets as the same simply because some digital wallets could theoretically hold a balance, the Bureau unreasonably seized on an ancillary feature of digital wallets to impose sweeping regulations designed for GPR cards. GPR cards and digital wallets are designed to serve different purposes: GPR cards serve as the equivalent of checking accounts for some (and are thus designed to hold funds) while digital wallets are designed principally to permit digital wallet providers to access payment credentials. The Bureau not only failed to grapple with that crucial distinction, it did not identify any evidence, statistics, reports, or competing analysis of its own. That failure of reasoning is fatal under the APA. *See Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019) ("[F]ail[ure] to provide an adequate explanation" "d[oes] not meet the APA's requirements for reasoned decisionmaking.").

The Bureau's category error—treating many digital wallets as if they were merely electronic versions of GPR cards—is especially glaring when it comes to the short-form disclosure requirement.  The Bureau's principal justification for that requirement was its belief that the form would facilitate comparison shopping between GPR products in a brick-and-mortar retail setting.  The Bureau explained that the disclosures are intended to "facilitate consumer understanding" of the prepaid account's key terms by "set[ting] forth the prepaid account's most important fees."  AR1 240.  This "consumer understanding," in turn, would permit "comparison shopping among prepaid account programs."  *Id.*  In other words, the Bureau designed the disclosure regime to assist a consumer rummaging through a rack of GPR cards at a pharmacy and attempting to comparison shop based on information visible on the package.  It makes no sense to take a disclosure regime designed to facilitate in-person comparison shopping and apply it to an electronic product like PayPal's, for which consumers do not comparison shop in a store and which already discloses key terms and conditions to users.

Moreover, the content of the short-form disclosure is wholly disconnected from the fee structure of digital wallets.  As the Bureau noted in the Rule's preamble, the short-form disclosure includes a "prepaid account's *most important* fees," including the four fees highlighted "above the line":  monthly maintenance, per purchase, ATM withdrawal, and cash reload.  AR1 240 (emphasis added).  But record evidence before the Bureau indicated that these fees were foreign to digital wallet products like PayPal's.  During the rulemaking process, the Bureau was aware that PayPal did not charge consumers a monthly fee, did not charge consumers a per purchase fee, and did not support ATM withdrawals or cash reloads.  *See* AR2 5880.  In forcing digital wallet providers into its GPR-card-focused short-form disclosure regime, the Bureau required providers to highlight fees that PayPal never charges (or imposes only in rare circumstances) in a manner highly misleading to consumers, including by forcing

23

PayPal to disclose the highest fee, even if that fee is applicable only in highly unusual circumstances.

The result, predictably, is a deeply flawed set of regulation commands for digital wallets. The Rule forces digital wallet providers to present consumers with a prescriptive disclosure outlining fees that, although germane to how GPR cards work, do not reflect the features of digital wallets and that digital wallet consumers (rightly) do not expect to encounter. As PayPal informed the Bureau, this leaves digital wallet users "confus[ed] and alarm[ed]" about the fees they should expect to pay when using their products. AR2 5880. None of this should be news to the agency. As the D.C. Circuit has explained in a different setting, "informing consumers about a price that … customers will almost never pay, and that they are unlikely to understand, unlashes [a mandated] disclosure from its claimed administrative mooring." *Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 962 F.3d 531, 539-540 (D.C. Cir. 2020). The Bureau's failure to grapple with this important aspect of the problem before it defies reasoned decisionmaking.[6]

### B.    The Bureau Lacked A Well-Founded, Non-Speculative Basis For Subjecting Digital Wallets To Heightened Regulation

The Rule is also arbitrary and capricious as applied to digital wallets because the Bureau identified *no* evidence of consumer harm with respect to digital wallets that warranted enhanced regulation above and beyond the general requirements of Regulation E, much less the costly,

---

[6] PayPal has, in fact, received an avalanche of complaints from consumers expressing uncertainty and alarm based on the mandated disclosures. *See, e.g.*, Dkt. 1 at 6-7 (Compl. ¶ 9) ("Seems like there's a fee for any way you use your money … I don't understand this new rule."); *id.* ("It sounds like there will be more fees than there was. It was unclear if I can still transfer to my bank without a charge."); *id.* ("Why do I have to have all these terms and conditions for a small amount of money in my [P]ay[Pa]l account?"); *id.* ("I'm not sure if you are going to charge me to hold the money & then the next time I pay with [P]ay[P]al, use it. Would that be free?").

prescriptive regulation imposed by the Rule.  The APA presupposes that the agency has identified a "problem" in need of a remedy, *State Farm*, 463 U.S. at 43; it follows that a regulation cannot be a "solution in search of a problem," *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 546 (S.D.N.Y. 2019).  In fact, a "regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist."  *City of Chicago v. Fed. Power Comm'n*, 458 F.2d 731, 742 (D.C. Cir. 1971).  Moreover, an agency may not rely "on speculation" to supply a problem in need of solving.  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013).

Those principles compel vacatur.  The Rule is based on the Bureau's stated desire to "lessen consumer risk," AR1 577, yet it failed to identify *any* real-world evidence of consumer risk or harm with respect to digital wallets.  In describing the supposed "problem" the Rule is intended to fix, the Bureau focused on GPR cards, citing studies that largely had nothing to do with digital wallets.  *See* AR1 242-248.  The Bureau also pointed to characteristics of GPR cards that made comparison shopping in brick-and-mortar retail locations challenging, which, the Bureau claimed, "mean[s] that consumers often purchase a card and load initial funds on it before they have an opportunity to review the full terms and conditions."  *Id.* at 245.  Those challenges, of course, are inapplicable to digital wallets—which are accessed online with a less time-constrained opportunity to review terms and conditions and far fewer space limitations for written disclosures.

When it came to digital wallets, the Bureau offered only a few perfunctory paragraphs describing the Bureau's (limited) understanding of the product.  AR1 249.  Significantly, the Bureau did not identify *any* evidence of consumer confusion or harm to consumers from digital wallet products.  Instead, the Bureau asserted (citing no record evidence) that it "understands that some, but not all, digital and mobile wallets allow a consumer to store funds[.]" *Id.*  But it failed

to explain why that fact, if true, demonstrated a problem in need of a regulatory solution.  Under the APA, "[p]rofessing that an order ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking."  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (Kavanaugh, J.).  That principle is controlling here:  it was arbitrary and capricious for the Bureau to rely on evidence relating to GPR cards to support the regulation of digital wallets without any evidence of actual consumer risk as to digital wallets.

*Cigar Association of America. v. FDA*, 436 F. Supp. 3d 70 (D.D.C. 2020), illustrates the point.  There, the FDA sought to apply a "health-warnings labeling regime" to *all* cigar products, despite evidence that *premium* cigars might "not pose the same public health concerns as mass-market cigars."  *Id.* at 72-73.  Makers of premium cigars pointed out, for example, that their customers had "far lower disease and mortality rates" than consumers of other cigar products, rendering warning labels "proposed for mass-market cigars … not warranted for premium cigars."  *Id.* at 73.  The court agreed, explaining that "[r]ather than analyzing the behavior of premium cigar consumers" or assessing "consumer understanding of the risks associated with premium cigar products," the FDA improperly relied on general "scientific studies" that contained "almost no discussion of the necessity for [the proposed] warnings for premium cigars."  *Id.* at 86.  And the court faulted the FDA for failing to explain why "concerns generally attendant to cigar or other tobacco consumption obtain with respect to premium cigars," criticizing the agency for failing to "cite any study indicating a lack of information about the health consequences of premium cigar use on the part of … premium cigar users" before extending the warning regime to those products.  *Id.*

That reasoning is on-point here.  The Bureau's identification of risks posed by GPR cards does not give it *carte blanche* to regulate any financial product that shares some feature

(however incidental) with GPR cards.  To apply the same additional regulatory requirements to digital wallets, the Bureau was required to provide a justification for doing so.  But the Bureau points to no evidence suggesting that it analyzed the behavior of digital wallet users; evaluated consumers' understanding of fees (or lack thereof) charged by digital wallets; or reviewed any academic or scientific study so much as mentioning digital wallets.  Rather than identifying evidence of risks that digital wallets posed to consumers, the Bureau resorted to speculation.  The Bureau acknowledged, for example, that "digital wallets currently on the market may not charge usage fees" to consumers, but it asserted that "may not hold true in the future."  AR1 274; AR1 321 (same).  The Bureau also attempted to justify regulating many digital wallets like GPR cards because they both permit a consumer to "load funds," "use those funds to make purchases," and "reload more funds later."  Dkt. 20 at 41-42.  That is also insufficient.  As PayPal explained to the Bureau during the rulemaking, most digital wallet users "never carry a balance," AR2 5862, 5865, and in the unusual event there is a balance in a user's account, that is often because the consumer received funds from someone else.  *See* AR2 5868.

Without at least some supporting evidence or reasoned analysis, the Bureau's unadorned speculation ("may not hold true in the future") simply will not do under the APA.  "[M]ere speculation" does not constitute "adequate grounds upon which to sustain an agency's action." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988); *see also Otay Mesa Prop., L.P. v. Dep't of the Interior*, 344 F. Supp. 3d 355, 370 (D.D.C. 2018).  Because "agency actions based upon speculation are arbitrary and capricious," *Horsehead Res. Dev. Co., Inc. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) (citing *Nat. Res. Def. Council*, *Inc.*, 859 F.2d at 210), the Rule's short-form disclosure requirement should be vacated as applied to digital wallets.

## II.    THE BUREAU FAILED TO PERFORM APPROPRIATE COST-BENEFIT ANALYSIS REGARDING APPLICATION OF THE PREPAID RULE TO DIGITAL WALLETS

The Rule is also unlawful because the Bureau failed to assess meaningfully the costs and benefits of applying the Rule to digital wallets.  The Bureau is statutorily obligated to weigh the costs and benefits of the rules it promulgates, and its failure to comply with this duty—imposed by the APA and sharpened by specific provisions in the Dodd-Frank Act—renders the Prepaid Rule arbitrary and capricious.  Although the Bureau assessed the costs and benefits of applying the Rule to traditional prepaid products like GPR cards, it failed to weigh the extensive burdens against the limited, speculative benefits of imposing the Rule's mandates on fundamentally dissimilar products like digital wallets.  For this reason, too, the Rule should be set aside.

### A.    The Bureau Is Obligated To Consider The Costs And Benefits Of Regulation

Generally, the APA requires an agency to consider the costs and benefits of the regulations it proposes.  "[R]easoned decisionmaking" demands "consideration of [all] the relevant factors" underlying agency action, *Metlife, Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d. 219, 230 (D.D.C. 2016) (quoting *Michigan*, 576 U.S. at 750), and an agency "may not 'entirely fai[l] to consider an important aspect of the problem,'" *Michigan*, 576 U.S. at 752. It follows that an agency typically must "pay[] attention to the advantages *and* the disadvantages" of its decisions.  *Id.* at 753.

The Bureau is subject to an additional statutory requirement to engage in cost-benefit analysis:  Under the Dodd-Frank Act, it must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule."  12 U.S.C. § 5512(b)(2).

Thus, particularly for the Bureau, "cost-benefit analysis is a central part of the administrative process." *Metlife, Inc.*, 177 F. Supp. 3d. at 240.[7]

An agency violates its cost-benefit analysis obligations when it "opportunistically frame[s] the costs and benefits of [a] rule; … neglect[s] to support its predictive judgments; contradict[s] itself; and fail[s] to respond to substantial problems raised by commenters." *Bus. Roundtable*, 647 F.3d at 1148-1149.  Uncertainty "does not excuse the [agency] from its statutory obligation … to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation before it decides whether to adopt the measure." *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

### B.    The Bureau's Cost-Benefit Analysis All But Ignores Digital Wallets

1.    The most glaring deficiency with respect to the Bureau's cost-benefit analysis regarding digital wallets is its absence:  In promulgating the initial Rule, the Bureau failed to perform the statutorily required cost-benefit analysis with respect to digital wallets *at all*.  As the Bureau has conceded, Dkt. 20 at 53, the Bureau's 37-page cost-benefit analysis in its preamble to the initial Rule does not mention the term "digital wallet," AR1 577-614, let alone provide a reasoned quantitative or qualitative assessment of the benefits and costs of regulation on the digital wallet product.  That oversight is conspicuous given that payroll card and government benefit accounts—both ancillary products that, like digital wallets, differ from the paradigm of GPR cards that motivated the rulemaking—received robust attention in the cost-benefit analysis section, with multiple pages devoted to each.  *See, e.g.*, AR1 578-579, 589-590.  The agency's

---

[7] Reflecting Congress's emphasis on the need to carefully consider the costs and benefits of regulatory action in this area, EFTA imposes a separate cost-benefit obligation on the Federal Reserve Board, which was charged with implementing EFTA prior to the Bureau's creation and which retains limited authority under the statute.  *See* 15 U.S.C. § 1693b(a)(2).

failure, therefore, to consider the "asserted differences" between GPR cards and digital wallets "with respect to their operations and the cost of compliance," coupled with "the failure to quantify any benefits … [and a] weak qualitative analysis," makes clear that "the agency has not reasonably explained why the rule is appropriate" for digital wallets in particular.  *GPA Midstream Ass'n*, 2023 WL 3471113, at *10.  Such a failure is a per se default of the Bureau's cost-benefit analysis obligations under the Dodd-Frank Act and the APA.

The Bureau's statutory violation was anything but harmless.  Record evidence and comments before the agency explained that the Bureau's premature and ill-advised regulatory regime would stifle innovation and product development while simultaneously confusing consumers.  For example, Google explained that the "development and adoption of [digital wallet] technology [wa]s still in its infancy," and called on the Bureau to "tread lightly in regulating digital wallets" because their "technology change[d] almost daily."  AR2 5267-5268. Google warned the Bureau that its "heavy regulation" of digital wallets would "risk inadvertently stunting the continuing development" of the products, which, Google predicted, "could have a deleterious impact on the broad range of consumers that would otherwise benefit[] from such innovation."  AR2 5268.  And PayPal raised serious concerns the that the Rule would "stifle innovation in the digital and mobile payments space," which would "impair[] the ability of companies … to develop new, valuable products to engage consumers" in an "increasingly digital society."  AR2 5862; *see also* AR2 10435 (Financial Innovation Now comment explaining that the Rule should be "narrowly crafted to avoid stifling continued innovation" in the "market for electronic payment products").  Indeed, even the Bureau's own 2015 analysis of "mobile financial services" highlighted that the "landscape [wa]s continuing to evolve" and that it should tread carefully regarding "choos[ing] technological winners and losers."  AR1 1578. The agency's failure to acknowledge and address such "significant," even if "unquantified,"

harms renders the Bureau's cost-benefit analysis deficient. *Nat'l Cmty. Reinvestment Coal.*, 2022 WL 4447293, at \*18, \*29; *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("agency must consider and respond to significant comments").

The Bureau also acted in defiance of cost-benefit principles by refusing to grapple with the costs of consumer confusion stemming from the Rule. As PayPal commented, such costs would be significant to both users and providers: "[T]he proposed disclosures would confuse and alarm" potential customers by outlining fees that a "consumer would not [actually] incur," causing "a major increase in potential customers abandoning the signup process, or calling the customer support line in confused frustration." AR2 5880. To be sure, the Bureau noted concerns that the Rule's disclosure requirement would adversely affect electronic providers, AR1 589, but the agency's response only highlights the lack of rigor with which the Bureau approached the application of the Rule to digital wallets. The Bureau confidently asserted that it "disagree[d]" with those concerns, citing "rounds of consumer testing." *Id.* But, critically, the Bureau acknowledged that its consumer testing "did not specifically test the disclosure regime in an electronic setting," *id.*, and the agency offered no reason why such nonelectronic testing would shed light on the complications with online, pre-acquisition disclosures for digital wallets. Nor did the Bureau grapple with the fact that the reason the disclosures would be misleading or confusing for digital wallets is because the disclosure regime is pegged to fees that have little or no relevance to digital wallets. The Bureau in this way "duck[ed] [a] serious evaluation of the costs" of the Rule as applied to digital wallets. *Bus. Roundtable*, 647 F.3d at 1152.

Finally, the Bureau did not consider quantitatively or qualitatively the benefits (if any) to users of digital wallets from the Rule's short-form disclosure requirement. Where, as here, the CFPB relies on "speculative" "benefits" to consumers "without any empirical data or even

broader survey data," "such reliance [is] arbitrary and capricious." *Nat'l Cmty. Reinvestment Coal*, 2022 WL 4447293, at *22 n.17.

In short, in imposing uniquely prescriptive and burdensome regulation on a nascent and fast-evolving digital financial product, the Bureau was statutorily required to offer at least some quantitative or qualitative assessment of the "costs" of regulation for digital wallets as well as the "benefits." 15 U.S.C. § 5512(b)(2).  Instead, the CFPB attempted to solve an imaginary problem at an unreasonable cost.  By ignoring the relevant factors that distinguish digital wallets from GPR cards; entirely failing to consider comparable market research on digital wallets; and wholly ignoring the costs to digital wallet providers and consumers from the short-form disclosure requirement, the Bureau failed to engage in the cost-benefit analysis required by the APA and the Dodd-Frank Act.  This omission, and agency's failure to respond reasonably to comments explaining why the Rule would threaten "access by consumers" to innovative financial products, renders the Rule arbitrary and capricious and contrary to law.

2.    The Bureau's defense of its cost-benefit analysis falls short.  First, the Bureau has maintained that it did "address the benefits and costs" of regulating digital wallets, pointing to two paragraphs in a nearly 700-page *Federal Register* preamble and Final Rule that were "incorporated … by reference" in the cost-benefit analysis.  Dkt. 20 at 52-53.  Whatever the propriety of satisfying § 5512(b)(2) by incorporating the preamble without specific attention to § 5512(b)(2) factors, the Bureau's incorporation argument gets it nowhere, as its two citations do not come close to satisfying its cost-benefit analysis obligations.

The first citation (AR1 272-273) refers to a paragraph summarizing arguments that PayPal and others made regarding the differences between digital wallets and GPR cards.  It contains *no* substantive analysis by the Bureau.  And the Bureau's second citation (AR1 277-278) encompasses a single relevant paragraph that asserts the Bureau "is not persuaded by …

objections to [its] proposal to cover digital wallets that can hold funds under the definition of prepaid account." AR1 278. Even credited at face value, this paragraph hardly counts as cost-benefit analysis: It contains no serious assessment of the benefits and costs of subjecting digital wallets to regulation under the short-form disclosure mandate; it cites no evidence, anecdotal or empirical, in support of the claims made; and it fails to quantify the costs and benefits of regulation or to explain why quantification is not possible. If such conclusory analysis were sufficient, the Bureau's cost-benefit obligations would be a dead-letter.

What is more, even if the paragraph could forgivingly be considered cost-benefit analysis, the rationality of the analysis collapses on inspection. The Bureau claimed that because "digital wallets … can hold funds," "consumers who transact using digital wallets deserve the same protections as consumers who use other prepaid accounts." AR1 278. But, as explained elsewhere, the Bureau ignored record evidence that consumers do not acquire digital wallets to "hold funds" and they do not meaningfully use digital wallets in that manner. *See supra* pp. 6-7, 14-16. Nor did the Bureau even investigate or establish existing regulations or practices with respect to digital wallets to assess whether new "protections" were needed. The Bureau next claimed that a "digital wallet could fall victim to erroneous or fraudulent transactions." AR1 278. But, again, the Bureau cites no evidence that this is a real-world problem with respect to digital wallets. While this concern might justify clarifying that Regulation E's baseline obligations apply to digital wallets (as PayPal has long agreed), it cannot justify subjecting digital wallets to the burdensome short-form disclosure mandate. *See supra* pp. 24-27.

Finally, the Bureau asserts that although "most digital wallets … do not typically charge many fees … it is impossible to rule out that existing or new digital wallet providers will charge such fees in the future." AR1 278. This is sheer speculation unmoored to any record evidence,

not a serious evaluation of the costs and benefits of subjecting digital wallets to a complex, burdensome regulatory regime. *See Nat'l Shooting Sports Found*, 716 F.3d at 214.

Perhaps recognizing that these two paragraphs will not carry the day, the Bureau argued earlier in this case that it had no obligation to "separately discuss the benefits and costs of applying [the Rule] to each specific type of product that the [R]ule covers." Dkt. 20 at 53. Instead, the Bureau argued, a "general discussion" of the Rule's overall "benefits and costs" should "appl[y] equally" to all of its regulated products. *Id.* at 54. This is doubly wrong.

To start, the Bureau cited only one case in support of its claim that it can ignore whole classes of products in assessing the costs and benefits of regulatory action. But in that case the organic statute (the Tobacco Control Act) contained no "requirement that costs be taken into account," *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 401 (D.D.C. 2017), *aff'd* 944 F.3d 267 (D.C. Cir. 2019), and the court emphasized the agency had in fact "separately address[ed] the costs to each of the regulated product categories," *id.* at 407. Here, not only is the Bureau subject to a robust statutory cost-benefit analysis requirement, but § 5512(b)(2) obligates the agency to consider, among other things, "the potential reduction of access by consumers to consumer financial products"—an inquiry that necessarily demands attention to different "products."

In addition, the Bureau's apparent premise that a generalized discussion of costs and benefits of regulating prepaid accounts can substitute for a product-specific analysis makes sense only if products are meaningfully similar. As PayPal has explained, the administrative record here demonstrated that GPR cards and digital wallets are not similar in relevant ways, as they differ in acquisition, functionality, funding, and business model. *See supra* pp. 8-9. The Bureau simply failed to confront those distinctions and contrary record evidence in its rush to force digital wallets into a regime designed for GPR cards. *See supra* pp. 19-24.

34

### III.    THE PREPAID RULE VIOLATES THE FIRST AMENDMENT

Finally, the short-form requirement violates PayPal's First Amendment rights by compelling PayPal to disclose information that is largely inapplicable to its products and likely to confuse its customers, while simultaneously prohibiting PayPal from presenting clarifications to dispel that confusion.[8]  The Court should therefore hold the Rule unconstitutional as applied to PayPal and enjoin the Bureau's enforcement of the Rule against the company.

Regulations that "target speech based on its communicative content" are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Examples of "content-based" restrictions include regulations that "'compel[] individuals to speak a particular message'" or to deliver a "government-drafted script."  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*").  Burdens of this type on commercial speech are "no exception" to the general rule, and demand "heightened scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).  Where commercial speech regulations require the disclosure of only "factual and noncontroversial information," the government still must prove that its regulation is "reasonably related" to its "interest in preventing deception of consumers" and not "unjustified or unduly burdensome."  *Zauderer v. Office of Disciplinary*

---

[8] On appeal, the D.C. Circuit concluded that because the Bureau's model clause "does not mandate the use of specific language" and allows financial providers to use phrasing that is "substantially similar" to its suggested phrases and terms, the "CFPB has not mandated a 'model clause' in contravention of EFTA."  *PayPal, Inc.*, 58 F.4th at 1279.  The court refrained from addressing PayPal's argument that the Bureau's mandated disclosure of fees—through either its preferred language or "substantially similar terms"—and prohibited clarifications violated the First Amendment, but it expressly reserved the constitutional argument for this Court's consideration on remand.  *Id.* at 1280.

*Counsel*, 471 U.S. 626, 650-651 (1985).  Here, the Bureau has failed to meet either of these standards.

The short-form disclosure is precisely the type of compelled speech that the Supreme Court has analyzed using strict scrutiny.  *NIFLA*, 138 S. Ct. at 2371.  Indeed, as PayPal has explained, *see supra* pp. 2-3, 13-14, 16, the mandated disclosure lays out (1) exactly what fees must be disclosed; (2) in what order those fees must be disclosed; (3) the font that must be used to make those disclosures; and (4) even the font size, down to the number of pixels.  What is more, the Bureau has acknowledged that many of those fees do not—and may never—apply to digital wallet products like PayPal's.  The Bureau's "mere speculation or conjecture" about the future runs directly afoul of the Supreme Court's requirement that a "governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  *Edenfield v. Fane*, 507 U.S. 761, 770-771 (1993).  Here, the Bureau has marshalled no evidence that digital wallet consumers were actually harmed by the product's existing disclosures, nor has it even explained how the-short-form disclosure might alleviate those unnamed harms in the future.

But even if strict scrutiny does not apply, the *Central Hudson* intermediate scrutiny framework should govern, not—as the Bureau contends—the more lenient *Zauderer* standard. *Zauderer* applies only where the government mandates disclosure of "purely factual and uncontroversial information about the terms under which … services will be available."  *NIFLA*, 138 S. Ct. at 2372.  And "to the extent that price regulations implicate the First Amendment, *Zauderer* may be the appropriate standard so long as the regulation does not impede a message the speaker would like to convey."  *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 392 (D.D.C. 2020) (collecting cases), *aff'd*, 983 F.3d 528 (D.C. Cir.).

Neither criterion is met here.  The mandated disclosures here would mislead, not educate, consumers.  As PayPal has explained, the disclosure mandate is factually divorced from the conditions under which consumers actually encounter and use digital wallets and thus confuses consumers about the "terms under which … services will be available."  *See supra* pp. 14-15, 24-25 & n.6.  Worse, the Rule restricts how PayPal can convey *accurate*—not misleading—information about the applicability (or lack thereof) of the fees it is required to disclose.  Where the government seeks to regulate a "communication [that] is neither misleading nor related to unlawful activity, the government's power is more circumscribed," and *Central Hudson* applies.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980).  Such is the case here: The short form serves the Bureau's interest in facilitating comparison shopping, not in regulating "misleading" or "unlawful" activity.  *See* AR1 52 (explaining that the short form would facilitate comparison shopping by a consumer "tak[ing] a package … off a J-hook in a retail store"); AR1 77 (noting that the mandated font sizes would allow the short form to "fit on most packaging material currently used in retail locations").

Regardless of whether *Central Hudson* or *Zauderer* applies, however, the Rule is deficient.  Under *Central Hudson*, "the State must assert a substantial interest to be achieved by restrictions on commercial speech," and "the regulatory technique must be in proportion to that interest."  447 U.S. at 564.  Under *Zauderer*, a disclosure must be "reasonably related" to a government interest and not "'unduly burdensome' in a way that 'chill[s] protected commercial speech.'"  *American Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26, 33 (D.C. Cir. 2014).  Furthermore, a mandated disclosure must "remedy a harm that is 'potentially real not purely hypothetical,' … and extend 'no broader than reasonably necessary.'"  *NIFLA*, 138 S. Ct. at 2377.  The requirement that PayPal describe fees that are largely inapplicable to its customers is not "reasonably related" to the Bureau's professed goal of providing consumers with information

37

relevant to choosing between prepaid products.  Similarly, prohibiting PayPal from making clarifying disclosures regarding fees that might confuse consumers in no way "directly advances" the government's interest in ensuring that consumers can comparison shop among like product offerings, nor is it "drawn to achieve that interest."  *Sorrell*, 564 U.S. at 572.  Indeed, just the opposite is true, as the Rule bars PayPal from providing on the short form any context about the fees consumers might actually encounter rather than the fees that the Bureau has deemed important for a wholly different product (GPR cards) acquired in a wholly different context (brick-and-mortar stores); *cf. Am. Hosp. Ass'n*, 983 F.3d at 541 (upholding rule requiring hospitals to post negotiated rates with insurance companies where rule did not "prevent[] them from adding their own message on the same website or even in the same file").

The Bureau has argued that a theoretical interest in informing consumers about products, without more, satisfies heightened First Amendment review.  *See* Dkt. 20 at 58-59.  That is incorrect.  A predicate for regulating speech is evidence of harm absent regulation.  That is fatal because the Bureau points to no evidence that it evaluated what disclosures digital wallet providers were already making to consumers before the Rule was promulgated, much less those disclosures (such as those already required by Regulation E) were inadequate.  The Bureau appears to assume that the only way consumers can be informed about a product is through exacting regulatory controls.  That premise, of course, is at war with the First Amendment, which embodies the principle that the key to informed consumers (and citizens) is free speech, not government restraint.  *E.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("'The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish.'").

In sum, the Rule forces PayPal to make statements likely to confuse and mislead customers and then prohibits it from clearing up the resulting confusion.  This content-based restriction on PayPal's speech rights violates the First Amendment and should be enjoined.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Rule's short-form requirement and enjoin its enforcement against PayPal.

Dated:  May 26, 2023

Respectfully submitted,

/s/ *Kelly P. Dunbar*
Kelly P. Dunbar (D.C. Bar No. 500038)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
kelly.dunbar@wilmerhale.com

Rebecca Lee (D.C. Bar No. 229651)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: (628) 235-1056
Fax: (628) 235-1001
rebecca.lee@wilmerhale.com

*Counsel for Plaintiff PayPal, Inc.*