## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAYPAL, INC.,<br>2211 North First Street<br>San Jose, CA 95131,<br><br>     *Plaintiff*,<br><br>   v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>and<br><br>ROHIT CHOPRA, in his official capacity as<br>Director, Consumer Financial Protection<br>Bureau,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>     *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 19-3700 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPPOSITION TO DEFENDANTS'
## AMENDED MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page(s)

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................5

I.     The Short-Form Disclosure Mandate Is Arbitrary And Capricious.....................................5

     A.     The Capacity Of Digital Wallets To Hold Funds Does Not Justify The Bureau's Regulatory Approach To Those Products...............................................................8

     B.     Uncertainty About The Applicability Of Regulation E Does Not Justify The Bureau's Regulatory Approach To Digital Wallets...............................................17

II.     The Bureau's Cost-Benefit Analysis Was Deficient ......................................................28

     A.     The Bureau Is Wrong That It Rigorously Assessed The Costs And Benefits Of Regulating Digital Wallets With Balance Functionality ......................................29

     B.     The Bureau Is Wrong That It Had No Obligation To Consider The Costs And Benefits Of Regulating Digital Wallets With Balance Functionality...................31

IV.     Supplemental Briefing As To The Appropriate Remedy May Be Helpful To The Court ......................................................................................................................39

CONCLUSION....................................................................................................39

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alfa International Seafood v. Ross*,
  264 F. Supp. 3d 23 (D.D.C. 2017) ..................................................................6

*ALLTEL Corp. v. Federal Communications Commission*,
  838 F.2d 551 (D.C. Cir. 1988) ......................................................................12

*American Gas Association v. Federal Energy Regulatory Commission*,
  593 F.3d 14 (D.C. Cir. 2010) ........................................................................18

*American Hospital Association v. Azar*,
  983 F.3d 528 (D.C. Cir. 2020) ......................................................................36

*American Meat Institute v. U.S. Department of Agriculture*,
  760 F.3d 18 (D.C. Cir. 2014) ...................................................................35, 37

*American Paper Institute v. Train*,
  543 F.2d 328 (D.C. Cir. 1976) ........................................................................6

*Amerijet International, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ......................................................................6

*Associated Builders and Contractors, Inc. v. Shiu*,
  773 F.3d 257 (D.C. Cir. 2014) ......................................................................13

*Associated Dog Clubs of New York State, Inc. v. Vilsack*,
  75 F. Supp. 3d 83 (D.D.C. 2014) ..................................................................14

*Business Roundtable v. Securities and Exchange Commission*,
  647 F.3d 1144 (D.C. Cir. 2011) ....................................................................34

*Butte County, California  v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ........................................................................9

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
  447 U.S. 557 (1980) ......................................................................................36

*Chamber of Commerce of the United States v. Securities and Exchange
  Commission*, 412 F.3d 133 (D.C. Cir. 2005) ...............................................18

*Cigar Association of American v. Food and Drug Administration*,
  436 F. Supp. 3d 70 (D.D.C. 2020) ................................................................13

*Coalition of MISO Transmission Customers v. Federal Energy Regulatory
Commission*, 45 F.4th 1004 (D.C. Cir. 2022) ........................................................27

*Connecticut Bar Association v. United States*,
620 F.3d 81 (2d Cir. 2010).........................................................................37

*Constellation Mystic Power, LLC v. Federal Energy Regulatory Commission*,
45 F.4th 1028 (D.C. Cir. 2022) ...................................................................23

*CTS Corp. v. Environmental Protection Agency*,
759 F.3d 52 (D.C. Cir. 2014) .......................................................................7

*Department of Homeland Security v. Regents of the University of California*,
140 S. Ct. 1891 (2020)..........................................................................20, 21

*Edenfield v. Fane*,
507 U.S. 761 (1993)...................................................................................37

*Edwards v. District of Columbia*,
755 F.3d 996 (D.C. Cir. 2014).....................................................................37

*Encino Motorcars LLC v. Navarro*,
579 U.S. 211 (2016)...................................................................................24

*Federal Communications Commission v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021)..........................................................................12, 27

*Genuine Parts Co. v. Environmental Protection Agency*,
890 F.3d 304 (D.C. Cir. 2018) ......................................................................9

*GPA Midstream Association v. U.S. Department of Transportation*,
67 F.4th 1188 (D.C. Cir. 2023)........................................................2, 8, 13, 29

*Huntco Pawn Holdings, LLC v. U.S. Department of Defense*,
240 F. Supp. 3d 206 (D.D.C. 2016) ..............................................................32

*International Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983) ...............................................................5, 6, 8

*Merck & Co., Inc. v. U.S. Department of Health and Human Services*,
962 F.3d 531 (D.C. Cir. 2020) ................................................................33, 34

*MetLife, Inc. v. Financial Stability Oversight Council*,
177 F. Supp. 3d 219 (D.D.C. 2016) ..............................................................28

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm
Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .....................................10

iii

*National Community Reinvestment Coalition v. Consumer Financial Protection Bureau*, No. 20-2074, 2022 WL 4447293 (D.D.C. Sept. 23, 2022) ......................................29

*National Institute of Family and Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018).........................................................................................35, 37

*Natural Resources Defense Council, Inc. v. Environmental Protection Agency*,
859 F.2d 156 (D.C. Cir. 1988)......................................................................................6

*New York Stock Exchange LLC v. Securities and Exchange Commission*,
962 F.3d 541 (D.C. Cir. 2020).............................................................................2, 6, 11

*Nicopure Labs, LLC v. Food and Drug Administration*,
266 F. Supp. 3d 360 (D.D.C. 2017)............................................................................32

*Portland Cement Association v. Environmental Protection Agency*,
665 F.3d 177 (D.C. Cir. 2011)......................................................................................5

*Prairie Band Potawatomi Nation v. Yellen*,
63 F.4th 42 (D.C. Cir. 2023).......................................................................................27

*Public Citizen, Inc. v. National Highway Traffic Safety Administration*,
374 F.3d 1251 (D.C. Cir. 2004)...................................................................................27

*Public Citizen v. Federal Motor Carrier Safety Administration*,
374 F.3d 1209 (D.C. Cir. 2004)...................................................................................28

*Rural Cellular Association v. Federal Communications Commission*,
588 F.3d 1095 (D.C. Cir. 2009)...................................................................................27

*Sorenson Communications Inc. v. Federal Communications Commission*,
755 F.3d 702 (D.C. Cir. 2014).....................................................................................26

*Southwest Airlines Co. v. Federal Energy Regulatory Commission*,
926 F.3d 851 (D.C. Cir. 2019)..................................................................................9, 10

*Stilwell v. Office of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009).....................................................................................11

*Turner Broadcasting System, Inc. v. Federal Communications Commission*,
512 U.S. 622 (1994).............................................................................................36, 37

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
471 U.S. 626 (1985).............................................................................................35, 36

iv

**Statutes and Regulations**

12 C.F.R. § 1005.2 ................................................................................................16, 18, 19

12 C.F.R. § 1005.7 ................................................................................................15, 18, 22

12 C.F.R. § 1005.18 ......................................................................................................4, 5

12 U.S.C. § 5512 ........................................................................................................28, 31

12 U.S.C. § 5532 ..............................................................................................................31

15 U.S.C. § 1693b ............................................................................................................31

15 U.S.C. § 1693c ............................................................................................................22

## INTRODUCTION

The story of this rulemaking is one of unexplained plot twists and an untenable ending. From the start, the Consumer Financial Protection Bureau focused its regulatory efforts on general purpose reloadable, or GPR, cards—typically known as "prepaid cards." Its Advance Notice of Proposed Rulemaking described little else, and not once mentioned digital wallets. *See* AR1 1-3. As the rulemaking record before the agency demonstrated, GPR cards are typically plastic cards sold in retail stores; they hang on J-hooks or behind the sales counter until a consumer takes one to the register and loads it with funds, usually cash. The benefit of a GPR card—as the Bureau found, AR1 242—is that it allows consumers to hold funds and spend them in electronic transactions; the risks—as the Bureau also found, AR1 243, 249-250—are unexpected fees and costly, unwanted "overdraft" features. Rather than subjecting these products to Regulation E's preexisting baseline protections for standard consumer asset accounts (such as checking and savings accounts), the Bureau determined in the Prepaid Rule that GPR cards warranted heightened—and more exacting—regulation, including highly prescriptive fee disclosure regulation and a 30-day ban on linking certain credit features to GPR cards (a provision already invalidated by this Court).

Whatever the merit of the Bureau's justifications for heightened regulation of GPR cards, those justifications did not warrant the same heightened regulation of digital wallets that have the capacity to hold funds ("digital wallets with balance functionality"). Quite unlike GPR cards, digital wallets such as PayPal's core consumer account that existed at the time of the rulemaking were not acquired in retail stores; they were not principally vehicles for consumers to load cash for later use; they did not come with costly or unexpected fees, indeed consumer-facing fees were charged in only unusual circumstances; and their fundamental purpose was not

1

to serve as a substitute for a checking account but to link with credit and other existing accounts to facilitate payments with those accounts.  *See* Dkt. 39-1 at 5-9 ("PayPal Br.").  And yet, when the Bureau issued its 235-page Notice of Proposed Rulemaking, the Bureau introduced to the story a plot twist (described in a mere three pages) that applied—wholesale—the more burdensome regulatory regime designed for GPR cards to the very different product of digital wallets.  This was regulatory overreach, as PayPal has explained.  Critically, digital wallets shared none of the GPR-card risks cited by the Bureau as a basis for its heightened regulation, and the Bureau identified zero consumer risks specific to digital wallets, much less did it point to any empirical or even anecdotal evidence of such risks.  The Bureau finalized its proposal more than three years later, despite having undertaken no meaningful efforts to assess—quantitatively or qualitatively—how or why consumers used digital wallets or whether there were any problems (such as inadequate disclosures) with such products that required a regulatory fix.

The Bureau's "regulate first, ask questions later" approach to digital wallets cannot be reconciled with the Administrative Procedure Act's ("APA") requirement of reasoned decisionmaking or with the cost-benefit analysis requirements in the Dodd-Frank Act or under the APA, as PayPal explained in its opening motion.  As the D.C. Circuit has emphasized, "[r]ules are not adopted in search of regulatory problems to solve," and "unless an agency's authorizing statute says otherwise, an agency regulation must be designed to address identified problems."  *New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 556 (D.C. Cir. 2020).  And as the D.C. Circuit's recent decision in *GPA Midstream Association v. Department of Transportation*, 67 F.4th 1188 (D.C. Cir. 2023), makes clear, agencies must grapple with, not gloss over, relevant differences in regulated products in assessing the benefits and costs of regulation.  Yet the administrative record here contained no reliable, real-world evidence of consumer harm

associated with any digital wallet products that would justify imposing exacting regulatory burdens—including the overly prescriptive short-form disclosure mandate—on such products. Nor did the agency justify its approach of shoehorning digital wallets with balance functionality into a heightened regulatory regime designed principally for GPR cards, particularly in the face of substantial record evidence making clear that the products differed in most ways that matter and that the mandated short-form disclosure was not reasonably tailored to ensure that digital wallet users would receive information relevant to them.

The Bureau's summary judgment motion fares no better than the scant explanation offered by the Bureau in the administrative proceeding in justifying the agency's decision to sweep digital wallets with balance functionality into a regulatory mold designed for GPR cards. Failing to engage with the record, the Bureau defends the Rule largely based on a series of conclusory assertions and unexplained assumptions that bottom on the *ipse dixit* that GPR cards and digital wallets are sufficiently alike, such that digital wallets should not be "carve[d] out" from the Prepaid Rule's heightened regime, for uniformity's sake.  Dkt. 38 at 2 ("CFPB Br."). The Bureau's mantra of "uniformity" might make sense in instances in which regulated products pose similar risks or are sufficiently alike in how they are acquired and used by consumers.  A regulatory preference for uniformity is decidedly insufficient, however, when undisputed evidence demonstrates that consumers acquired and used digital wallets (including those with balance functionality) in fundamentally distinct ways from GPR cards and in the absence of any evidence of consumer risk—crucial facts that the Bureau continues to overlook.

In its motion, the Bureau also defends the Rule on the ground that including digital wallets with balance functionality in the Rule eliminated regulatory uncertainty about whether such products were subject to Regulation E's preexisting baseline protections—a complete red

herring.  The *baseline* requirements of Regulation E have existed for decades and applied broadly to any consumer asset "account" held by a financial institution.  If there was uncertainty regarding the applicability of those baseline requirements to digital wallets, a limited rulemaking to clarify the issue may have been justified.  But the Prepaid Rule uniquely imposes *heightened* requirements—what the Bureau euphemistically calls "specially tailored" requirements, CFPB Br. 2—to address the specific risks posed by GPR cards; in doing so, the agency elected to go above and beyond the Regulation E baseline requirements that apply to virtually every other Regulation E-covered account (for example, checking accounts).  The Bureau's claimed interest in dispelling regulatory uncertainty could have been adequately served by extending Regulation E's preexisting baseline protections to digital wallets with balance functionality, a reasonable regulatory alternative that PayPal would have gladly supported.  But the Bureau unreasonably disregarded that more tailored, careful approach to regulation, opting for regulatory maximalism at every turn.  The result of the Bureau's handiwork is a regulatory regime gravely unsuited to digital wallets with balance functionality.

A leading example of the Rule's poor fit with respect to digital wallets is the Rule's short-form disclosure mandate.  As PayPal has explained, that disclosure regime—one the Bureau based on consumer testing of non-electronic disclosures for GPR cards, not digital wallets—is deeply problematic because it obligates PayPal to prominently refer to certain types of fees, regardless of whether it charges those fees.  *See* 12 C.F.R. § 1005.18(b)(2)(i)-(viii).  Making matters worse, when PayPal charges a fee that can vary in amount depending on the circumstances of a transaction, it must disclose only the highest possible fee under a worst-case scenario for its entire customer base, *id.* § 1005.18(b)(3)(i), and it is prohibited from explaining in the short-form disclosure how a customer could avoid or lower the fee, *id.*

4

§ 1005.18(b)(7)(iii).  The regulation further limits the words that PayPal can use in the short-form disclosure to describe the nature of the fees (and indeed, the nature of the product that PayPal offers), and it goes so far as to dictate the layout, ordering, typeface, type size, and type color to be used, *see, e.g.*, *id.* § 1005.18(b)(7).

The Bureau's motion fails to engage persuasively with the reality that this highly regimented compelled disclosure regime—crafted for GPR cards—is wholly unnecessary for digital wallets with balance functionality and, worse, that by forcing PayPal to convey information to consumers not germane to most users, it risks the confusion and bewilderment, not education, of consumers.  The ill-fitting nature of the short-form disclosure mandate well illustrates the consequences of the Bureau's unlawful refusal throughout the rulemaking to assess carefully and rigorously the many "obvious and substantial differences" between digital wallets with balance functionality and GPR cards.  *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983).

For these reasons and others stated below as well as those set forth in PayPal's motion for summary judgment, the Court should grant summary judgment to PayPal.

## ARGUMENT

### I.    THE SHORT-FORM DISCLOSURE MANDATE IS ARBITRARY AND CAPRICIOUS

The APA's demand of reasoned decisionmaking serves as a critical check on agency discretion, as this case demonstrates.  Indeed, "[t]he importance of reasoned decisionmaking in an agency action cannot be overemphasized.  When an agency is vested with discretion to impose restrictions on an entity's freedom to conduct its business, the agency must exercise that discretion in a well-reasoned, consistent, and evenhanded manner."  *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 188 (D.C. Cir. 2011) (internal quotation marks and alterations omitted).  The

obligation of reasoned decisionmaking includes at least three corollary principles relevant here: an agency must reasonably take account of "differences" in regulated products, *International Ladies' Garment Workers' Union*, 722 F.2d at 824; it may not substitute "mere speculation" for reasoned analysis, *Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988); and "an agency regulation must be designed to address identified problems," *New York Stock Exch.*, 962 F.3d at 556.[1]

The Bureau defied those basic principles of reasoned decisionmaking by failing to articulate and defend a reasonable, non-speculative basis for subjecting digital wallets with balance functionality to a stringent, enhanced regulatory regime designed for a materially different product, GPR cards. As PayPal has explained (PayPal Br. 5-9), the administrative record before the Bureau made clear that digital wallets and GPR cards differed in almost every way that matters. While GPR cards were typically physical cards acquired in brick-and-mortar locations (think grocery stories and pharmacies), digital wallets with balance functionality were purely digital and Internet-based. PayPal Br. 8. While the core purpose of a GPR card was to store a consumer's funds for later use in a transaction, the primary purpose of a digital wallet was to store a user's payment credentials (such as a credit card or bank account). *Id.* While "the essence of traditional prepaid cards is indeed pre-funding," AR2 5865, at the time of the rulemaking, most users of digital wallets never carried a balance, let alone affirmatively loaded

---

[1] While the Bureau insists that arbitrary and capricious review is "'narrow'" and "'very deferential,'" CFPB Br. 16, such review is "not toothless," *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 54 (D.D.C. 2017), and the Court's task is not merely to "rubber-stamp agency decision-making," *American Paper Inst. v. Train*, 543 F.2d 328, 338 (D.C. Cir. 1976). Instead, the Bureau must demonstrate that it considered all relevant factors, "especially in highly technical cases" like this one, *id.*, and reasonably explain "'why it chose to do what it did,'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

funds into their wallets, PayPal Br. 8—in fact, it arguably abused common English to refer to digital wallets as "prepaid" products since there was very little prepaid about them. And finally, while GPR card issuers generated revenue by charging consumers fees for maintaining accounts and effecting transactions (much like a substitute checking account), providers of digital wallets relied on a very different business model, generating revenue primarily from fees charged to merchants. *Id.* In these critical ways, the administrative record before the agency established that digital wallets were fundamentally different from GPR cards, as the Bureau is forced to acknowledge. *See, e.g.*, CFPB Br. 19 (conceding that "the record showed some difference[s] between" digital wallets and GPR cards, including that digital wallets came with "fewer fees," that digital wallets were not used as "substitute[s] for a checking account," and that consumers may have been only using the "stored-payment-credential functionality of digital wallets"); *id.* at 22 ("most digital-wallet asset accounts did not impose many fees at the time").[2]

In nevertheless rushing to apply the Rule's GPR-card-centric regulatory requirements to digital wallets, the Bureau accomplished a regulatory overreach and breached its duty of reasoned decisionmaking. Indeed, the Bureau's patent "fail[ure]to give adequate consideration"

---

[2] Although it is "black-letter administrative law that in an [APA] case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision,'" *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014), the Bureau makes various references to post-record developments. For example, as the Bureau notes (at 9 n.2), although it was not true during the underlying rulemaking, the current PayPal-branded consumer-facing digital wallet offering has been structured such that an account capable of holding a balance is a distinct offering from the digital wallet account. PayPal made these changes to its product construct—changes that impose their own operational burdens to PayPal's business—solely because of the Prepaid Rule. Under this structure, the "asset account"—that is, the balance functionality—"is subject to the [Prepaid] Rule." CFPB Br. 9. And regardless of the current dual account structure for PayPal-branded offerings, PayPal Inc.'s Venmo accounts currently provide and have always provided digital wallet and balance functionalities within the same account. *See, e.g.*, Dkt. 1 at 13 (Compl. ¶ 31 (discussing Venmo)).

to the "obvious and substantial differences" between digital wallets with balance functionality and GPR cards reflects a clear-cut failure of "reasoned decisionmaking." *International Ladies' Garment Workers' Union*, 722 F.2d at 824; *see also GPA Midstream Ass'n*, 67 F.4th 1188.

The contrary arguments advanced by the Bureau, *see* CFPB Br. 16-26, fail to justify the agency's paradigmatically arbitrary-and-capricious approach to the regulation of digital wallets with balance functionality.

### A.    The Capacity Of Digital Wallets To Hold Funds Does Not Justify The Bureau's Regulatory Approach To Those Products

In defending the Rule, the Bureau begins by relying heavily on a superficial similarity between digital wallets with balance functionality and GPR cards:  the fact that consumers "can load funds into the account," can "use those funds," and can "reload more funds later." CFPB Br. 17.  Based on this "similar functionality"—that is, balance functionality—the Bureau maintains that digital wallets with balance functionality should be subject to the same regulations that govern GPR cards.  *Id.*  This position thus boils down to a regulatory syllogism: (a) due to the circumstances in which they are acquired and used, GPR cards pose special risks warranting heightened regulation above and beyond Regulation E's preexisting baseline protections; (b) some digital wallets, like GPR cards, can hold consumers' funds and can allow consumers to make payments; (c) *ergo* such digital wallets should be subject to heightened regulation, too.

For at least four reasons, this overly simplistic line of reasoning cannot justify the application of the short-form disclosure requirement to digital wallets with balance functionality:

**1.**    Right out of the gate, the Bureau's "capacity to hold funds" rationale disregards evidence from the rulemaking proceeding making clear that, unlike GPR cards, the capacity to hold funds was at best incidental to, not a central feature of, digital wallets.  *See, e.g.*, PayPal Br.

6-9 (collecting record evidence). Saying that certain digital wallets "*can* [be] use[d]" to hold funds, CFPB Br. 2 (emphasis added), is distinct from saying that consumers in the real word *in fact* acquired or used digital wallets in that way. Reasonable regulation should focus on actual, not theoretical, use cases. Rulemaking record evidence here established that consumers acquired digital wallets primarily to access payment credentials (for example, a credit card or bank account), not to store funds. Thus, as PayPal explained to the Bureau and the Bureau did not dispute, while "[n]early 100% of PayPal's US consumer accounts are linked to at least one payment card or bank account as a funding source," "most [consumers] never carry a balance." AR2 5862, 5865. It is also undisputed in the record that when a balance happened to be held in a digital wallet, that was generally because the consumer had received funds from someone else— not because the user added funds to the account in the first instance. *See* AR2 5868. To PayPal's knowledge, the Bureau did not identify in the administrative record a single real-world instance in which the user of a digital wallet uploaded her own funds to the wallet for use in a future transaction. This collection of record evidence all points toward one conclusion: namely, that while the capacity to store funds was the primary design feature of a GPR card, it was merely an ancillary feature of digital wallets with balance functionality.

In view of this unrebutted evidence, the Bureau has offered no persuasive justification for seizing on an incidental feature of certain digital wallets (namely, that consumers can store funds) as a basis for regulating them as if they were the same as GPR cards (which are designed solely to store funds). *See* PayPal Br. 22. It is blackletter law that an agency "cannot ignore evidence contradicting its position," *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and "it may not minimize such evidence without adequate explanation," *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). This follows from "[o]ne of the most fundamental

principles of administrative law … that agencies must give reasons for their actions." *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 855 (D.C. Cir. 2019). The Bureau breached those obligations by failing to account in the rulemaking proceeding for significant evidence regarding how digital wallets with balance functionality are actually used by consumers.

In its motion, the Bureau does not respond to these points. Instead, it concedes that record evidence showed that PayPal's customers "rarely actually use their digital wallets' asset accounts." CFPB Br. 25. That concession should be the end of the matter. It certainly does not reflect reasoned decisionmaking—or attention to "an important aspect of the problem" before it, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)—for an agency to regulate very different products as if they were essentially the same based on a superficial functionality (a capacity to hold funds) that is "rarely actually use[d]."

2.    Equally problematic, the Bureau's "capacity to hold funds" theory of regulation ignores that, whether or not consumers do store funds on certain digital wallets, there was no evidence whatsoever before the Bureau of a *bona fide* problem with digital wallets that demanded a regulatory solution. *See* PayPal Br. 25-27. Even before this Court, the Bureau still has failed to explain cogently any consumer risk or harm posed by digital wallets with balance functionality that could justify the imposition of GPR-card-focused regulations, such as the short-form disclosure mandate.

This should not be surprising. From the very beginning of the rulemaking, the Bureau was laser focused on risks in how GPR cards are marketed, acquired, and used by consumers. *See, e.g.*, AR1 9. For example, the Bureau expressed concern about how GPR cards are displayed for purchase at retail stores: The cards are often displayed on physical "J-hooks" that offer providers "limited space in which to explain their product and disclose key features" or are

10

sometimes "displayed behind a register, requiring a consumer to ask to see each product packaging individually." AR1 9-10.  As a result, "only limited fee information on the outside of packaging for GPR cards" may be available, preventing consumers from "access[ing] comprehensive information about the card's fees and terms."  AR1 316; *see also* AR1 245 (explaining that "various factors continue to negatively affect consumers' ability to make meaningful comparisons" between GPR cards); *id.* (describing consumers' inability to "review the full terms and conditions" of GPR cards before purchasing them and consumers' difficulties "disentangl[ing] themselves from their [GPR cards]").

But these professed concerns with GPR cards are wholly disconnected from digital wallets—which, the rulemaking record made clear, were not purchased in retail stores and whose primary purpose was to link other credit and deposit accounts to facilitate consumer payments, *see* AR2 5862, 5865—and the Bureau pointed to no comparable risks that could justify applying the same enhanced regulatory scheme to both products.  This gap in the administrative record is fatal:  "Rules are not adopted in search of regulatory problems to solve," and "unless an agency's authorizing statute says otherwise, an agency regulation *must* be designed to address *identified* problems."  *New York Stock Exch.*, 962 F.3d at 556 (emphases added).

Granted, agencies may sometimes "adopt prophylactic rules to prevent potential problems before they arise."  CFPB Br. 25 (quoting *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)).  But the agency still must "justify" its action "with a reasoned explanation."  *Stilwell*, 569 F.3d at 519.  When it comes to digital wallets, the Bureau can muster nothing but speculative theories.  That must be insufficient, otherwise agency *ipse dixit* cloaked in claims of predictive judgment could justify all manner of regulation.  Indeed, it is telling that the Bureau has not offered any evidence or made any findings that the pre-Rule disclosures used

11

by digital wallet issuers were inadequate.  And, as explained further below, not one of the

Bureau's consumer testing groups appears to have involved a single digital wallet product or

user.  *See infra* p.33.  True, an agency does not always need to build a thick empirical record to

justify every action, *e.g.*, *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021), but that is

no license for pure speculation or for an agency to rely on consumer testing or studies relating to

one product as a basis for regulating a different product.

In short, the Bureau's identification of risks posed by GPR cards does not give it *carte

blanche* to regulate any product that shares some feature with GPR cards.  To apply the same

additional regulatory requirements to digital wallets, the Bureau was required to provide a

reasoned justification for doing so.  But the Bureau has nothing.  It presents no evidence showing

that it analyzed the behavior of digital wallet users; evaluated consumers' understanding of fees

(or lack thereof) charged by digital wallets; or reviewed any academic or scientific study so

much as mentioning digital wallets.  The Court is to "accord deference" to the Bureau's

determination that "a problem exists within its regulatory domain," but that deference is "not a

blank check," *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988), and here, the

Bureau's failure to attempt to understand how digital wallets are marketed, acquired, or used or

to engage with digital wallets as distinct products is not a hallmark of reasoned decisionmaking.

Recognizing this hole in the record, the Bureau asserts (at 21) that "even if the only

'problems' in the market involved other types of prepaid accounts," the Bureau had free rein to

"extend[] the Rule's protections to digital wallets with asset accounts as well."  That is as wrong

as it sounds.  Generic or theoretical industry risks, without more, cannot justify applying the

same regulatory regime to every part of an industry, especially in the face of undisputed record

evidence demonstrating material differences in the products at issue. *See Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70 (D.D.C. 2020); PayPal Br. 26-27 (discussing *Cigar Association*).

The D.C. Circuit's recent decision in *GPA Midstream Association*, 67 F.4th 1188, is instructive. That case involved a challenge to an agency regulation that imposed new safety requirements on gas and hazardous liquid pipelines. *Id.* at 1911. The petitioners challenged the application of those requirements to a type of pipeline, called a gathering pipeline, that collects raw gas and crude oil from a well. *Id.* Petitioners argued, in part, that the agency failed to distinguish transmission pipelines (the target of the new safety standards) from gathering pipelines in assessing the costs and benefits of the rule. *Id.* at 1196. The D.C. Circuit agreed. Although it recognized that gathering and transmission pipelines presented "a similarity in risk," that did not mean that the safety standards "ha[d] similar benefits and costs when applied to a different sector of the pipeline industry," that is, gathering pipelines. *Id.* at 1198. In that case, like here, the agency defended itself on the ground that gathering and transmission pipelines are "similar" in terms of risk and operation and that the court was obligated to defer to this "'informed conjecture.'" *Id.* 1199. The court firmly rejected that proposition, explaining that although their risks may be "comparable," that does not mean the "pipelines are similar in all important respects." *Id.* Based on deficiencies that are uncannily similar to the Bureau's failures here—including the agency's failure reasonably to account for "asserted differences" in pipeline types; its failure to quantity costs; and its "weak qualitative analysis"—the Court vacated the safety standards as applied to gathering pipelines. *Id.* at 1201. The same result is required here.

The Bureau's contrary authority (at 21-22) does not support a different result. In *Associated Builders & Contractors, Inc. v. Shiu*, 773 F.3d 257, 264 (D.C. Cir. 2014), the court permitted the government to infer that disparities in the employment of disabled individuals

existed among government contractors because they existed among the general workforce, but plaintiffs never attempted to demonstrate that this inference was unreasonable.  And in *Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014), a case in which the court upheld a regulation applying to small and large online pet sellers even though the "agency had only received" specific reports of "mistreatment by large online sellers," the court also had before it information pointing to "concerns about unregulated Internet breeders generally."  Here, the Bureau had no information suggesting concerns with digital wallet providers—generic or specific—and the differences between digital wallets and GPR cards were fundamental and go well beyond the scale of operation (like a large or small pet seller).

The Bureau fares no better in attempting to excuse (at 20) its lack of evidence or data by claiming that regulating digital wallets like GPR cards was just a "policy judgment" that does not "requir[e] evidence."  This makes little sense.  Issues of how digital wallets with balance functionality were marketed, acquired, or used; what existing disclosures providers made and whether those disclosures were adequate or insufficient; and whether those products created genuine risks for consumers that could justify applying heightened regulation are undoubtedly empirical questions that require evidence or facts to assess.  It would be a startling proposition if an agency could invoke a "policy judgment" rationale to subject a whole class of products to regulation absent any evidence of a problem to remedy.  Surely reasoned decisionmaking requires that even a policy judgment must be based on some analysis of real-world harm.

At bottom, the Rule was premised on and designed for "risks" that the agency identified pertaining to GPR cards.  *See, e.g.*, AR1 245 ("[s]tructure of [t]ypical GPR [c]ard [p]rograms" could "expose consumers … to greater risks, such as potential losses resulting from … insolvency or malfeasance").  Because the Bureau identified no evidence in the administrative

14

record demonstrating that digital wallets with balance functionality posed those same (or similar) "risks," the Bureau's reliance on the theoretical capability of such digital wallets to hold funds cannot bear the weight of justifying the application of enhanced regulations to those products.

3.      In addition, even if the theoretical capacity of digital wallets to hold funds could be a basis for regulation, that theory would support, at most, the application of Regulation E's *baseline* requirements to digital wallets with balance functionality.  That rationale cannot logically support applying *heightened* regulatory protections (including, for example, the short-form disclosure mandate) to digital wallets.  That is because GPR cards and other prepaid products as well as standard consumer asset accounts are all capable of holding funds.  A checking account, for instance, permits consumers to "load funds" into their accounts (via an in-branch deposit, direct deposit, etc.), "use those funds to make purchases" (*e.g.*, via debit cards), and "reload more funds later" (via additional deposits).  Thus, the presence of a balance capacity does not distinguish digital wallets from the consumer asset accounts that are already subject to Regulation E's preexisting baseline protections.[3]  To justify the imposition of the Prepaid Rule's *heightened* restrictions, the Bureau needed to identify some other similarity between digital wallets with balance functionality and GPR cards.  But it has not done so.  That omission negates the Bureau's oft-repeated assertion that digital wallets with balance functionality are

---

[3] In the first round of briefing, *see* Dkt. 24 at 17, the Bureau suggested that Regulation E, standing alone, was inadequate because it requires disclosures at a later point in the process (i.e., when the consumer "contracts for [the] service or before the first electronic fund transfer is made," 12 C.F.R. § 1005.7(a)), while the Prepaid Rule requires disclosures to be made "before a consumer acquires a prepaid account," *id.* § 1005.18(b)(1).  This is another red herring.  PayPal objects not to the timing of the Prepaid Rule's required disclosures but rather their form and content, which are ill-suited and confusing in the context of digital wallets with balance functionality.  Further, the Bureau has not identified any evidence that the timing of the disclosures with respect to such products was problematic or posed any risks to consumers.

"sufficiently similar" to GPR cards and "other prepaid accounts" as to "warrant consistent regulatory treatment." CFPB Br. 19; *id.* at 21 (users of digital wallets with balance functionality "should get the same protections" as those "who use other types of prepaid accounts"); *id.* at 22 (users of digital wallets with balance functionality "should have the same opportunity" to learn about fees as users of "other types of prepaid accounts").

To sum up, pointing out that some digital wallets can hold funds cannot reasonably justify the application of heightened regulation to such products because that feature, standing alone, does not meaningfully distinguish digital wallets with balance functionality from other asset "account[s]" that are subject to baseline, not heightened, regulatory protections. 12 C.F.R. § 1005.2(b)(1); *see also* CFPB Br. 1 ("Regulation E has long applied to other types of accounts, including checking and savings accounts and some limited types of prepaid products.").

    **4.**    Finally, the Bureau's narrow focus on the hypothetical capacity of digital wallets to hold funds overlooks that the short-form disclosure mandate does not simply regulate the so-called "asset account" functionality of digital wallets. For purposes of the short-form disclosure requirement, a digital wallet provider is required to disclose *all* fees associated with the product as a *whole*; not just fees associated with the balance functionality. By way of example, a digital wallet provider would need to disclose on the short form a 3% fee for a person-to-person transfer of funds originating from a linked credit card (a core digital wallet function), even though that transaction has nothing to do with a digital wallet's balance functionality. This overbreadth

underscores the irrationality of the mandate and demonstrates why the Bureau's focus on the

theoretical ability to hold a balance cannot justify the scope of the Rule as designed.[4]

### B.    Uncertainty About The Applicability Of Regulation E Does Not Justify The Bureau's Regulatory Approach To Digital Wallets

Searching for any possible defense of the Rule, the Bureau spills substantial ink arguing

that the Prepaid Rule's treatment of digital wallets was needed to ensure that Regulation E

applies to digital wallets with balance functionality.  The Bureau thus contends (at 17-18), for

example, that PayPal has not "explained why digital-wallet asset accounts should not be subject

to Regulation E as a general matter."  The Bureau's motion is filled with similar statements.  *See,

e.g.*, *id.* at 21 (citing uncertainty as to whether Regulation E applied to digital wallets with

balance functionality as the "problem" the Bureau was attempting to solve); *id.* at 19-20

(describing importance of extending "limited-liability and error resolution rights [under

Regulation E]" to digital wallets with balance functionality); *id.* at 20 (claiming Rule "eliminates

uncertainty" about applicability of Regulation E); *id.* at 8 (claiming "the Rule eliminated the

previous uncertainty about whether and when Regulation E's protections applied"); *id.* at 6

(before the Rule, "it was less clear what rules applied to GPR cards and other prepaid products

like digital wallets with asset accounts").

---

[4] The Bureau's motion obfuscates this fact by claiming, for example, that "the Bureau … explained why it was useful to require the same disclosures for asset accounts tied to digital wallets."  CFPB Br. 3; *see id.* at 9 ("[I]t is the presence of that asset account, not the digital wallet's pass-through functionality, that brings the digital wallet within the Rule's scope.").  That description elides that the disclosure regime also applies to fees untethered to any balance functionality (what the Bureau characterizes as the "asset account") associated with a digital wallet.  Indeed, the Bureau does not even attempt to justify why the disclosure mandate applies broadly to all fees, even those that relate solely to the core function of digital wallets (storing payment credential, such as credit cards), and that are unrelated to balance functionality.

This line of argument rests on a false dilemma fallacy.  As the Bureau tells it, digital wallets with balance functionality must either be unregulated or they must be regulated under the Prepaid Rule's enhanced regulatory regime specifically designed for the unique features and risks of GPR cards.  That binary framing of the options unreasonably disregards an obvious alternative:  extending Regulation E's preexisting baseline requirements to digital wallets with balance functionality—a regulatory alternative PayPal, in fact, supported.  *See* AR2 5862 ("PayPal supports the Bureau's desire to apply Regulation E consumer protections to digital wallets"); PayPal Br. 11; *see also American Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) (agency has obligation to consider reasonable alternatives to regulatory approach chosen); *see Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005) (similar).

To understand this point, it is helpful to say a bit more about Regulation E as it existed prior to this rulemaking.  *See also* PayPal Br. 10-11.  The original class of products covered by Regulation E consisted of certain consumer asset accounts, defined as any "demand deposit (checking), savings, or other consumer asset account … held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes."  12 C.F.R. § 1005.2(b)(1).  Regulation E's baseline protections have long applied to those standard consumer asset accounts.  *See id.* § 1005.3(a).  These protections include "[g]eneral disclosure requirements," *id.* § 1005.4, under which disclosures must be "clear and readily understandable," *id.* § 1005.4(a)(1), as well as regulations regarding "[i]nitial disclosures," *id.* § 1005.7, which set forth detailed guidance on the content of information that must be provided to the consumer.  As relevant here, the provider must disclose "[a]ny fees imposed by the financial institution for electronic fund transfers or for the right to make such transfers," *id.* § 1005.7(b)(5), thus ensuring that fees actually charged are disclosed.  Regulation E's baseline protections also include many

requirements described in the Bureau's motion, such as limited liability for unauthorized transfers, error protection, and a right to stop preauthorized transfers of funds. *See* CFPB Br. 8.

The Prepaid Rule created a new, special category of "prepaid accounts" subject to Regulation E. In particular, in order to accomplish the goal of regulating GPR cards, the Prepaid Rule amended Regulation E's definition of "account" to "include[] a prepaid account," which encompasses "payroll card account[s]," "government benefit account[s]," and any account "[t]hat is issued on a prepaid basis in a specified amount or not issued on a prepaid basis but capable of being loaded with funds thereafter" and that meets other criteria. 12 C.F.R. § 1005.2(b)(3). The Bureau has interpreted that last provision to apply to digital wallets with balance functionality. As a result of the Bureau's decision to sweep digital wallets with balance functionality into the definition of "prepaid account," such products are subject to both the baseline protections of Regulation E as well as the Prepaid Rule's GPR-focused heightened requirements, such as the short-form disclosure mandate.

As PayPal has explained (at 11-16), the Bureau designed these heightened requirements for GPR cards and they go well above and beyond the baseline Regulation E requirements. When it comes to disclosure, for example, Regulation E's baseline requirements are a model of flexibility, while the short-form disclosure mandate is anything but. The short-form disclosure mandate, as PayPal has also explained (at 13), obligates PayPal to prominently refer to certain types of fees, regardless of whether it charges those fees; it requires PayPal to list the highest fee possible, regardless of rarity; and PayPal is prohibited from explaining in the short-form disclosure how a customer could avoid or lower the fee. *See also supra* pp.4-5.

All of this demonstrates that the Bureau made two choices, not one, regarding how to regulate digital wallets with balance functionality: the Bureau first decided to subject those types

of products to Regulation E as it existed prior to the Prepaid Rule and then decided to subject

them to an additional and heightened regulatory regime.  Against that backdrop, the Bureau's

consistent refrain before this Court about a need to ensure that digital wallets are subject to

Regulation E might justify the Bureau's first decision, but not its separate decision to force

digital wallets with balance functionality into the more exacting regime tailored for GPR cards.

If all the Bureau wanted to do with respect to digital wallets was to resolve uncertainty about the

applicability of Regulation E's baseline protections, it could have done so, with PayPal's

support.  *See, e.g.*, PayPal Br. 11.  But a professed concern about Regulation E's applicability

cannot logically justify the imposition of additional, heightened regulations—requirements that

go far beyond those imposed by the Regulation E baseline.

    The Supreme Court's decision in *Department of Homeland Security v. Regents of the*

*University of California*, 140 S. Ct. 1891 (2020), helps to show why the Bureau's decision here

was arbitrary and capricious.  In that case, the Supreme Court considered an arbitrary-and-

capricious challenge to the Department of Homeland Security's ("DHS") decision to rescind the

Deferred Action for Childhood Arrivals ("DACA") program.  As the Supreme Court explained

it, DHS's decision to rescind DACA was unreasonably framed as an all-or-nothing choice

because it ignored that DACA consisted of two components: a benefits authorization that

extended various federal benefits to DACA-eligible individuals and a forbearance component

that embodied a decision not to seek removal of those same individuals.  The Court held that it

was arbitrary and capricious for DHS to fail to give "'any consideration whatsoever'" to a

"forbearance-only policy," *id.* at 1912—that is to say, DHS unreasonably overlooked the

possibility of rescinding DACA's authorization component while retaining DACA's forbearance

policy.

Although the legal and factual context in that case differs from here, the Bureau's legal error is similar. Like DHS, the Bureau here considered only a binary choice: should digital wallets with balance functionality be subject to the enhanced Regulation E regime it designed specifically for GPR cards or not regulated at all? In so framing the issue before it, the Bureau failed to consider the obvious alternative of extending Regulation E's preexisting baseline protections to digital wallets with balance functionality without the special, prescriptive enhancements the Bureau specifically designed for GPR cards. In the same way that DHS's failure to consider decoupling DACA's benefits authorization from its forbearance component was arbitrary and capricious, the Bureau's failure to consider a decoupled (rather than all-or-nothing) approach to regulating digital wallets—that is, extending Regulation E's baseline requirements to digital wallets but not the enhanced regime—was a decided failure "'to consider … an important aspect of the problem'" before it. *Id.* at 1913.

Relatedly, the Bureau contends (at 17) that it lumped digital wallets with balance functionality with GPR cards under the banner of "prepaid accounts" to prevent "substantial and unwarranted regulatory complexity" and to reduce "consumer[] confus[ion] about which protections applied to which products." But here again, the Bureau appears to misapprehend the nature of PayPal's challenge. PayPal is not claiming—nor has it argued—that digital wallets with balance functionality should be left unregulated; its position is that the Bureau failed reasonably to explain why those products should be treated like GPR cards rather than under the baseline Regulation E requirements applicable to other standard consumer asset accounts. The core defect in the Bureau's reasoning is thus not that it chose to regulate certain digital wallets. Rather, the problem is that the Bureau failed to justify its decision to impose stringent regulations

21

designed for GPR cards rather than simply extending the baseline protections for standard consumer asset accounts to digital wallets capable of holding funds.

If the Bureau had simply clarified that Regulation E's preexisting baseline protections applied to digital wallets with balance functionality, that would have fully addressed any risk of regulatory complexity or consumer confusion. That more reasonable approach, among other things, would have had the virtue of aligning the disclosure requirements applicable to such digital wallets with the fees actually applicable to consumers using those products, consistent with Congress's design, *see* 15 U.S.C. § 1693c(a) (disclosures shall include "*to the extent applicable*," among other things, "any charges for electronic fund transfers") (emphasis added), as well as Regulation E's baseline disclosure requirements, *see* 12 C.F.R. § 1005.7(b)(5) (requiring disclosure of "[a]ny fees imposed"). For those reasons, the Bureau cannot defend its decision to treat digital wallets with balance functionality like GPR cards by claiming a generalized interest in "avoid[ing] a patchwork regulatory regime." CFPB Br. 21. In fact, the Bureau itself *created* a patchwork regime by subjecting digital wallets with balance functionality to heightened regulations not applicable to asset accounts regulated under Regulation E's baseline protections and not applicable to digital wallets without balance functionality.

C.    **The Bureau's Specific Defense Of The Application Of The Short-Form Disclosure Mandate To Digital Wallets Is Unpersuasive**

The fundamental category error at the heart of the Rule's approach to digital wallets—the Bureau's (afterthought) decision to shoehorn digital wallets into a regime engineered for GPR cards—manifests itself most concretely when it comes to the short-form disclosure mandate. As PayPal has explained (*see supra* pp.6-7), the Rule unreasonably compels digital wallet providers to present consumers with a prescriptive disclosure outlining fees that, although germane to GPR

cards, do not reflect the features of digital wallets and that digital wallet users rightly do not expect to encounter.  Predictability, this threatens to leave digital wallet users "confus[ed] and alarm[ed]" about the fees they should expect to pay when using these products.  AR2 5880.  The Bureau's consistent failure to grapple with this important issue does not "demonstrate the markers 'of principled and reasoned decisionmaking supported by the evidentiary record.'" *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1043 (D.C. Cir. 2022).

To start, there can be no debate that the short-form disclosure was designed with physical GPR cards (not digital wallets with balance functionality) in mind.  *See* PayPal Br. 13-14.  For example, the administrative record is replete with references to how the in-store acquisition process motivated the format and content of the short-form disclosure.  *See, e.g.*, AR1 945 (describing the testing of various disclosures "on the backs of prepaid card package prototypes"); AR1 946 (describing "shopping" simulations in which consumers were asked to compare prepaid cards "hanging on a vertical surface"); AR1 391 (noting that the short-form disclosure's "size requirements will ensure that consumers can read and understand the disclosures … while also accommodating the existing packaging constraints for prepaid accounts sold at retail locations"); AR1 360 (describing the short-form disclosure as designed in light of the "size constraints of existing J-hook packaging").  And as the contractor the Bureau hired to assist it with designing the short-form disclosure explained, this was no accident:  The Bureau's rulemaking effort was keyed to "decid[ing] how information about the costs and features of [prepaid card] products … c[ould] most effectively be disclosed to consumers, particularly in retail stores."  AR1 862.

What is more, the key differences between GPR cards and digital wallets described in the rulemaking record did not relate only to where or how they were acquired.  As PayPal has explained, the contents of the short-form disclosure were vastly disconnected from the fee

23

structure of digital wallets.  *See* PayPal Br. 23.  Although the Bureau claims that the short-form disclosure is designed to highlight a "prepaid account's most important fees," AR1 240, record evidence made clear that those fees were largely beside the point when it came to digital wallet products like PayPal's, *see* AR2 5880.  Had the Bureau's rounds of consumer testing actually involved any digital wallets or digital wallet users, the Bureau would have learned that the short-form disclosure was not tailored to promote the "most important fees" for digital wallet users.

Despite a lengthy administrative proceeding and multiple briefs in this Court, the Bureau has not identified any agency effort to understand how or why digital wallet users acquired their accounts, whether they comparison shopped before selecting a digital wallet, or whether any of the fees mandated in the short-form disclosure were at all relevant to consumers' decision to obtain a digital wallet.  Nor did the Bureau develop a prototype of the short-form disclosure as applied to digital wallets with balance functionality.  Instead, the Bureau simply asserts (at 23)—without evidence—that one-size-fits-all regulation is appropriate:  Despite being designed in a retail context, the short-form disclosure mandate is just as "useful" if a prepaid product is acquired "online, over the phone, [or] through some other channel."  But the APA requires "reasoned explanation," *Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221 (2016), and here the Bureau offers no reasoned explanation for why a disclosure designed to aid consumers in selecting a GPR card in a retail context has applicability to a different product, with a vastly different business and fee model, and obtained in a different way.

Next, the Bureau claims that excluding digital wallets with balance functionality from the Prepaid Rule would have created a "patchwork regulatory regime," CFPB Br. 22, and that standardized disclosures are "easier for consumers to read and understand," *id.* 24.  But standardized disclosures make sense only if consumers are likely to comparison shop among

24

digital wallets and GPR cards, something the Bureau never investigated.  What is more, this response once again ignores that there was an obvious alternative—extending Regulation E's preexisting baseline disclosure requirements to digital wallets with balance functionality.  *See supra* pp.18-20.  The Bureau has not articulated any compelling reason for bypassing those longstanding baseline disclosure requirements and instead imposing on digital wallets with balance functionality a set of prescriptive disclosures designed for GPR cards.  As PayPal has explained, *supra* p.22, applying Regulation E's baseline protections would have completely dispelled any regulatory uncertainty.  And if the uniformity achieved by those requirements suffices for standard consumer asset accounts like checking and savings accounts, the same should be true of the balance functionality associated with digital wallets.

The Bureau asserts (at 22) that digital wallets with balance functionality and GPR cards (and other prepaid products) are similar enough to justify the application of a disclosure tailor-made for the latter to the former.  But the Bureau has not reasonably identified, based on evidence in the administrative record, any commonality between the two types of products beyond their capacity to hold funds that would allow the Bureau to bootstrap the risks posed by GPR cards as a basis for regulating digital wallets.  And for the reasons explained above, *see supra* Part I.A, the Bureau's "capacity to hold funds" rationale cannot, standing alone, justify the imposition of the short-form disclosure requirement given that many other asset accounts (for example, checking and savings accounts) are not subject to that mandate.  As with standard consumer asset accounts, the regulatory interests that the short-form disclosure seeks to advance (such as informing consumers about fees) would have been served simply by applying Regulation E's preexisting disclosure requirements to digital wallets with balance functionality.

Indeed, the Bureau's motion before this Court contains an avalanche of concessions supporting the view that it lacked a sound basis for believing that the short-form disclosure mandate was at all tailored to digital wallet users.  The Bureau acknowledges, for example, that during the relevant time period and as reflected in the administrative record, digital wallets with balance functionality "generally did not charge the fees listed on [the short-form] disclosure's topline (or did not offer those features at all)," CFPB Br. 23; that "most digital wallets did not charge many fees at the time," *id.* at 10; that digital wallets "have different fee structures," *id.* at 23; and that PayPal's customers "rarely actually use[d] their digital wallets' asset accounts," *id.* at 25.  Those multiple acknowledgments about the administrative record underscore the irrationality of applying the short-form disclosure to digital wallets with balance functionality.

The Bureau's response (at 22-24) is to speculate that providers of digital wallets with balance functionality might begin charging fees in the future.  But the Bureau's only basis for this speculation was an unadorned assertion (at 24) that "nothing prevents" providers of such products from charging fees, with no reasoned assessment of whether and why that was likely.  Although "an agency's predictive judgments … are entitled to deference," "deference to such … judgment[s] must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (citations and internal quotation marks omitted).  In relying on predictive judgment cases, the Bureau forgets that "the wisdom of agency action is rarely so self-evident that no other explanation is required." *Id.*  In this case, the Bureau still has not provided any reasonable explanation for its conjecture that providers of digital wallets would begin charging the fees reflected in the short-form disclosure or that providers would not adequately disclose those fees without government mandate, and it

continues to ignore contrary evidence.[5]  This case is accordingly a far cry from the type of

expertise- and evidence-based predictive judgments that courts sometimes uphold.[6]

In any event, whatever the merit of the Bureau's conjecture about fees, that concern

might justify applying Regulation E's baseline disclosure requirements to ensure that applicable

fees are disclosed.  But it does not logically support the Bureau's rush to regulate digital wallets

with balance functionality under the heightened GPR-card-centric regime.

---

[5] Citing PayPal's current short-form disclosure, the Bureau states (at 24) that PayPal now "charg[es]" some of the "fees" listed in the "top-line" disclosure.  Any changes to PayPal's fee structure following the Prepaid Rule's promulgation, however, fall well outside the administrative record and are legally irrelevant to whether it was arbitrary and capricious for the Bureau to sweep digital wallets with balance functionality into the GPR-card-focused regime in promulgating the Prepaid Rule.  And, tellingly, the Bureau does not even attempt to identify any evidence regarding how often those fees are imposed by PayPal; this post-record development thus says nothing about whether the short-form disclosure is tailored to how consumers actually use or experience PayPal's products.  Further, PayPal's current short-form disclosure only reinforces the confusing and misleading nature of that information it must disclose.  In particular, PayPal is prohibited from providing additional context within the corners of the short-form disclosure clarifying the specific circumstances when these fees will actually be imposed and whether the fee will be lower than the amount set forth in the short form.

[6] The cases the Bureau cites (at 24-25) are readily distinguishable.  In *Public Citizen, Inc. v. NHTSA*, 374 F.3d 1251 (D.C. Cir. 2004), the agency relied on specific factual "findings" regarding the "economic incentive[s]" of regulated entities, their past behavior, and the impact of "other regulatory requirements."  *Id.* at 1260.  In *Rural Cellular Association v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009), the agency "relied on its expertise" and "identif[ied] the considerations it found persuasive" to "make predictive judgments about the effects of" its own proposed action. *Id.* at 1105.  In *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021), the agency "repeatedly asked commenters to submit empirical or statistical studies" on the question at hand and, in the absence of such submissions, "made a reasonable predictive judgment based on the evidence it had."  *Id.* at 1160.  In *Coalition of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022), the agency relied on "industry conditions" and "'trends' in project development."  *Id.* at 1020.  Here, the agency has not offered any relevant factual findings, has not relied on its expertise, has not identified any relevant evidence, and has wholly ignored both the economic incentives of providers of digital wallets with balance functionality as well as the impact of other regulatory requirements.  Finally, in *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42 (D.C. Cir. 2023), the D.C. Circuit held that the Secretary of the Treasury had failed to adequately "explain [her] decision."  *Id.* at 47.  The same is true here.

## II.    THE BUREAU'S COST-BENEFIT ANALYSIS WAS DEFICIENT

Independently, the Prepaid Rule's heightened regulatory regime, including the short-form disclosure mandate, cannot lawfully be applied to digital wallets with balance functionality because it is the product of deficient cost-benefit analysis, as PayPal has explained. *See* PayPal Br. 28-34. The Bureau does not dispute that it had obligations under the APA, *see MetLife, Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219, 230 (D.D.C. 2016) (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)), as well its organic statute, *see* 12 U.S.C. § 5512(b)(2), to engage in a rigorous cost-benefit analysis. Nor could it. Congress specifically restricted the Bureau's rulemaking authority by mandating that the Bureau, in promulgating rules, "shall consider … the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." *Id.* As the D.C. Circuit has held, "[a] statutorily mandated factor"—such as the costs or benefits of regulation identified in 12 U.S.C. § 5512(b)(2) —"by definition, is an important aspect of any issue before an administrative agency … [.] When Congress says a factor is mandatory, that expresses its judgment that such a factor is important." *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

In this case, however, the Bureau failed to discharge properly these statutory duties when it came to digital wallets with balance functionality. In response, the Bureau brushes aside the deficiencies of its cost-benefit analysis based on two defenses: that the agency did properly assess the costs and benefits when it came to digital wallets with balance functionality but that it had no legal obligation to do so. *See* CFPB Br. 26-29. Neither defense holds water.

28

A.    **The Bureau Is Wrong That It Rigorously Assessed The Costs And Benefits Of Regulating Digital Wallets With Balance Functionality**

The Bureau's thin and conclusory assessment of the costs and benefits of regulating digital wallets under a heightened regulatory regime designed for a different product was insufficient.  As PayPal has explained (at 29-30), the agency's cost-benefit analysis did not mention "digital wallets," much less meaningfully assess the qualitative or quantitative costs and benefits to consumers, digital wallet providers, and others of subjecting digital wallets with balance functionality to the Rule's short-form disclosure requirement (or indeed any of the other heightened requirements going beyond baseline Regulation E provisions).  The Bureau, for example, failed meaningfully to engage with the predictable costs and disadvantages of subjecting digital wallets with balance functionality to a disclosure mandate designed for a different product—including confusing consumers and stifling innovation.  *See id.*  The D.C. Circuit's decision in *GPA Midstream Association*, 67 F.4th 1188 (D.C. Cir. 2023), drives home the conclusion that this superficial approach to cost-benefit analysis simply will not do, as PayPal explained above, *see supra* p.13; *see also National Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau*, 2022 WL 4447293, at *31 (D.D.C. Sept. 23, 2022) (vacating CFPB rule for violation of cost-benefit analysis requirements where agency failed to respond meaningfully to comments bearing on the analysis and failed to consider nonquantifiable harms).

As it has attempted to do before, and seizing upon two citations to the *Federal Register*, the Bureau boldly claims that it "did address the benefits and costs of applying the Rule to digital wallets with asset accounts specifically."  CFPB Br. 27 (citing AR1 272, 277-278)*.*[7]  Right out of

---

[7] The Bureau acknowledges this "discussion did not appear in the section entirely devoted to" cost-benefit analysis, relying on a general incorporation by reference.  CFPB Br. 27.

the gate, the fact that the Bureau's claimed assessment of the costs and benefits of regulating

digital wallets consists of *two* citations in a nearly 700-page *Federal Register* discussion should

raise alarm bells as to whether Bureau took its statutory obligation to weigh costs and benefits

seriously.  And reviewing the citations the Bureau relies upon only confirms the deficiency of the

analysis.  As PayPal has explained (at 32-33), the Bureau's first citation (AR1 272-273), refers to

stakeholder comments, not to any analysis by the Bureau, much less to any of the careful

quantitative and qualitative weighing of benefits and costs that should be expected of an agency

subject to a statutory cost-benefit analysis requirement.

    The Bureau's second citation (AR1 277-78) is a model of conclusory reasoning, not

rigorous cost-benefit analysis.  *See* PayPal Br 32-33.  The substance of the Bureau's purported

"cost-benefit analysis" is a single paragraph, marked by conclusory reasoning (the Bureau is "not

persuaded" a different regulatory approach for digital wallets is justified, AR1 278) and

speculation ("it is impossible to rule out" consumer-facing fees, AR1 278), as PayPal has

explained.  And even the Bureau's speculative reasoning ("[i]f fees" are charged in the future,

consumers deserve to know, AR1 278), ignores that the solution to that concern would be to

extend Regulation E's baseline disclosure obligations to digital wallets, not to force digital

wallets into a highly prescriptive, ill-fitting short-form disclosure regime designed for different

products.  It would make a mockery of Congress's cost-benefit analysis requirements to permit

---

The Bureau's blanket reliance on a provision that incorporated other sections of the regulatory
preamble (AR1 575-576) should not be permitted to salvage its failure to engage in a cost-benefit
analysis.  The incorporation provision does not specify which sections or excerpts are relevant to
which aspects of the cost-benefit analysis, making it so that the agency's purported assessment of
costs and benefits is not reasonably discernable.  Permitting agencies to engage in such
maneuvers will complicate efforts by courts and stakeholders to review the cost-benefit analysis
of agencies.  In any event, even crediting this incorporation-by-reference approach, the Bureau's
reasoning is badly deficient, as explained in the text.

such threadbare and conclusory reasoning—devoid of any effort to calculate costs and benefits in a quantitative or qualitative fashion—to satisfy the Bureau's statutory obligations.

### B.    The Bureau Is Wrong That It Had No Obligation To Consider The Costs And Benefits Of Regulating Digital Wallets With Balance Functionality

Perhaps recognizing that its specific discussion of digital wallets cannot carry the day, the Bureau falls back to a contention that it had no obligation to "separately discuss the benefits and costs of applying [the Rule] to each specific type of product that the [R]ule covers." CFPB Br. 28.  In the Bureau's view, a "general discussion" of costs and benefits, without attention to digital wallets in particular, was sufficient.  *Id.*  PayPal has already explained why the Bureau is wrong as a matter of law, *see* PayPal Br. 34, but a few points bear emphasis.

To start, the Bureau's narrow understanding of its cost-benefit analysis obligation is untenable.  In imposing a cost-benefit analysis obligation on the Bureau, Congress specified that the obligation included assessing "the potential reduction of access by consumers to consumer financial *products* or services resulting from such rule," 12 U.S.C. § 5512(b)(2) (emphasis added)—statutory evidence that Congress expected a product-specific analysis.  What is more, when it came to disclosures specifically, Congress required the agency to focus on "the costs, benefits, and risks associated with *the product* or service, in light of the *facts and circumstances*," 12 U.S.C. § 5532 (emphases added), and under EFTA specifically, Congress required that model clause disclosures "*shall* take account of *variations* in the services and charges under different electronic fund transfer systems," 15 U.S.C. § 1693b(b) (emphases added).  Read together, those statutory provisions have a common thread:  at least when it comes to mandated disclosures, Congress expected the Bureau to undertake a product-specific—not highly generalized—assessment of costs and benefits, which is lacking here.

None of the Bureau's authority is to the contrary. *See* CFPB Br. 28-29. Neither the statutory scheme in *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 401 (D.D.C. 2017) (the Tobacco Control Act), nor in *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 221 (D.D.C. 2016) (the Military Lending Act), even contained a cost-benefit analysis requirement. It follows that neither case sheds light on how to interpret a statutory cost-benefit analysis obligation, much less the scope of the Bureau's specific statutory duty. On top of that, in each case, the court concluded that the agency had "separately address[ed]" each product category, *Nicopure Labs*, 266 F. Supp. at 407, or offered an explanation that "appl[ied] fully" to the product at issue, *Huntco Pawn Holdings*, 240 F. Supp. 3d at 222.[8] Neither is true here.

At the end of the day, the signal flaw in the Bureau's cost-benefit defense is that, however specific or general an agency may be when regulating closely related products, the record demonstrated that digital wallets (including those with balance functionality) were fundamentally different from GPR cards—including in terms of how they are acquired, how they are used, whether and how funds are added, and providers' business models. *See* PayPal Br. 7-9 (collecting administrative record evidence). Contrary to the Bureau's view (at 29), these differences make the "lack of specificity" in the Bureau's assessment far from trivial. The Bureau recognized as much in engaging in a meaningful cost-benefit analysis of payroll card and

---

[8] In *Huntco*, the court held that an agency was not required to respond to a specific request (one of approximately 50) from the pawn loans association for an exemption to the agency's policy covering high-cost loans because it had explained its reasoning in responding to exemptions generally. 240 F. Supp. 3d at 210-221. As the court explained, pawn loans were materially similar to other regulated loans in that they were "indisputably" high cost and posed a risk to borrowers, even if the risks were not as severe as those posed by other loans. *Id.* at 220. *Huntco* in no way stands for the proposition that agencies need not conduct a proper cost-benefit analysis when subjecting industries that are materially different to the same regulatory regime.

government benefit accounts—which also differ from GPR cards—and in even developing disclosures specific to those accounts.  *See* PayPal Br. 29; AR1 578-579, 588-89, 645.

When it comes to the short-form disclosure mandate specifically, a more rigorous cost-benefit analysis would have required the Bureau to take seriously the risks of consumer confusion resulting from the lack of fit between digital wallets and the disclosure mandate.  *See* PayPal Br. 31.  The Bureau claims that it did address this concern, citing consumer testing it conducted during the rulemaking.  CFPB Br. 30 (citing AR1 589).  But the Bureau does not dispute that it did not "test the disclosure regime in an electronic setting," AR1 589, and that its resulting disclosure requirement was calibrated for "a consumer who is shopping for a prepaid card," *id.*—a description that makes little sense applied to digital wallet users, who do not typically shop for and purchase digital wallets.  Perhaps more critically, the Bureau's reliance on consumer testing irrationally misses the fact that, to PayPal's knowledge, none of that testing involved digital wallet users and thus none of that testing could account for the risk that many consumers would be befuddled by reviewing disclosures that have nothing or vanishingly little to do with digital wallets.  *See* PayPal Br. 31.

The Bureau confidently dismisses the concern that consumers, compelled to read about irrelevant fees, might be confused, calling it "a deeply counter-intuitive assertion"—one so insubstantial, in fact, the Bureau had no obligation to address it.  CFPB Br. 31; *see id.* at 25 (claiming this position "strains credulity").  But common sense readily supports the fear that a government-compelled disclosure written for one product relating to features that have next to nothing to do with how consumers acquire or use a distinct product will generate confusion.  The D.C. Circuit, for example, recently had no trouble understanding this point in a different context. *See Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 962 F.3d 531, 539-540 (D.C. Cir. 2020)

(recognizing the potential that "harmful [consumer] confusion" could result from disclosure of health care prices that are "largely disconnected from" the actual pricing at issue under Medicaid and Medicare).  The Bureau's dismissive approach overlooks that disclosures should be connected to, not divorced from, the actual uses and purposes of a product.

Indeed, the Bureau's professed inability to understand this concern reinforces the point that the Bureau simply did not take this concern into account in crafting the short-form disclosure mandate.  For example, a "cash reload" fee may mean one thing to a GPR card user—likely the cost of "reloading" cash on the card, as she initially did at purchase—but can imply something very different and confusing to a digital wallet user, who does not usually deal in literal "cash" but who does use the wallet to access funds from linked accounts and occasionally to receive peer-to-peer payments from friends and family.  Likewise, the Bureau's assurance (at 25) that "nearly all participants understood that 'N/A' meant a feature was not offered and that '$0' meant a feature was free" misunderstands the problem.  It is not that consumers are unable to discern what "$0" or "N/A" means; it is the presence of inapplicable fee disclosures that generates confusion as to whether consumers genuinely understand the nature of the digital wallet product.  Just as a hiker in the Alleghenies is likely to be disoriented by a sign that reads "Grizzly Killings: 0" and wonder precisely what she is getting into, so too a potential digital wallet user who sees "Monthly Fee: $0" might worry that such fees are typical of digital wallets and thus that PayPal plans to charge them in the future.  If her concern is great enough, she might even abandon the sign-up process entirely.  The Bureau's failure to grasp these predictable costs resulted in the agency impermissibly "ducking [a] serious evaluation of the costs" of the Rule as applied to digital wallets.  *Business Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011).

34

III.    **THE SHORT-FORM DISCLOSURE MANDATE VIOLATES THE FIRST AMENDMENT**

Finally, the short-form disclosure mandate violates PayPal's First Amendment rights, forcing PayPal to communicate a scripted, misleading series of statements that will confuse customers (and potential customers) while simultaneously prohibiting it from effectively offering customers contextual information necessary to dispel that confusion. *See* PayPal Br. 35-38. The Bureau's defense of the disclosure mandate falls short. *See* CFPB Br. 31-35.

As an initial matter, the Bureau is incorrect (at 31-33) that the disclosure mandate need only meet the more forgiving standard for compelled commercial speech outlined in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), rather than a heightened level of scrutiny. *Zauderer* applies only where the government mandates disclosure of "purely factual and uncontroversial information about the terms under which … services will be available." *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*"). That is not the case here. As PayPal has explained, the disclosure mandate is factually divorced from the conditions under which consumers encountered and used digital wallets with balance functionality because it is targeted, by design, to address the relevant terms and conditions of a different product, GPR cards. By prescribing the disclosure of fees not germane to digital wallets, the mandate has little to do with the "terms under which" digital wallets "will be available" and risks confusing consumers. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014). This is a disclosure that is "so … incomplete that [it] would not qualify as 'factual and uncontroversial.'" *Id.*

What is more, the mandate's prohibition against saying anything more within the short form, even if additional language would better inform consumers, makes *Zauderer* inapplicable. The requirement compels PayPal to recite the script pre-approved by the Bureau for a different

product in the manner preapproved by the Bureau without adding any further information not

approved by the Bureau. Such a mandate is accordingly untethered from the rationale

undergirding *Zauderer*: "[b]ecause the extension of First Amendment protection to commercial

speech is justified principally by the value to consumers of the information such speech

provides," a commercial provider's "constitutionally protected interest in not providing any

particular factual information in his advertising is minimal." *Zauderer*, 471 U.S. at 651.

Indeed, the Bureau's reliance (at 33) on *American Hospital Association v. Azar*, 983 F.3d

528, 540-542 (D.C. Cir. 2020), simply reinforces *Zauderer*'s inapplicability. The regulation at

issue in that case required that hospitals publish their insurance-negotiated and cash rates as part

of their "standard charges" but, as the D.C. Circuit emphasized, imposed no restriction on

hospitals "adding their own message … in the same file." *Id.*[9] Because the short-form

disclosure mandate targets digital wallet providers' speech based on its communicative content

and prohibits them from including accurate, clarifying details, the correct standard is strict

scrutiny or, at minimum, *Central Hudson Gas & Electric Corp. v. Public Service Commission of

New York*, 447 U.S. 557 (1980). *See* PayPal Br. 35-36.

Whatever the precise standard of heightened First Amendment review, it is clear that the

government "must do more than simply 'posit the existence of the disease sought to be cured'";

"[i]t must demonstrate that the recited harms are real, not merely conjectural, and that the [law]

will … alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512

---

[9] Furthermore, the hospital disclosure rule required disclosure of rates that could help provide more patients with critical information related to their co-payments or out-of-pocket costs, in contrast to the former rule requiring the disclosure of rates that applied to fewer than ten percent of patients and which patients "rarely pay." *American Hosp. Ass'n*, 983 F.3d at 535, 538, 541. But the Bureau's mandate is the inverse: digital wallet providers must disclose largely inapplicable rates, providing consumers with less relevant information.

U.S. 622, 664 (1994).  That principle is fatal here.  The absence of real-world evidence of

consumer harm in connection with digital wallets (including those with balance functionality) is

dispositive because, as the Supreme Court has emphasized, "mere speculation or conjecture" will

not suffice:  The Bureau must "demonstrate that the harms it recites are real."  *Edenfield v. Fane*,

507 U.S. 761, 770-771 (1993); *see also Edwards v. Dist. of Columbia*, 755 F.3d 996, 1003 (D.C.

Cir. 2014) (evidence that conduct "'*might* pose a danger'" did not satisfy heightened First

Amendment review).   Even if the Bureau's speculative reasons for applying the short-form

disclosure mandate to digital wallets with balance functionality were enough under the APA (and

they are not), those justifications are surely insufficient under the First Amendment.

      Finally, even under *Zauderer*, the short-form disclosure requirement may not be

constitutionally applied to PayPal.   Under *Zauderer*, a disclosure must be "reasonably related"

to a government interest and not "'unduly burdensome' in a way that 'chill[s] protected

commercial speech.'" *American Meat Inst.*, 760 F.3d at 26, 33.  What is more, a disclosure

must "remedy a harm that is 'potentially real not purely hypothetical,' … and extend 'no

broader than reasonably necessary.'"  *NIFLA*, 138 S. Ct. at 2377.  As explained, the Bureau

cannot satisfy that standard.  *See* PayPal Br. 37-38.

      Citing out-of-circuit precedent, the Bureau claims that disclosure requirements—as

opposed to speech restrictions—do not require that the government provide "evidence or

empirical data" supporting the disclosure or demonstrating that "the harms" "are real."   CFPB

Br. 33-34 n.6 (citing *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 97-98 (2d Cir.

2010)).  But assuming the distinction survives *NIFLA, see* 138 S. Ct. at 2377 ("Our precedents

require disclosures to remedy a harm that is 'potentially real not purely hypothetical'"), it is of

little relevance here where the short-form disclosure mandate contains a prohibition against

saying anything that is not government-approved within the tabular disclosure—an obvious speech restriction. The Bureau responds (at 35) that PayPal is free to provide any message it feels is necessary to clarify the compelled disclosures *outside* the short form, but that is cold comfort: The short-form disclosure requirement was explicitly designed to focus consumers' attention on the information presented there at the expense of any information that might be provided elsewhere. In other words, the speech compelled by the Bureau is displayed prominently while the information PayPal wishes to convey to counteract the confusing effects of the compelled speech is relegated to the "fine print."

Lastly, in an attempt to articulate some "harm" that the short-form disclosure requirement purports to remedy, the Bureau argues (at 34) that "some" unidentified "companies did not disclose key information upfront at all—leading many consumers to incur unexpected fees" and that "variations in how account terms were displayed made it challenging for consumers to quickly find and evaluate the information." But the Bureau does not explain how this had anything to do with digital wallets. The research the Bureau relied on focused on when consumers were provided with fee disclosures—that is to say, "some financial institutions were not disclosing the fees that consumers may find relevant to their acquisition decision until the account was purchased (or otherwise acquired)." AR1 323, 381. And most of the variations in formats were an issue with prepaid accounts in "retail stores," as the Bureau acknowledged that "financial institutions are more likely to present fee information in a clearer and more complete format for prepaid account products offered online." AR1 384. Because the Bureau failed to consider whether the harms and risks it identified in that distinct setting were actually present with respect to digital wallets with balance functionality, the Bureau is precluded from invoking these supposed harms in defense

38

of the short-form disclosure mandate here.

**IV.   SUPPLEMENTAL BRIEFING AS TO THE APPROPRIATE REMEDY MAY BE HELPFUL TO THE COURT**

Finally, PayPal agrees with the Bureau that supplemental briefing on the appropriate remedy may be helpful to the Court.  *See* CFPB Br. 35 n.7.  Although PayPal had previously proposed vacating the short-form mandate as a remedy, *see* Dkt. 39-2 (proposed order), the scope of the appropriate remedy may well depend on the precise grounds of the Court's ruling in PayPal's favor.  Additional briefing on the remedy in light of the Court's ruling would thus be warranted, as the Bureau suggests.

## CONCLUSION

For the foregoing reasons, the Court should grant PayPal's motion for summary judgment and deny the Bureau's cross-motion for summary judgment.

Dated:  June 23, 2023

Respectfully submitted,

/s/ *Kelly P. Dunbar*
Kelly P. Dunbar (D.C. Bar No. 500038)
Donna Farag (D.C. Bar No. 90006157)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
kelly.dunbar@wilmerhale.com
donna.farag@wilmerhale.com

Rebecca Lee (D.C. Bar No. 229651)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: (628) 235-1056
Fax: (628) 235-1001
rebecca.lee@wilmerhale.com

*Counsel for Plaintiff PayPal, Inc.*