**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAYPAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **Civil Case No. 19-3700 (RJL)** |
| | ) |
| CONSUMER FINANCIAL | ) |
| PROTECTION BUREAU, et al., | ) |
| | ) |
| Defendants. | ) |

<u>MEMORANDUM OPINION</u>
March **28**, 2024 [Dkt. ##38, 39]

In December 2019, plaintiff PayPal, Inc., a digital wallet provider, sued the Consumer Financial Protection Bureau ("CFPB") and its Director (together, "defendants"), challenging a rule that regulates digital wallets and prepaid accounts ("Prepaid Rule")[1] on statutory, administrative, and constitutional grounds. Four years, two opinions, and one appeal later, this case has returned to the Court on the parties' cross-motions for summary judgment, in which they seek resolution of three remaining issues. Two of those issues are treated here: whether the Prepaid Rule's short-form disclosure requirement is arbitrary and capricious as applied to digital wallets, and whether the CFPB performed a reasoned cost-benefit analysis before extending the Rule to digital wallet products.

For the reasons that follow, I will **GRANT** PayPal's motion for summary judgment

---

[1] References to the "Prepaid Rule" correspond to several related final rules that collectively implement the regulations at issue here. *See* AR1 240–693 (Nov. 22, 2016) (entitled "Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)"); AR1 698–704 (Apr. 25, 2017) (delaying implementation of the final rule by six months); AR1 743–828 (Feb. 18, 2018) (amending the final rule and delaying its implementation until April 1, 2019).

and **DENY** the CFPB's cross-motion.  The agency's failure to identify a well-founded, non-speculative reason for subjecting digital wallets to the Rule's short-form disclosure regime, coupled with a cost-benefit analysis that scarcely addresses digital wallets, render the Prepaid Rule arbitrary, capricious, and contrary to law.  As applied to digital wallets, then, the Rule's short-form disclosure requirement is accordingly **VACATED**.

## BACKGROUND

### I.      Factual Background

The facts of this case are recited in this Court's previous memorandum opinion, *see* Mem. Op. (Dec. 30, 2020) [Dkt. #27], and need not be repeated in full, except as relevant to the parties'. current motions.

"PayPal is one of the largest providers of digital wallets." *PayPal, Inc. v. Consumer Fin. Protection CFPB*, 58 F.4th 1273, 1277 (D.C. Cir. 2023).  A digital wallet is a financial product that electronically stores a consumer's payment credentials, much like a traditional wallet stores a consumer's physical credit cards, debit cards, and the like.  AR1 249.  While some digital wallets, including PayPal's, have the capacity to store funds as well, storing a consumer's *funds* (as opposed to her *credentials*) is not the driving feature of a digital wallet.  AR2 5862.[2]  Most consumers never carry a balance in their digital wallets, AR2 5862, 5865, and when they do, it is usually because a consumer received funds from someone else and chose to leave those funds in her wallet—not because the consumer

---

[2] Here on in, this opinion uses the term "digital wallet" to mean only digital wallets that are subject to the Prepaid Rule, i.e., those with balance functionality.  The Court recognizes that not all digital wallets on the market have that functionality, and likewise acknowledges that digital wallets without balance functionality are not covered by the Rule.

preloaded funds into the wallet from a separate account, AR2 5868. Instead, the core purpose of digital wallets is to ensure that consumers can access their stored payment credentials and use them to complete transactions in a secure and trusted way. AR2 5869. This purpose is reflected in PayPal's business model, which generates revenue principally by charging fees not to consumers, but to merchants, who recognize the value of—and are willing to pay for—consumer confidence in transaction security. AR2 5864, 5869. Indeed, seldom do PayPal and other digital wallet providers charge usage fees to consumers, particularly when it comes to the basic services provided by a digital wallet. AR2 5864. They do not charge fees to open or maintain a digital wallet account, to make purchases or send funds using a digital wallet's stored credentials or existing balance, to transfer funds from a digital wallet to another account using the default service, or to obtain customer support. AR2 5871–5872, 5864.

Nevertheless, in a rulemaking originally intended to target a different product altogether—namely, general-purpose reloadable ("GPR") cards—the CFBP developed a regulatory regime that ignores these features of a digital wallet. Most relevant here, the Prepaid Rule imposes a short-form disclosure mandate on all products "capable of being loaded with funds," AR1 553, 573, 652, to include digital wallet offerings, like PayPal's, that satisfy that high-level description. The mandate requires that preacquisition fee disclosures be provided to consumers in a specifically formatted "short form," which should look something like this:

| Monthly fee $5.99* | Per purchase $0 | ATM withdrawal $0 in-network $1.99 out-of-network | Cash reload $3.99* |
|---|---|---|---|

| ATM balance inquiry (in-network or out-of-network) | $0 or $0.50 |
|---|---|
| Customer service (automated or live agent) | $0 or $0.50* per call |
| Inactivity (after 12 months with no transactions) | $1.00 per month |

**We charge 4 other types of fees. Here are some of them:**

| [Additional fee type] | $1.00* |
|---|---|
| [Additional fee type] | $3.00 |

*' This fee can be lower depending on how and where this card is used.*

**No overdraft/credit feature.**
Not FDIC insured. Register your card for other protections.
For general information about prepaid accounts, visit *cfpb.gov/prepaid*.
Find details and conditions for all fees and services inside the package,
or call **800-234-5678** or visit *xyz.com/prepaid*.

As applied to GPR cards, a short form of this kind makes sense. Unlike digital wallet products, GPR cards are typically purchased as physical, plastic cards at brick-and-mortar retail locations and displayed next to each other on "J-hooks." AR1 52; *see also* AR1 243–245. This standardized short form—designed to "fit on most packaging material currently used in retail locations," AR1 77—would facilitate comparison shopping chiefly for in-person consumers, which digital wallet shoppers are not. AR2 10435–10436. Similarly, mandating the disclosure of fees involved, for example, in maintaining an account or obtaining customer service is reasonable when the provider's revenue channels depend on charging these types of fees to consumers—which it does for issuers of GPR card, but not digital wallet providers. AR1 243, AR2 547–562; *see also* AR1 1997–2014. And where the product's basic functionality is not to store consumer credentials but to act as a substitute checking account, requiring a short form with "cash reload" and ATM-

related fees likewise adds up, as it conforms to the conditions under which a consumer actually encounters and uses the product.

Understandably, then, the Advanced Notice of Proposed Rulemaking ("ANPR") that preceded the proposed and final Prepaid Rule focused exclusively on GPR cards. Nowhere in the ANPR were digital wallets mentioned, let alone discussed, as the CFPB has admitted. *See* AR1 274; Ans. [Dkt. #17] ¶ 53. Yet the proposed rule that was issued two years later, and eventually the final Prepaid Rule, chose to include digital wallets in the regulatory regime heralded by the APNR. Indeed, even while acknowledging the "significant variations" between products, AR1 13, the CFPB seized on a single, shared feature of GPR cards and digital wallets to justify its extension of the Rule: Both products are capable of storing a consumer's funds. As for the conceded differences, the CFPB concluded that it was simply "not convinced" and "not persuaded" that those differences warranted the exclusion of digital wallets from the Prepaid Rule. AR1 274, 278, 321. It offered essentially three reasons for this.

First, despite its admission that "digital wallets currently on the market" do "not charge usage fees," the CFPB insisted the Rule was necessary because this fee structure "may not hold true in the future." AR1 274; *see also* AR1 278, 321, 347. It suggested that digital wallet providers might one day change their minds about charging fees to consumers, "especially if these products become more widely used and the features and services offered broaden." AR1 274, 321. For that reason, a Rule that encompassed digital wallets *now* might prevent consumer harm in the *future*, by ensuring that "[i]f fees do become standard in this space, consumers [will] … know what those fees are." AR1 278.

The CFPB did not explain why it believed digital wallet fees would "become standard" in the future, nor did it address the fact—raised by industry commenters, *see, e.g.*, AR2 5881– 5882—that the absence of consumer fees in the digital wallet context is a consequence of the product's core functionality and business model, which are unlikely to transform over time.

Second, the CFPB maintained that the Prepaid Rule was filling a regulatory gap for digital wallets. *See* AR1 242, 251. The Electronic Fund Transfer Act ("EFTA") and its implementing regulation, Regulation E, impose an array of disclosure duties on certain providers of financial services. *See* 15 U.S.C. § 1693 *et seq.* But as the CFPB recognized in the ANPR, EFTA and Regulation E "generally d[id] not apply to GPR cards." AR1 2. The Prepaid Rule thus guaranteed that "GPR cards and certain other newer prepaid products such as digital and mobile wallets" would receive full consumer protection, since the "status" of those products "[wa]s less clear under existing regulation." AR1 242. In purporting to fill this regulatory gap, the CFPB did not acknowledge that "Regulation E already applies" to digital wallets in certain circumstances. AR2 5862. So, too, did it decline to answer PayPal's comments that it "has developed consumer protections that meet and go beyond the requirements of Regulation E," AR2 5870, and that if the CFPB were concerned about the regulatory "status" of digital wallets, PayPal would welcome a rule clarifying that Regulation E applies, AR2 5862, 5882, 5886.

Lastly, the CFPB asserted that it was intentionally "cast[ing] a wide net," AR1 31, to avoid a patchwork regime and ensure that digital wallet users "have the same opportunity to review fees (or lack thereof) in the short-form disclosure as consumers of other prepaid

accounts," AR1 321.  On this point, the agency reiterated its belief that digital wallets and

GPR cards were "like products," AR1 31, because "to the extent that they are used to access

funds the consumer has deposited into the account in advance, ... digital wallets operate

very much like a prepaid account." AR1 274.  The CFPB did not evaluate how often digital

wallets are used in this way, much less confront the record evidence showing that

consumers "are not required to pre-load funds" in order to use their digital wallets, "and

most never do pre-load a balance." AR2 5868.  Nor, again, did the agency elaborate on

why this one similarity was more material than the numerous distinctions between digital

wallets and GPR cards raised by industry commenters, *see*, *e.g.*, AR2 10435–10436—and

·which the CFPB only briefly acknowledged before dismissing as "not ·... sufficient," AR1

321.

Reasoning thus in place for regulating digital wallets, the CFPB turned to its

statutory obligation to "consider the potential benefits and costs" of the Prepaid Rule.

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 12 U.S.C.

§ 5512(b)(2); *see also* Administrative Procedure Act ("APA"), 5 U.S.C. § 706.   Across

nearly forty pages of the Federal Register, the CFPB professed to undertake a general,

broadly applicable discussion of the Rule's impact on both providers and consumers. *See*

AR1 577–614.  This discussion did not mention digital wallets, though it devoted several

paragraphs to the costs and benefits of providing electronic disclosures versus in-store

ones, AR1 588–592, and broadly concluded that the short-form disclosure would make it

easier for consumers to find, understand, and compare information about different products

while being inexpensive for providers to implement, AR1 577.  Meanwhile, GPR cards

and other specific types of prepaid accounts, including payroll cards and government benefit accounts, received robust attention in the CFPB's cost-benefit analysis. *See* AR1 578, 595–596, 598–600, 606.

## II.    Procedural Background

The Prepaid Rule took effect on April 1, 2019. *See* AR1 743. Half a year later, PayPal filed this action seeking vacatur of the Rule, and both parties moved for summary judgment the following spring and summer. In those initial motions, the parties disputed a number of statutory, administrative, and constitutional issues, including the issues they again raise here, as well as two others: whether the Prepaid Rule's short-form disclosure requirement exceeded the CFPB's authority under EFTA, and whether its 30-day credit linking ban exceeded the agency's authority under the Truth in Lending Act ("TILA").

In December 2020, this Court agreed with PayPal that the CFPB had acted outside its statutory authority when issuing those two provisions. *See PayPal, Inc. v. Consumer Fin. Protection Bur.*, 512 F. Supp. 3d 1 (D.D.C. 2020), *rev'd*, 58 F.4th 1273 (D.C. Cir. 2023). As for the credit linking ban, it held that the agency lacked authority to create a rule that substantively regulates a consumer's access to and use of credit because "TILA is only a disclosure statute." *Id.* at 12 (internal quotation marks omitted). As for the short-form disclosures, the Court likewise held that the CFPB had acted without statutory authority because those disclosures effectively mandated the use of a model clause in contravention of EFTA. *Id.* at 9. With those two rulings in hand, the Court declined to reach PayPal's other three arguments. *See id.* at 13 n.9.

In our Circuit Court, the CFPB appealed only this Court's ruling that the agency

lacked authority under EFTA to impose the short-form disclosure requirement. It did not

challenge the Court's vacatur of the credit linking ban, nor did it contest that EFTA

generally prohibits mandatory model clauses. As a result, in early 2023, our Circuit Court

issued a narrow decision. It held that that, because the short-form disclosure mandate "does

not require PayPal to use specific language, it does not mandate a 'model clause'" and

therefore does not violate EFTA. *PayPal*, 58 F.4th at 36. The panel accordingly reversed

this Court's judgment, acknowledging that, "[o]n remand, "the district court may consider

PayPal's other challenges to the Rule." *Id.* at 42.

Back before this Court, the parties submitted another round of briefing to account

for the Court of Appeals' decision. *See generally* Mem. Supp. Pl.'s Renewed Mot. Summ.

J. [Dkt. #39-1] ("PayPal Mot."); Am. Mem. Supp. Defs.' Mot. Summ. J. [Dkt. # 38]

("CFPB Mot."). Amended briefing concluded in July of last year, and the Court held a

hearing on the parties' renewed summary judgment motions. Those motions, now fully

briefed and heard, are ripe for decision.

## LEGAL STANDARD

While, normally, Federal Rule of Civil Procedure 56 governs the Court's review of

motions for summary judgment, "the standard set forth in Rule 56[] does not apply" in

cases challenging agency action "because of the limited role of a court in reviewing the

administrative record." *Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

Instead, "[s]ummary judgment is … the mechanism for deciding whether as a matter of

law the agency action is supported by the administrative record and is otherwise consistent

with the APA standard of review." *Id.* In turn, the APA requires a court to set aside agency

action if is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). That standard obligates the agency to examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Although the arbitrary and capricious standard is "narrow" and "deferential," *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000), it is not toothless. An agency "must at all times demonstrate the markers of principled and reasoned decisionmaking supported by the evidentiary record." *Constellation Mystic Power, LLC v. Fed. Energy Regul. Comm'n*, 45 F.4th 1028, 1043 (D.C. Cir. 2022) (internal quotation marks omitted).

## DISCUSSION

On remand before this Court, PayPal resurrects three of its objections to the Prepaid Rule's short-form disclosure requirement. It first argues that the disclosure requirement is arbitrary and capricious because the CFPB had no rational justification for subjecting digital wallets to a heightened regulatory regime that was designed for a very different product (GPR cards). Second, PayPal posits that the disclosure regime is doubly arbitrary and capricious because the CFPB failed to meaningfully comply with its duty under Dodd-Frank to assess the costs and benefits of applying the Rule to digital wallets.[3] Finally,

---

[3] PayPal seems to argue that these two objections offer independent grounds on which to find the short-form disclosure requirement unlawful, suggesting that if this Court determines that PayPal's first objection is meritorious, it need not proceed to PayPal's second objection. I do not view these two arguments as distinct, however. While, to be sure, Dodd-Frank imposes an obligation on top of the APA's baseline requirements to perform a reasoned cost-benefit analysis, the question of whether an agency has violated that separate obligation essentially boils down to the same (or similar) questions we ask under the

PayPal insists the short-form disclosure regime violates the First Amendment because it compels PayPal to disclose information that is inapplicable to its product and misleads consumers.

Because I can resolve this case on other grounds, I will decline to pass on PayPal's First Amendment claim.  *See Sohm v. Fowler*, 365 F.2d 915, 918 (D.C. Cir. 1966) (invoking "the fundamental doctrine that courts should avoid passing on unnecessary constitutional questions, particularly when the issues are "far reaching" and "difficult"). PayPal's first two objections, however, are addressed—and sustained—below.

## I.     The CFPB lacked a rational justification for subjecting digital wallets to the Prepaid Rule's short-form disclosure requirement.

I begin with PayPal's argument that the short-form disclosure requirement is arbitrary and capricious because the CFPB lacked a well-founded basis for subjecting digital wallets to the Prepaid Rule's prescriptive regime.  PayPal asserts that the CFPB ignored key differences between digital wallets and GPR cards when it shoehorned digital wallets into a regulatory regime clearly designed for the latter type of product.  In PayPal's view, the CFPB relied too heavily on what amounts to an insignificant and superficial similarity between digital wallets and GPR cards to rationalize its extension of the Rule: Both products allow a consumer to "load funds into the account, spend the funds[,] … and reload the account once the funds are depleted."  AR1 278.  This "balance functionality,"

_____

APA:  Did the agency "fail[] to consider an important aspect of the problem," fail to "explain why it has exercised its discretion in a given manner," or "offer[] an explanation for its decision that runs counter to the evidence"?  *State Farm*, 463 U.S. at 43, 48–49 (1983).  Accordingly, this opinion addresses both of PayPal's arbitrary and capricious objections, even if either might independently serve as a basis for finding the CFPB's action unlawful.

PayPal says, is so ancillary to the core purpose of a digital wallet that it cannot serve as a basis for treating digital wallets and GPR cards the same, especially given the many distinctions between the products.  In response to these points, the CFPB doubles down on the conclusion it reached in the Prepaid Rule:  Regardless of the products' differences, the fact that a digital wallet has balance functionality renders it "sufficiently similar to other prepaid accounts to warrant consistent regulatory treatment."  CFPB Mot. 19.

This conclusory explanation falls well short of the APA's demand for reasoned decisionmaking.  The record before the CFPB clearly demonstrates that digital wallets are different in kind from GPR cards and other types of prepaid products, like payroll cards. Unlike these other products, digital wallets are not primarily used to access funds or to function as a substitute checking account.  They do not require a consumer to preload or prefund an account before they can use it (and indeed, most digital wallet users never carry an account balance).  Their underlying business model does not depend on charging usage fees to consumers.  And they are not available in brick-and-mortar retail locations, instead existing only in the digital space.

The CFPB does not dispute these record facts, nor contest that these distinctions exist.  Instead, it cavalierly dismisses them, claiming—as it did in the Prepaid Rule—that the cited differences are irrelevant in the face of the products' shared balance functionality. But for the agency to say without more that it is "not convinced" or "not persuaded" that those differences render digital wallets "fundamentally dissimilar to other types of prepaid accounts," AR1 274, 278, is pure "ipse dixit," *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir. 2011).  *See also See Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)

("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."), *vacated as moot*, *Arkansas v. Gresham*, 142 S. Ct. 1665 (Mem.) (2022); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered … is not a substitute for considering it.").  Not once does the Prepaid Rule explain *why* the differences between products are irrelevant, or *why* their one similarity is somehow more consequential than those material differences.  Certainly it does not identify any evidence, statistics, reports, or competing analyses to support the CFPB's conclusion on this score.  Indeed, even with 100-plus pages of factual substantiation going the opposite direction, the agency cites nothing but its own "belie[f]" that digital wallets·and GPR cards "operate very much [a]like," AR1 274—a belief, no less, that seems to defy the CFPB's own prior statements on this subject.  *See* AR1 1599–1603 (2015 study by the CFPB treating "prepaid products" separately from "mobile payment[]" mechanisms like digital wallets).

The CFPB's error in treating these different products "[a]like" is especially glaring when it comes to the short-form disclosure requirement.  That requirement, which mandates the preacquisition display of a specifically formatted table of fees, is wholly disconnected from the way in which providers structure their digital wallet businesses, and in which consumers buy and use digital wallet products.  For one thing, the CFPB's principal justification in designing this short form was that it "could fit on existing packaging material used to market prepaid products on J-hooks in retail locations," and thereby help with in-person comparison shopping.  AR1 260; *see* AR1 391 (explaining that the short form was "designed … to accommodate the existing packaging contracts related

to the sale of prepaid accounts on J-hooks displays in retail locations"). Needless to say, that justification is misplaced in the digital wallet context, since digital wallets are never sold in brick-and-mortar stores. For another, none of the seven fees that comprise the top, "static" section of the short form is applicable to digital wallet products, AR1 240, which do not charge monthly fees, per-purchase fees, customer service fees, or inactivity fees, and which do not support ATM withdrawals, ATM inquiries, or cash reloads, AR2 5880. This is true even as the CFPB claims that these "static fees" are "the prepaid account's most important fees" and, presumably also, the most common fees imposed by prepaid products (yet not by digital wallets). AR1 240. Finally, quite apart from the fact that digital wallets do not charge these fees in practice, the static fees, even in theory, do not reflect what digital wallets are designed or used for. GPR cards, payroll cards, and prepaid products serve primarily as payment methods, often standing in "for traditional checking accounts." AR1 242. Digital wallets, by contrast, serve primarily as *repositories* for payment methods. *Accord* AR2 1602 (2015 CFPB study describing digital wallets as mechanisms through which "[b]ank accounts, credit cards, debit cards, *and prepaid cards* can be accessed" (emphasis added)). Whatever consumer risks the short form is meant to alleviate by disclosing the static fees are simply not present with digital wallets. Worse still, the disclosure of these fees creates a new consumer risk: the risk of confusion and alarm, stemming from the display of prices that "customers will almost never pay, and that they are unlikely to understand." *Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 962 F.3d 531, 539–540 (D.C. Cir. 2020); *see* AR2 10434–10437.

The CFPB tries to shrug off these "fundamental mismatch[es]" between the short-

form disclosure regime and digital wallets. AR2 10435. In doing so, it leans heavily on the "deferential" and "narrow" standard that characterizes arbitrary and capricious review, *Transmission Access*, 225 F.3d at 714, arguing that, because the Prepaid Rule does "articulate a satisfactory explanation" for including digital wallets, the CFPB has discharged its duty under the APA, *State Farm*, 463 U.S. at 43. But almost nothing about the CFPB's "explanation" is "satisfactory." To the contrary, all three of the reasons it gave in the Prepaid Rule for extending the short-form disclosure mandate to digital wallets collapse on minimal inspection.

First, the notion that the short-form disclosure requirement is necessary because "it is impossible to rule out" that digital wallets "may ... in the future" start charging usage fees to consumers, AR1 274; *see also* AR1 278, 321, 347, is both senseless and badly speculative. It is senseless because, as PayPal told the CFPB—and as the CFPB never disputed—the underlying revenue model of digital wallet providers is not dependent on charging fees to consumers, as opposed to merchants. As that revenue model "is not likely to change," AR2 5880, neither is the decision to keep digital wallet offerings free or low-fee, with any such fee imposed only in "narrow circumstances" and with advanced notice, AR2 5881. *See id.* (explaining that "PayPal charges fees to consumers only in two narrow circumstances, and we disclose information about any fees before they are paid"). The static fees, in particular, have no obvious place in the digital wallet setting, either now or in the conceivable future, especially since many of them are not even supported by the product's functionality (e.g., anything ATM related).

More to the point, the agency's "impossible to rule out" rationale, AR1 278, is "pure

speculation," and no substitute for a reasoned examination of the facts, *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994). *See Nat. Res. Def. Council, Inc. v. EPA.*, 859 F.2d 156, 210 (D.C. Cir. 1988) ("[M]ere speculation" do not constitute "adequate grounds upon which to sustain an agency's action."); *accord Dist. of Columbia v. U.S. Dep't of Agric.*, 441 F. Supp. 3d 1, 29 (D.D.C. 2020); *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 70 (D.D.C. 2016). The CFPB offers no explanation for why it believes consumer fees might one day "become standard in this space," AR1 278, except to say that if digital wallets "become more widely used and the features and services offered broaden," digital wallet providers could change their minds, AR1 274, 321. Saying so does not make it so, however, especially in the face of industry comments explaining why a total transformation of their fee structures, revenue channels, and product functionality is not likely to occur. *See* AR2 5881–5882. In short, the CFPB dreams up a problem in search of a solution by making "unsupported assumptions," *Nat'l Gypsum Co. v. EPA*, 968 F.2d 40, 43–44 (D.C. Cir. 1992), about fees that "may" be charged by digital wallet providers at some unspecified time "in the future," AR1 274. That kind of conjecture cannot masquerade as a predicate for rational agency action.

Second, the CFPB's claim that the Prepaid Rule is necessary to fill a regulatory gap for digital wallets, *see* AR1 242, 251, is dubious at least twice over. For starters, it ignores the fact—pointed out by PayPal—that EFTA and Regulation E "already appl[y] to [digital wallet] accounts" in certain circumstances. AR2 5888. And to whatever extent industry members were uncertain about that, or were not already complying with EFTA and Regulation E, the CFPB could have clarified in a more limited rulemaking that those laws

did indeed cover digital wallets, an approach that PayPal specifically invited. AR2 5888; *see also* PayPal Mot. 11. Instead, the CFPB opted for an enhanced disclosure regime for digital wallets that goes beyond the baseline requirements of Regulation E, without ever acknowledging that a more obvious and less drastic solution to this (possibly illusory) regulatory gap existed. While, to be sure, the APA does not require that agencies "tailor their regulations as narrowly as possible to the specific concerns that generated them," *Assoc. Dog Clubs of N.Y. State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014), it certainly requires the agency "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives," *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)). *See also Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) (collecting cases for the proposition that "[t]he failure of an agency to consider obvious alternatives has uniformly led to reversal" under the arbitrary and capricious standard). The CFPB's failure in this case to even "consider" a rule that would simply extend Regulation E to digital wallets, let alone "explain" why that option was somehow less doable, warrants vacatur almost by itself. *Cf. Chamber of Com. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 145 (D.C. Cir. 2005) (holding that agency's failure to consider "facially reasonable alternative[]" raised by party "violated the APA" (internal quotation marks omitted)).

Yet this "regulatory gap" rationale suffers from another defect as well: Even assuming such a gap existed, the CFPB does not explain why that gap is a problem, except in platitudes about regulatory uncertainty. *See* AR1 242, 249, 251. It identifies *no* evidence

of consumer confusion or harm stemming from digital wallets or their "less clear" regulatory "status." AR1 242. It conducted *no* studies, analyses, or consumer testing specific to digital wallets, and unsurprisingly, points to *no* real-world examples in which the consumer risks identified for other products arose for digital wallet users. By contrast, the evidence and examples of consumer harm emanating from GPR cards, payroll cards, campus cards, and government benefit cards practically blanket the Federal Register. *Compare, e.g.*, AR1 242–248 (discussing consumer protection concerns with GPR cards, payroll cards, campus cards, and government benefit cards), *with* AR1 249 (discussing digital wallets without identifying any consumer risk or harm). Perhaps for these products, filling the regulatory gap is a reasonable measure for remedying the problems identified. But for digital wallets, where the record of consumer concerns is *nonexistent*, the CFPB strays far afield from "reasoned decisionmaking" when it "profess[es] … [to] ameliorate[] a real industry problem but then cite[s] no evidence demonstrating that there is in fact an industry problem." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006); *see City of Chi. v. Fed. Power Comm'n*, 458 F.2d 731, 742 (D.C. Cir. 1971) ("A regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.").

Third, and finally, the CFPB's insistence that including digital wallets in the Prepaid Rule avoids patchwork regulation and gives digital wallet users "the same opportunity to review fees (or lack thereof) in the short-form disclosure as consumers of other prepaid accounts," AR1 321, is circular. That reasoning assumes the premise PayPal now disputes: that digital wallets are similar enough to prepaid accounts to warrant being subject to the

same disclosure requirement. But for all the reasons already discussed, these products are not similar in the ways that count. They do not have comparable fees; revenue channels; patterns of purchase, use, or consumption; or consumer protection concerns. Their only similarity is balance functionality, and yet the CFPB ignores record evidence showing that even that similarity—the capacity to load funds, hold funds, use funds, and reload more later—is so rarely employed by digital wallet users that it is almost theoretical. To take PayPal as an example, "[t]he vast majority of consumer transactions … are funded by stored payment credentials," not by money sitting in (much less preloaded into) an account. AR2 5868. "Nearly 100%" of PayPal wallets "are linked to a payment card or bank account," suggesting a steep preference for making payments using linked methods rather than account balances. AR2 5868. "Only a small percentage of PayPal customers store funds in their PayPal accounts for any period of time, and the large majority of those … are not consumers: they are merchants." AR2 5868; *see* AR2 5884. And "in the rare cases that [consumers] do hold a balance," they "hold it only briefly," in very small amounts, and usually because they received it from someone else, not because they loaded it into the wallets themselves. AR2 5868, 5883–5884. Indeed, "[t]he average PayPal account balance … is only $6.00." AR2 5868; *see* AR2 5875.

The Prepaid Rule all but whistled past these record facts, while the CFPB's summary judgment motion now insists they are essentially irrelevant. *See* CFPB Mot. 25–26. But this is a strange admission from an agency that, several pages up, agrees that the arbitrary and capricious standard disallows it to "entirely fail[] to consider an important aspect of the problem" or explain its decision in a way "that runs counter to the evidence."

*State Farm*, 463 U.S. at 43; *see Am. Lung Ass'n v. Env't Prot. Agency*, 985 F.3d 914, 967 (D.C. Cir. 2021) ("An agency's wooden refusal to factor in reality … render[s] its decisionmaking arbitrary and capricious."), *rev'd on other grounds*, *West Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022).  It also stands reality on its head:  The only reason digital wallets were swept into the disclosure regime in the first place is because they offer balance functionality.  Surely it is *not* irrelevant, then, that the "vast majority" of digital wallet consumers do not use that functionality, and when they do, they use it in ways markedly different than consumers of prepaid accounts.  *Cf.* AR1 243 (describing use of GPR cards, which requires consumers to preload funds before the cards can be used, by direct deposit, check deposit, or cash reloads).  For this reason, too, application of the short-form mandate to digital wallets reads as "a classic case of arbitrary and capricious agency action."  *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 461 (D.C. Cir. 2000).

## II.    The CFPB's statutorily mandated cost-benefit analysis was deficient.

The short-form disclosure requirement is additionally unlawful because the CFPB failed to meaningfully assess the costs and benefits of that mandate in the digital wallet context.  This it was obligated to do, not only by the APA's general requirement that an agency "consider[] … all the relevant factors," *Metlife, Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219 (D.D.C. 2016) (internal quotation marks omitted), but also by specific provisions of the Dodd-Frank Act, which demand attention to "the potential benefits and costs to consumers and covered persons" that come from regulation, 12 U.S.C. § 5512(b)(2).  In this case, however, the CFPB gave almost no consideration *at all* to "the potential benefits and costs" of applying the short-form disclosure mandate specifically to

digital wallets. That glaring omission only adds to the pile of reasons for vacating that mandate here.

To begin with, the forty pages of the Federal Register that contain the CFPB's cost-benefit analysis of the Rule, *see* AR1 577–614, do not once mention "digital wallets." Although the CFPB now claims that it "did address the benefits and costs of applying the Rule to digital wallets," CFPB Mot. 27, even that after-the-fact claim identifies only four pages in the 700-page Rule in which this cost-benefit analysis supposedly occurred, *see id.* (citing AR1 272–273, 277–278). None of these pages, unsurprisingly, is among the forty pages devoted to the agency's Dodd-Frank obligation. More importantly, none of them actually contains a cost-benefit analysis specific to digital wallets. The CFPB's first citation, AR1 272–273, points only to a recitation of industry comments, not to any independent analysis by the agency, and certainly not to a thoughtful quantitative and qualitative weighing of the Rule's costs and benefits with respect to digital wallets. And the CFPB's second citation, AR1 277–278, is the same "impossible to rule out" line of speculative reasoning that this Court has already rejected. *See supra* 15–17. These citations plainly cannot satisfy Dodd-Frank's cost-benefit analysis requirements.

Perhaps recognizing its deficiencies on this front, the CFPB next insists that it had no obligation, period, to "separately discuss the benefits and costs of applying [the] rule to each specific type of product that the rule covers." CFPB Mot. 28. Instead, it was entitled to rely on a "general" cost-benefit analysis that "appl[ies] fully" to each covered product to fulfill its obligations under the Act. *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 222 (D.D.C. 206); *see also Nicopure Labs, LLC v. FDA*, 266 F. Supp.

3d 360, 407 (D.D.C. 2017). But while that might be true in other cases, it is not true in this one. For starters, the forty-page "general" analysis on which the CFPB relies, AR1 577–614, does not "apply fully" to digital wallet products, *Huntco*, 240 F. Supp. 3d at 222. Most of it does not apply at all. The only part of that cost-benefit analysis that arguably rings true for digital wallets is the few pages discussing how web-based providers should deliver the mandated disclosures. *See* AR1 589–590. But the CFPB undercuts its own analysis on this score by admitting, in conclusion, that it never "test[ed] the disclosure regime in an electronic setting." AR1 589. That is surely not the kind of rigorous assessment that Congress contemplated for Dodd-Frank rulemakings, even if it does apply to digital wallets.

Th agency's attempt to hide behind a "general" cost-benefit discussion has other problems, too. Chief among them is the fact that, however general or specific an agency may be when regulating similar products, the record here shows that digital wallets are *not* similar to the Rule's other covered products. Nor, for that reason, are the costs and benefits of regulating these products sufficiently similar to get the same treatment. Indeed, the CFPB's "general" cost-benefit analysis entirely ignored concerns specific to digital wallets that the short-form disclosure would "risk inadvertently stunting the continuing development" of digital wallet products in this highly technological space. AR2 5268; *see* AR2 5267, 5862, 10435; *see also* AR1 1578 (2015 CFPB study describing how the "landscape [wa]s continuing to evolve" in the "mobile financial services" realm and cautioning against regulation that might "choose technological winners and losers"). It likewise "duck[ed] [a] serious evaluation of" the risks of consumer confusion resulting

from the use of the short form in the digital wallet setting. *Bus. Roundtable*, 647 F.3d at 1152. Even now, the CFPB dismisses these risks by arguing that consumers likely understand that, when the short form says "$0" or "N/A," it means that the feature is either free or inapplicable. *See* CFPB 25, 31. But the risk of consumer confusion is not just the repeated disclosure of "$0" or "N/A," although that also creates alarm in consumers who might question "[w]hy" they are being confronted with "all these terms and conditions" if the product was truly free. PayPal Mot. 24 n.6 (quoting complaint from consumer); *see also* AR2 10434. Rather, it also stems from the fact that digital wallet providers are forced to highlight the highest possible fees that could be incurred in worst-case scenarios, even when consumers will almost never pay those fees, and without allowing simultaneous clarification on when the fees do and do not apply. *Cf. Merck*, 962 F.3d at 539–540 ("[I]nforming consumers about a price … [they] will almost never pay, and that they are unlikely to understand, unlashes the disclosure from its claimed administrative mooring."). The CFPB's refusal to take these digital wallet concerns seriously—in addition to its failure to "[c]onsider[] asserted differences between" products, "quantify any benefits" to digital wallet consumers, and provide a "qualitative analysis" of the real (not imaginary) harms faced by digital wallet consumers and providers alike—defied its cost-benefit obligations under the Dodd-Frank Act and APA. *GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1201 (D.C. Cir. 2023).

*     *     *

All told, in imposing a prescriptive and burdensome disclosure regime on a nascent and fast-evolving financial product, the CFPB was required to offer—at a minimum—"a

rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43, and some quantitative or qualitative assessment of the "costs" of regulation for digital wallets as well as its "benefits," 15 U.S.C. § 5512(b)(2).  The CFPB did neither, and instead tried to solve an imaginary problem with no real evaluation of what that "solution" would cost digital wallet providers *or* consumers.  These missteps render the Prepaid Rule's short-form disclosure requirement arbitrary and capricious and contrary to law.  Administrative arrogance of this magnitude is hardly deserving of judicial imprimatur!

## CONCLUSION

For the foregoing reasons, PayPal's motion for summary judgment is **GRANTED**, the CFPB's cross-motion is **DENIED**, and the Prepaid Rule's short-form disclosure requirement as applied to digital wallets is **VACATED**.[4]  An order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge

---

[4] PayPal does not request vacatur of the whole Prepaid Rule—just the Rule's short-form disclosure requirement as applied to digital wallets.  *See* PayPal Mot. 5, 27, 39.  The Court grants that limited request.  *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81–82 (D.C. Cir. 2020).